FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

JUL 1 4 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **PLAINTIFF** | * |
| | * |
| **V.** | * **DOCKET NO. 1:97CR00496-ODE-GGB-1** |
| | * |
| **ROBERT ETHAN MILLER** | * |
| | * |
| **DEFENDANT.** | * |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. SECTION 2255**

Counsel for Movant respectfully submits this Memorandum of Law in support of Motion

to Vacate, Set Aside or Correct a Sentence by a Person in Federal Custody, under provisions of

Title 28, United States Code, Section 2255.

## I. JURISDICTION

Title 28 U.S.C. §2255 is used to test the legality of a prisoner's detention if the remedy by

motion is adequate and effective. A 2255 motion is merely another step in the Defendant's

criminal case and is favored over the traditional habeas corpus actions under 28 U.S.C., §2241

for cases challenging the validity of a conviction or sentencing.

In pertinent part, Title 28 U.S.C. §2255 states:

> A prisoner in custody under sentence of a court ... claiming the
> right to be released upon the ground that the sentence was imposed
> in violation of the Constitution, or laws of the United States, or that
> the court was without jurisdiction to impose such a sentence, or
> that the sentence was in excess of the maximum authorized by law,
> or is otherwise subject to collateral attack may move the court
> which imposed the sentence to vacate, set aside, or correct the

sentence.  (Emphasis added.)

The pleading is being filed within one year of the newly discovered recantation evidence. It establishes Miller's innocence.

## II. STATEMENT OF THE CASE[1]

### 1. PROCEEDINGS IN THE TRIAL COURT

The Defendant, Robert Ethan Miller was originally indicted on November 25, 1997 on two counts of manufacturing and distributing counterfeit currency in violation of 18 U.S.C. §471 and 18 U.S.C. §473.  On March 25, 1998, the Grand Jury returned a True Bill for a superseding indictment adding counts for solicitation to kill a witness in violation of 18 U.S.C. §§373 and 1512(a)(1)(A) and attempt to murder a witness in violation of 18 U.S.C. 1512(a)(1)(A) and 2.

On June 11, 1998, Miller filed a motion in liminie seeking to exclude several items of evidence included in the Government's 404(b) disclosure statement of June 1, 1998.  Among the evidence sought to be suppressed was Government witness testimony of prior bad acts that in no way met the requirements for admission under F.R.E. 404(b).  At the preliminary hearing, the trial court addressed Miller's motion and allowed the admission of most of this evidence.  In particular, the Court allowed testimony regarding four separate incidents of unrelated prior bad acts: 1) Defendant allegedly threatened Jason South and Jason Bailey with a gun; 2) Defendant allegedly choked and threatened to kill Jennifer Ashford in April or May 1996; 3) Defendant allegedly mentioned to career convict Troy Plante, the prospect of killing the parents of Kathryn Miller; and 4) Defendant allegedly participated in a scheme to defraud a Sears store out of some

---

[1]The Statement of the Case and Statement of Facts have been taken almost verbatim from the Opening Brief to the Eleventh Circuit Court of Appeals filed by former counsel John Harbin.

computer equipment.

At the close of the Government's case and again at the close of the entirety of the evidence, Miller made motions for judgment of acquittal on each count of the indictment (T. 830, 861) pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. The trial court summarily denied the motions. (T. 832, 861)

The jury convicted Miller on all counts of the indictment. On October 1, 1998, the trial court conducted Miller's sentencing. During the hearing the Court considered a portion of the pre-sentencing report where the Government sought a two point upward adjustment for obstruction of justice relating to allegations of attempted escape. The Government presented testimony that Miller admitted ownership of several blades allegedly mailed to him by girlfriend Erin Helms. Miller objected to the Court's consideration of this evidence and any fruits arising therefrom. Miller was neither read his Miranda rights or represented by counsel as guaranteed by the Sixth Amendment when interrogated about the blades. The Court overruled the objection and denied his motion to strike. The trial court allowed the upward adjustment, placing Miller's base offense level at 40 with a Criminal History Score of VI. The Court also considered the evidence of attempted escape in arriving at the sentence.

The Court sentenced Miller to 110 months for the manufacture of counterfeit, 110 months for the distribution of counterfeit, 240 months for the solicitation to commit murder and 240 months for attempted murder. The two counterfeiting sentences would run consecutively with the solicitation sentence. The attempted murder 240 month sentence was to run concurrently with the solicitation sentence.

Miller filed a timely notice of appeal on November 19, 1998. The Eleventh Circuit

3

Court of Appeals affirmed Miller's conviction and sentence in 1999. (202 F.3d 287) He did not file post conviction motions.

Miller is presently in custody at the United States Penitentiary, Pollock, Louisiana.

### III. STATEMENT OF FACTS

The Government presented evidence at trial that Miller manufactured and distributed counterfeit currency in denominations of $100 and $20 throughout the first part and summer of 1997. (T-100, 181) Miller used computer equipment, including a scanner and ink jet printer to scan in actual bills and print multiple copies of them out on a printer. (T-99, 100) Miller then used a paper cutter and scissors to cut the counterfeit down to the proper size. (T-100) In order to accentuate authenticity of the bills, he would often crumble them up to make them appear worn and used. (T-101)

The evidence indicated that Miller distributed the counterfeit to friends and associates who in turn passed them to vendors in Atlanta, Gainesville, Georgia and other areas. Miller's girlfriend as the time, Jennifer Ashford, reported this activity to the U. S. Secret Service. (T-102, 103) Miller was arrested and indicted in November 1997.

While detained in the Cobb County Jail, facing probation revocation for unrelated charges, the evidence showed the Miller befriended a fellow cell mate, Troy Plante. (T-541) While in jail, Miller and Plante constantly discussed plans for making money as soon as one or the other bonded out. According to Plante, they talked about defrauding another cell mate's wife out of $1,100 on a promise to bond out her alien husband. (T-586), about Plante meeting with someone who wished to sell expensive jewelry and robbing them of it upon their encounter, (T-584-585), and, at some point, the murder of Jennifer Ashford, a witness in Miller's pending

4

counterfeiting trial. (T-544;, et seq.)

### ISSUES RAISED ON DIRECT APPEAL

**I. WHETHER THE TRIAL COURT ERRED IN ADMITTING 404(b) EVIDENCE THAT FAILED TO PROVE UP THE RECOGNIZED EXCEPTIONS.**

**II. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO STRIKE THE RECORD REFLECTING DEFENDANT'S ADMISSION REGARDING HIS OWNERSHIP OF CERTAIN BLADES.**

**III. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL AS TO COUNTS 3 AND 4.**

**IV. WHETHER THE TRIAL COURT ERRED IN CONCLUDING THAT THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT.**

### IV. ARGUMENT

**A. DEFENDANT'S CONVICTION AND SENTENCE ARE SUBJECT TO COLLATERAL ATTACK AND HE IS ENTITLED TO RELIEF PURSUANT TO 28 U.S.C. SECTION 2255.**

### 1. INTRODUCTION

Habeas Corpus has traditionally been regarded as governed by equitable principles. *Fay v. Noia*, 372 U.S. 391, 483, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

This case has exceptional circumstances and unforeseeable exigencies that were learned after trial, sentencing, and direct appeal that may now be resolved only through this Court's intervention pursuant to 28 U.S.C. §2255.

Due process mandates that a defendant be sentenced by a judge knowledgeable of all the material facts. In fact, the Supreme Court addressed the notion as follows:

5

The result of the procedural irregularity is that the sentence rests on a foundation of confusion, misinformation and ignorance of acts virtually material to mitigation. If justice is to be done, a sentencing judge should know all the material facts.... Fair administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion but will impose sentence with insight and understanding. *Harris v. United States*, 382 U.S. 160, 166, 865, Ct. 353, 15 L.Ed.2d 240 (1965).

In *Davis v. United States*, 417 U.S. 333 (1973), the Supreme Court permitted a collateral attack involving a claim that a judgment that was lawful when entered should be set aside because of a later development. The subsequent development in that case, however, was a change in the substantive law that established that the conduct for which petitioner had been convicted and sentenced was lawful.

### (2) **NEWLY DISCOVERED EVIDENCE/*BRADY/GIGLIO***

Newly discovered material facts exist which require that the solicitation to commit murder and attempted murder convictions and 240 month sentences be vacated by the Court because it was learned post trial, and within the past year, that government trial witness Troy Plante committed perjury during trial.

During the trial Troy Plante, a life-long career criminal, provided detailed and elaborate testimony that he was solicited by Ethan Miller to kill the mother of his son, Jennifer Ashford. (Complete copy of his trial testimony included as Exhibit A)

In substance Plante's most harmful testimony involved his assertion that Miller had solicited his involvement in killing Ashford. Plante testified he was in the county jail with Miller and that Miller hatched the plan to do the dastardly deed.

In this instant case, Plante's testimony was **incredible as a matter of law**, therefore, a determination by the jury should not have been accepted. *United States v. Reveres*, 775 F.2d

6

1559, 1561 (11th Cir. 1985). For testimony to be incredible as a matter of law, it must be unbelievable on its face; for example, it must be testimony as to the facts that the witness, physically could not have possibly observed or events that could not have occurred under the laws of nature. *Reveres*, 775, F.2d at 1561. Plante was not to be believed because in trial he could not even provide a dollar figure he would be paid if he actually killed Ashford. He said Miller told him "he would be taken care of".

Despite Plante's inculpating testimony, Miller's lawyer suggested Miller was actually trying to secure Plante's help in moving some marijuana so that he could retain private legal counsel.

It even appeared the Court, through its trial questioning of Plante, had doubt as to the veracity of his testimony. After all, Plante the career criminal, told the jury he really expected nothing for his testimony and instead was testifying because he felt sorry for Ashford's son.

After years of living the lie that sent Miller to prison for an extra 240 months (20 years), Plante has come forward with the truth. Plante provided an affidavit to Florida Attorney, John E. Maines on July 14, 2005 recanting his perjured trial testimony wherein he implicated Miller in a murder for hire scheme.

In the affidavit Plante admits that he lied at trial about Miller's acts and that the Government was less than candid about its relationship with Plante. In fact in the affidavit Plante states in pertinent part:

"Mr. Miller paid for or arranged the payment for the bond which was required for my release from the Cobb County Jail. The Secret Service allowed my to keep the bond money for

my personal use.

During the course of my trip to Atlanta, the U. S. Government arranged for payment of several hundred dollars per day during my stay.

The statement given to the United States Secret Service and its agents, the grand jury, and the U. S. Attorney, were incorrect, misleading and fabricated.

These fabrications were relayed to the various United States officials because I saw an opportunity to concoct a story, which if believed by the Government, might result in a reduction of sentence or some consideration concerning my grand theft charge.

Ultimately, following my cooperation with the government, I received probation for the grand theft charge. The probationary sentence was a reward for my incriminating testimony against Mr. Miller.

Mr. Miller provided the location information and I drew the map. My testimony that he drew the map was untrue.

Mr. Miller did discuss with me performing certain actions, such as moving stolen property and drugs in exchange for which he would pay my bond and, ultimately after all the tasks were completed, the sum of $5,000.00.

While it is true that Mr. Miller requested my involvement in certain other criminal activity, in my estimation, the disclosure to the government of such overtures would not be sufficient to interest the government in using me as an informant.

The response of the government to my reluctance was that if I failed to testify in accordance with my previous statements, I would be sentenced to prison on the grand theft charges and would be charged as a co-conspirator in the contemplated and/or attempted murder

8

of Jennifer Diane Ashford.

In addition, to the previously mentioned sums paid, the government provided me over $300.00 to obtain clothing for the trial." (Exhibit B)

It is clear from Plante's affidavit that he lied to the jury, he received undisclosed benefits from the Government, and that Miller was denied a fair trial as a result.

In *Durley v. Mayo*, 351 U.S. 277 (1956) the Untied States Supreme Court granted certiorari to consider the question of whether due process was offered by a conviction which was later alleged to rest upon perjured testimony, despite the fact that the prosecutor did not know of the testimony's falsity at trial.[2] The case was dismissed for lack of jurisdiction. However, four justices would have reached the merits. Justice Douglas writing for the dissenters would have found a "clear" due process violation as noted below.

"It is well settled that to obtain a conviction by the use of testimony known by the prosecution to be perjured offends due process. *Mooney v. Holohan*, 294 U.S. 103; *Pyle v. Kansas*, 317 U.S. 213. While the petitioner knew that petitioner's co-defendants were lying when they implicated petitioner, the state now knows that the testimony of the only witnesses against petitioner was false. No competent evidence remains to support the conviction. Deprivation of a hearing under these circumstances amounts, in my opinion, to a denial of due process under law. 351 U.S. at 290-91."

Because it is unclear whether the prosecutor knew of the false testimony, the "reasonable

---

[2]In Plante's affidavit, paragraph 38, he states that he expressed his reluctance to the Government to testify as a witness in the case. He states his reluctance was based on the falsity of his testimony. In response (in paragraph 39) he states the Government said if he did not testify in accordance with his prior statements he would go to prison and be charged as a Miller co-defendant.

probability of a different result standard" applies. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley,* 478 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed 2d. 481 (1985).

The knowing use of false testimony involves a lower materiality burden. *United States v. Agurs,* 417 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed. 2d 342 (1976).

Recantation of testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict". *Dobbert v. Wainwright*, 468 U.S. 1231; 105 S.Ct. 34; 82 L.Ed.2d 925 (1984).

Troy Plante, as noted in his affidavit (Exhibit B), has recanted his testimony. He also suggests that he received some monetary consideration for his testimony against Miller. If, in fact, this was a benefit known to the Government and withheld from Miller, a *Brady* and *Giglio* violation may well have existed.

(a) NEWLY DISCOVERED EVIDENCE

To establish a claim for a new trial under Fed. R. Crim. P. 33 based on newly discovered evidence, the defendant must show that: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a new result. In determining whether to grant the

10

motion, the district court should use "great caution." An appellate court reviews the district

court's ruling for an abuse of discretion.

(b) *BRADY*

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 1 0 L. Ed. 2d 215 (1963), mandates the

disclosure of all favorable evidence to the defendant for use in his trial by the prosecution. The

withholding of evidence favorable to an accused denies him due process of law irrespective of

the good faith or bad faith of the prosecution. *Kyles v. Whitney,* 514 U.S. 419, 115 S.Ct. 1555,

131 L.Ed 2d 490, 504 (1995). In *United States v. Sagle,* 473 U.S. 667 (1985): "the Court

disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes."

*Kyles*, 131 L.Ed 2d at 505. *Kyles* also held that:

> [A1]showing of materiality does not require
> demonstration by a preponderance that disclosure of the
> suppressed evidence would have resulted ultimately in the
> defendant's acquittal  ... the question is not whether the
> defendant would more likely than not have received a
> different verdict with the evidence, but whether in its
> absence he received a fair trial, understood as a trial
> resulting in a verdict worthy of confidence. A 'reasonable
> probability' of a different result is accordingly shown
> when the Government's evidentiary suppression
> 'undermines confidence in the outcome of the trial.'"

131 L. Ed. 2d at 506.

A *Brady* violation occurs "by showing that the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the

verdict." Id. at 506. It does not matter that there would still be adequate evidence to convict "even

if the favorable evidence had been disclosed." 131 L. Ed. 2d at 506, note 8.  Once there has been

*Bagley*[3] error as claimed in this case, it cannot be subsequently found harmless. 131 L. Ed. 2d at

507.

The *Kyles* case says that:

     1) the burden of proof in *Brady* claims post-trial is a reasonable probability of a reasonable doubt;

     2) courts are precluded from considering sufficiency of evidence in determining whether the burden of proof has been met;

     3) the emphasis should be placed on assessing the evidence as favorable in light of how it may strengthen the defense case and weaken the state's case; an important corollary is that the court legitimized discrediting or impeaching the caliber of the state's investigation as a defense tactic;

     4) once a court has found a *Brady/Bagley* error, harmless-error review is not necessary;

     5) prosecutors have an affirmative obligation to discover all of the evidence favorable to the defendant known to all members of the prosecution team;

     6) prosecutors, must seek fairness and truth, not victory.

     (1)     BURDEN OF PROOF-- REASONABLE PROBABILITY OF A REASONABLE DOUBT

     In order to prevail on a *Brady* claim, a defendant need not "demonstrate by a

preponderance that disclosure of the suppressed evidence would have resulted ultimately in the

defendant's acquittal.

          "*Kyles,* 131 L. Ed. 2d at 506. Rather, Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the objective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair

---

[3]   *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed 2d 491 (1985)

trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 131 L. Ed. 2d at 506. See *Strickland v. Washington*, 466 U.S. 668, 693-94,(1986)

(this test is not outcome-determinative - - an individual "need not show that the [error) more

likely than not altered the outcome of the case. The result of the proceeding can be rendered

unreliable, and hence the proceeding unfair, even if the [suppressed evidence] cannot be shown

by a preponderance of the evidence to have determined the outcome").

(2)    COURTS ARE PRECLUDED FROM CONSIDERING SUFFICIENCY OF EVIDENCE IN DETERMINING WHETHER THE BURDEN OF PROOF HAS BEEN MET

"*Bagley* materiality ... is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence, there would not have been enough left to convict.... One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence Could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome."

*Kyles,* at 506, *Kyles* also held that it does not matter that every item of the state's case would not

have been directly undercut if *the Brady* evidence had been disclosed. 131 L. Ed. 2d at 516.

(3)  THE PROPER ASSESSMENT OF THE SUPPRESSED EVIDENCE MUST BE DONE IN LIGHT OF HOW IT MAY HAVE STRENGTHENED THE DEFENSE CASE (INCLUDING DISCREDITING OR IMPEACHING THE CALIBER OF THE STATE'S INVESTIGATION) OR WEAKENED THE STATE'S CASE

Most trial courts and prosecutors view *Brady* evidence in a very narrow light, i.e.,

whether it "exculpates" the defendant, despite a number of appellate decisions to the contrary.

The *Kyles* court strongly reaffirmed these prior appellate cases, and throughout the opinion

discusses whether the evidence was "favorable" to *Kyles* in that it could have strengthened the

13

defense case and weakened the State's case. At the close of the *Kyles* opinion, the Court discussed what the jury would have been entitled to find had the favorable evidence been disclosed.

Evidence of monetary benefit to Plante would have weakened the state's case as relates to the attempted murder and solicitation to commit murder charges.

> "These developments would have fueled a withering cross-examination, destroying confidence in [the children's and Lanier's] story and raising a substantial implication that [someone] had coached [them] to give it."

Since all of these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them, "'fairness' cannot be stretched to the point of calling this a fair trial" (131 L.Ed.2d at 518); confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find that the most damning evidence was subject to suspicion and that the investigation that produced it was insufficiently probing.

To paraphrase *Kyles* had the evidence been disclosed, "the defense could have laid the foundation for a vigorous argument" against the reliability, trustworthiness and credibility of the allegations. *Kyles* 131 L.Ed.2d at 514.

**(4) ONCE A COURT HAS FOUND *BRADY/BAGLEY* ERROR, HARMLESS-ERROR REVIEW IS NOT NECESSARY**

"[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review...*Bagley* error could not be treated as harmless, since [the test]...necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict," *Kyles*, 131 L.Ed.2d at 507.

**(5) PROSECUTORS HAVE AN AFFIRMATIVE OBLIGATION TO DISCOVER ALL OF THE EVIDENCE FAVORABLE TO THE DEFENDANT KNOWN TO ALL MEMBERS OF THE PROSECUTION TEAM.**

In an effort to skirt the *Brady* requirements, defendant expects the government to claim

that the prosecutor was unaware of the existence of the newly discovered evidence.

"[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case....

   \*\*\*

'[P]rocedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it....' Since, then, the prosecutor has means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles*, 131 L.Ed 2d at 508, 509.

It should be noted that in the *Kyles* case "some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial." 131 L.Ed 2d at 508.

"This means, naturally, that a prosecutor anxious about tacking too close to the wind disclose a favorable piece of evidence. See *Aqurs*, 427 U.S., at 108 ('[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure")". *Kyles* at 1568.

(6) PROSECUTORS MUST SEEK FAIRNESS AND TRUTH, NOT VICTORY.

*Kyles* also held that:

> " '[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure ... This is as it should be. Such disclosure of evidence will serve to justify trust in the prosecutor as "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done'... And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." Kyles at 131 L.Ed. 2d at 509.

Based on the facts and the law this conviction is due to be vacated.

(c) *GIGLIO*

A potential Giglio error, a type of Brady violation that occurs when "the undisclosed

evidence demonstrates that the prosecution's case included perjured testimony and that the

prosecution knew, or should have known, of the perjury." United States v. Agurs, 427 U.S. 97,

103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)"In order to prevail on a Giglio claim, a

petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to

correct what he subsequently learned was false testimony, and that the falsehood was material."

*Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999) A *Giglio* analysis is a "highly fact-

dependent inquiry *Ventura v. Attorney Gen.*, 419 F.3d 1269, 1281 (11th Cir. 2005)

Plante's affidavit reveals that he expected and received favor from the Government for

his testimony. He told the jury otherwise. A *Giglio* violation occurred.

### (3) MOVANT IS ENTITLED TO BE RE-SENTENCED BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL

When Miller was sentenced *In Re Winship*, 397 U.S. 358 (1970)  and *McMillian v.

Pennsylvania, 477 U.S. 79 (1986)* were the law.  The Sixth Amendment has always required that

a jury not a judge should determine beyond a reasonable doubt any factor causing an increase in

punishment.

Justice Scalia in his concurrence in *Ring* two years after *Apprendi* stated: "I believe that

the fundamental meaning of the jury trial guarantee of the Sixth Amendment is that all facts

essential to imposition of the level of punishment that the defendant receives - whether the

statute calls them elements of the offense, sentencing factors, or Mary Jane - must be found by

the jury beyond a reasonable doubt."

Sentencing factors that increased Miller's punishment that were never presented to the

jury for a reasonable doubt finding should have been objected to at sentencing on Sixth

16

Amendment grounds

The Sixth Circuit in *Ballard v. United States*, 400 F.3d 404 (2005) held that Ballard's sentence was required to be vacated because her attorney failed to raise certain legal issues relevant to vacating her sentence on appeal and prejudiced the outcome of her case.

*Ballard* was a 28 U.S.C. §2255 case filed after she lost her direct appeal. In the 2255 *Ballard* contended that her lawyer was ineffective for failing to request a special verdict form or raise legal arguments pertaining to case law established in the co-defendant's case[4]. Ballard also contended she was entitled to relief pursuant to *Apprendi* and *Dale*.[5]

The Sixth Circuit was faced with the question of whether Ballard's counsel had been ineffective on appeal for failure to raise *Apprendi* and *Dale* claims. Both *Dale* and *Apprendi* were not available to Miller at sentencing. However, the predecessors *Winship* and McMillan were. The same analogy should apply in this case as *Ballards*.

In *Ballard*, her appellate counsel ignored *Dale* and *Apprendi*. The court held the lawyers performance was deficient. The Sixth Circuit went further to hold that the fact Ballard's co-defendant successfully briefed and won on the same issue on appeal rendered Ballard's counsel's performance objectively unreasonable.

A lawyer, cognizant of the Sixth Amendment requirements far beyond a reasonable doubt findings on sentencing enhancements and its progeny, made and preserved a Sixth Amendment *Blakely/Booker* argument in 2003 prior to the June 2004 release of *Blakely*. (See *United States v.*

---

[4] 178 F.3d 429 (6th Cir. 1999)

[5] *United States v. Dale*, 178 F. 3d 429 (6th Cir. 1999) *Dale* also dealt with Sixth Amendment jury trial issues.

*Reese*, 397 F.3d 1337 (11ᵗʰ Cir. 2005). (Exhibit C) This is evidence that the argument was not so novel that it excused Miller's counsel's failure to raise and preserve the Sixth Amendment issue.

As noted by the *Ballard* court, in addition to finding Ballard's counsel's performance objectively unreasonable, the court was also convinced that there was a reasonable probability that the result of the proceeding would have been different but for her attorney's errors. *Ballard* should be instructive in this case. In *Ballard* the issue of retroactivity was of no moment.

The Sixth Circuit in *Ballard* held: "...because we find that the district court was in plain error in sentencing Ballard based on the jury's general verdict and because we conclude that the error amounts to a miscarriage of justice that seriously affects the fairness, integrity, or public reputation of judicial proceedings, we hold that the failure of Ballard's appellate counsel to raise *Dale* and *Apprendi* issues on appeal had a direct effect on prejudicing the outcome of her appeal."

Surely this rationale should be no less applicable in this case where Miller's lawyer failed to make an a Sixth Amendment objection to the sentencing factors as to the non-jury, judge found, sentencing factors that enhanced Miller's punishment.

Miller has claimed ineffective assistance of counsel as a basis for 2255 relief which overcomes the procedural default in failing to raise the Sixth Amendment objection at sentencing and on direct appeal.

In *Ballard* the court stated: "Our court is charged with ensuring equal justice under the law for all who come within the walls of our judicial system. If we turn a blind eye to the

18

prequisites that result from ineffective legal representation we jeopardize the integrity of justice itself."

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. *Wiggins v. Smith*, 539 U.S. 510; 123 S.Ct. 1671, 151 L.Ed 2d 369(2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see Atkins* v. *Singletary,* 965 F.2d 952 (11th Cir.1992). Even under this heightened standard, it is clear Miller suffered from ineffective assistance of counsel at sentencing.

In the case of alleged sentencing errors, Miller must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been significantly less harsh due to a reduction in the defendant's offense level. *United States v. Camargo-Vergara*, 57 F.3d 993, 997 -998 (11th Cir. 1995); *Spriggs v. Collins,* 993 F .2d 85, 88 (5th Cir. 1993). An error increasing a defendant's sentence by as little as six months can be prejudicial within the meaning of *Strickland.* See *Glover v. United States*, 531 U.S. 198, 202-04, 148 L.Ed.2d 604, 121 S.Ct. 696 (2001).

In anticipation of a Government argument in opposition that *pre-Booker* lawyers could not have been expected to make Sixth Amendment *Apprendi* objections as the law was less than clear, Miller disagrees. *Pre-Apprendi* counsel had available prior Supreme Court precedent from rulings in *In Re Winship*, 397 U.S. 358 (1970) and *McMillian v. Pennsylvania*, 477 U.S. 79

19

(1986).

Miller's mandatory guideline sentence is required to be vacated and a re-sentencing ordered without mandatory guidelines. The guidelines are merely advisory. Miller is due to be sentenced under the Courts discretion.

"Under new *post-Booker* framework, the district court is empowered with greater discretion to consider the factors provided in 18 U.S.C. §3553(a) in determining a proper sentence." *United States v. Barnett*, 398 F.3d 516, 528 (6th Cir. 2005). In fact, Steven G. Kala in *Booker* Advisory: In the Breyer Patch, 29 Champion 8, 15 (Mar. 2005) suggested that the "prohibited or discouraged departure factors listed in Chapter 5H of the guidelines are tailor made for the broader equitable analysis" that will now apply under *Booker*.

It appears the finality of judgement rationale regarding habeas corpus that we have witnessed evolve to the detriment of justice appears premised on the notion of preserving judicial and financial resources. As noted by the Tenth Circuit in *United States v. Gonzalez-Huerta*, 403 F.3d 727 (10th Cir. 2005), there are a string of cases addressing plain error versus deprivation of rights that suggest the courts should err on the side of individual rights. Specifically these are noted as follows:

"The costs associated, however, are minimal, particularly in comparison to the benefits of ensuring that defendants are not subjected to unnecessary and improper deprivations of their liberty." *See United States v. Serrano-Beauvaix*, 400 F. 3d 50 (1st Cir. 2005) (Lopez, J., concurring) ("Given what is at stake in sentencing decisions - the potential for additional months or even years in prison - I believe that the increased administrative burdens are a tolerable price to pay."); *United States v. Williams*, 399 F.3d 50, 456 (2d Cir. Feb. 23, 2005) ("A re-sentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel.") *Barnett*, 398 F.3d at 532 (Gwin J., concurring) ("In summary, an unnecessarily restrictive plain error analysis will result in substantial additional work for this court and will save the district courts almost no time").

Miller argues that his illegal sentence should not stand based on his claim of ineffective assistance of counsel.

As the Tenth Circuit noted in *United States v. Brown*, 316 F.3d 1151, 1161 (10th Cir. 2003) the federal circuits have not hesitated to exercise their discretion to correct pre-*Booker* sentencing errors where the correct application of the  sentencing laws would likely significantly reduce the length of the sentence.

As held by the United States Supreme Court in *Glover v. United States*, supra (an appeal from denial of a 28 U.S.C. §2255), any amount of jail time which results from the misapplication of the guidelines establishes prejudice. *Glover* was an ineffective assistance of counsel case.

Miller argues his lawyer at sentencing was ineffective and so abridged his Sixth Amendment right to effective representation of counsel. The Sixth Amendment right to counsel is the right to effective representation of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).

In *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court delineated the proper scope of review in examining a claim of ineffective assistance of counsel:

> A convicted felon making a claim of ineffective assistance of counsel must identify the acts or omissions that are alleged not to have the result of reasonable judgment.  The court must then determine whether, in light of all the circumstances, the identified acts were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

21

The *Strickland* standard calls for a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id., at 687.

The United States Court of Appeals for the Eleventh Circuit has interpreted *Strickland* for purposes of evaluating counsel's performance as follows:

> [t]he court must...determine whether, in the light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Smith v. Wainwright*, 777 F.2d 609,616 (citing *Strickland*, 466 U.S. at 690).

Similarly, under the prejudice component,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome...When a defendant challenges a conviction, the question is whether there is a reasonable probability that, but for counsel's unprofessional errors, the fact finder would have had a reasonable doubt respecting guilt.

*Smith*, 777 F.2d at 616 (citing *Strickland,* 466 U.S. at 694-695).

In evaluating trial counsel's performance under the *Strickland* standard, the reviewing court must strongly presume that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S.

22

at 689. With this burden in mind, Mr. Miller alleges that his counsel was ineffective as noted above.

## V.  MILLER REQUESTS AN EVIDENTIARY HEARING

Contested fact issues, in a proceeding on a Motion to Vacate a federal conviction and sentence, must be decided on the basis of an evidentiary hearing and not on affidavits. *Montgomery v. United States*, 469 F. 2d 148 (5th Cir. 1972).

In post conviction proceedings such as 28 U.S.C. §2255, the statute calls for evidentiary hearings unless the motion, files, and records of the case conclusively show that the Movant is entitled to no relief. *Fountaine v. United States*, 411 U.S. 213, 96 S.Ct. 1461, 36 L.Ed. 2d 169 (1973) (per curium).

The Defendant, denied of an opportunity to be heard, "has lost something indispensable however convincing the ex parte showing." *United States v. Hayman*, 342 U.S. 205, 220, 72 S.Ct. 263, 96 L.Ed. 232 (1952), citing *Snyder v. Massachusetts*, 692 F.2d 565 (1982), an evidentiary hearing under the present circumstances is mandated. The Ninth Circuit, in *Bauman v. United States*, 692 F.2d 565 (1982), held that a "hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims." This legal authority and the sound reasoning associated should be equally applicable to the case at bar.

The facts of this case are distinguishable from those noted in *United States v. McGill*, 11 F. 3d 223 (1st Cir. 1993), because it cannot be said in Movant's case that an evidentiary hearing would serve no purpose.

## VI.  CONCLUSION

Wherefore for all the foregoing reasons, Miller requests that his convictions for solicitation to commit murder and attempted murder be vacated or at the very least that he be granted a re-

sentencing.

Respectfully submitted,

Robert Ethan Miller, Pro Se
48707-019
U.S.P.
P. O. Box 2099
Pollock, LA 71467

## CERTIFICATE OF SERVICE

I hereby certify that I filed on July 13, 2006 with the Clerk of Court sending notification of such filing to the following:

Christopher Wray
AUSA
755 Spring Street, S. W.
600 U. S. Courthouse
Atlanta, GA 30303