# EXHIBIT A

485

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN  DISTRICT OF GEORGIA

3                    ATLANTA DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                   )  DOCKET NO. 1:97-CR-496-ODE
                 PLAINTIFF,         )
6                                   )
          VS.                       )  ATLANTA, GEORGIA
7                                   )
   ROBERT ETHAN MILLER, JR.,        )  JUNE 23, 1998
8                                   )
              DEFENDANT.            )
9                                   )
   _____)
10

11                     VOLUME 4

12                    PROCEEDINGS

13     BEFORE THE HONORABLE ORINDA D. EVANS, UNITED STATES

14  DISTRICT JUDGE.

15  APPEARANCES OF COUNSEL:

16

17     FOR THE GOVERNMENT:       MR. CHRISTOPHER WRAY
                                 ASST. U.S. ATTORNEY
18

19

20     FOR THE DEFENDANT:        MR. JOHN HARBIN
                                 POWELL GOLDSTEIN FRAZER & MURPHY
21                               ATTORNEY AT LAW

22
       COURT REPORTER:           PATTI ALLEN
23                               OFFICIAL COURT REPORTER
                                 75 SPRING ST., S. W.
24                               ATLANTA, GEORGIA   30303
                                 PHONE:  (404) 331-3722
25


                    PATTI ALLEN, COURT REPORTER

VOL 4 – JUN 23, 1998

486

1                                    INDEX

2    GOVERNMENT'S WITNESSES          DIRECT     CROSS REDIRECT  RECROSS

3    TZEGAI HINSON (CONT'D)                      499      524       533

4    TROY PLANTE                     536        606

5                        -- -- --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PATTI ALLEN, COURT REPORTER

1    SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL GIVE IN THE

2    MATTER NOW PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE

3    WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

4              THE WITNESS:  I DO.

5              THE CLERK:  HAVE A SEAT IN THE WITNESS BOX AND

6    STATE YOUR NAME FOR THE RECORD.

7              THE WITNESS:  MY NAME IS TROY MARTIN PLANTE.

8                        - - -

9                    TROY MARTIN PLANTE

10   CALLED AS A WITNESS ON BEHALF OF THE GOVERNMENT, BEING FIRST

11   DULY SWORN, TESTIFIED AS FOLLOWS:

12                    DIRECT EXAMINATION

13   BY MR. WRAY:

14   Q.   MR. PLANTE, CAN YOU SPELL YOUR LAST THE NAME, PLEASE?

15   A.   P-L-A-N-T-E.

16   Q.   MOVE JUST A LITTLE BIT CLOSER TO THE MICROPHONES.

17   MR. PLANTE, HOW OLD ARE YOU?

18   A.   26 YEARS OLD.

19   Q.   AND WHERE WERE YOU BORN?

20   A.   VERO BREACH, FLORIDA, INDIAN RIVER COUNTY.

21   Q.   YOU MAY NEED TO SPEAK JUST A LITTLE MORE SLOWLY SO THE

22   COURT REPORTER CAN HEAR YOU.

23   A.   VERO BEACH, FLORIDA, INDIAN RIVER COUNTY.

24   Q.   AND WHAT PART OF THE COUNTRY DID YOU GROW UP IN?

25   A.   CHICAGO, ILLINOIS; AND VERO BEACH, FLORIDA; AND SAVANNAH,

1    GEORGIA; IN BETWEEN THE THREE.

2    Q.   AND WHAT CITY ARE YOU LIVING IN RIGHT NOW?

3    A.   ST. AUGUSTINE, FLORIDA.

4    Q.   IS ANYBODY LIVING WITH YOU?

5    A.   YES, SIR.

6    Q.   WHO?

7    A.   MY GIRLFRIEND'S GRANDPARENTS, MY GIRLFRIEND, MY KID, AND

8    I GOT ANOTHER KID ON THE WAY THAT IS DUE ANY DAY.

9    Q.   WHEN YOU SAY ANY DAY NOW, WHAT IS THE DUE DATE?

10   A.   THE 29TH OF JUNE.

11   Q.   ARE YOU WORKING IN ANY WAY RIGHT NOW?

12   A.   WORKING AT A HOSPITAL AS A FLOOR TECHNICIAN.

13   Q.   YOU SAY A FLOOR TECHNICIAN.  WHAT KIND OF WORK ARE YOU

14   DOING FOR THE HOSPITAL?

15   A.   BUFFING THE FLOORS, WAXING THE FLOORS, STRIPPING THE

16   FLOORS.

17   Q.   HAVE YOU EVER SPENT MUCH TIME IN ATLANTA?

18   A.   NO, SIR.

19   Q.   DO YOU KNOW YOUR WAY AROUND IN ATLANTA?

20   A.   NOT VERY GOOD.

21   Q.   NOW, WHERE WERE YOU LIVING FROM OCTOBER 6TH OF 1997 UNTIL

22   MARCH 6TH OF 1998?

23   A.   THE COBB COUNTY JAIL.

24   Q.   AND WHY WERE YOU THERE?

25   A.   FOR POSSESSION OF STOLEN PROPERTY CHARGES, TWO COUNTS.

PATTI ALLEN, COURT REPORTER

1   Q.   AND WERE THOSE CHARGES RECENTLY RESOLVED?

2   A.   YES, SIR.

3   Q.   DID YOU PLEAD GUILTY TO THEM?

4   A.   YES, SIR.

5   Q.   WHAT DID YOU PLEAD GUILTY TO, IF YOU REMEMBER?

6   A.   THREE YEARS PROBATION AND A THOUSAND DOLLAR FINE.

7   Q.   AND WHAT PROSECUTOR'S OFFICE WAS HANDLING THAT CASE?

8   A.   THE COBB COUNTY PROSECUTOR'S OFFICE.

9   Q.   TO YOUR KNOWLEDGE, DOES THE FEDERAL GOVERNMENT HAVE ANY

10  AUTHORITY WHATSOEVER OVER THOSE CHARGES?

11  A.   NO, SIR.

12  Q.   NOW, WERE YOU ALSO RECENTLY ARRESTED IN FLORIDA ON SOME

13  OTHER CHARGES?

14  A.   YES, SIR.

15  Q.   AND HOW RECENT?  WHEN WERE YOU ARRESTED, IF YOU REMEMBER?

16  A.   I WAS ARRESTED AROUND THE END OF MARCH, BUT THEY WERE

17  CHARGES FROM 1994.  IT WAS AN OUTSTANDING WARRANT FROM FOUR

18  YEARS AGO.

19  Q.   SO, THE END OF MARCH OF WHAT YEAR WERE YOU REARRESTED?

20  A.   1998.

21  Q.   AND WHEN YOU WERE IN THE COBB COUNTY JAIL FROM OCTOBER

22  6TH OF 1997 UNTIL MARCH 6TH OF 1998, WERE YOU EVEN AWARE THAT

23  THOSE CHARGES WERE OUT THERE?

24  A.   NO, SIR.

25  Q.   WHAT IS THE STATUS OF THOSE CHARGES?

539

1   A.   THEY ARE PENDING.

2   Q.   AND TO YOUR KNOWLEDGE, WHAT PROSECUTOR'S OFFICE IS

3   HANDLING THAT CASE?

4   A.   THE OSCEOLA COUNTY PROSECUTOR'S OFFICE IN FLORIDA.

5   Q.   AND TO YOUR KNOWLEDGE, DOES THE FEDERAL GOVERNMENT HAVE

6   ANY AUTHORITY WHATSOEVER OVER THOSE CHARGES?

7   A.   NO, SIR.

8   Q.   NOW, NONETHELESS, HAVE YOU COOPERATED WITH THIS

9   INVESTIGATION?

10  A.   YES, SIR.

11  Q.   AND IS THERE SOME BENEFIT THAT YOU ARE HOPING THE FEDERAL

12  GOVERNMENT CAN PROVIDE TO YOU IN CONNECTION WITH EITHER OF

13  THESE CASES?

14  A.   NOT VERY MUCH.  THE CASE UP HERE IS ALREADY OVER WITH,

15  AND THE CASE IN FLORIDA IS BASICALLY -- I SHOULD HAVE THAT

16  CASE THROWN OUT, NO PROBLEM, WITHOUT ANY HELP.

17  Q.   ARE YOU HOPING THE GOVERNMENT WILL PUT IN A GOOD WORD FOR

18  YOU IN EITHER OF THESE CASES?

19  A.   IF NEEDED.

20  Q.   NOW, THESE CHARGES IN COBB COUNTY AND FLORIDA ARE NOT

21  YOUR ONLY FELONY CHARGES; IS THAT CORRECT?

22  A.   NO, SIR.  I HAVE A PAST RECORD.

23  Q.   DO YOU HAVE A PRIOR CONVICTION FOR THEFT IN THE SAVANNAH

24  AREA IN MAY OF '91?

25  A.   YES, SIR.

PATTI ALLEN, COURT REPORTER

540

1    Q.   AND ANOTHER CONVICTION FOR AUTO THEFT IN SAVANNAH IN
2    APRIL OF '91?
3    A.   YES, SIR.
4    Q.   DO YOU HAVE A CONVICTION FOR POSSESSION OF A FIREARM BY A
5    FELON AGAIN IN THE SAVANNAH AREA IN JULY OF '91?
6    A.   YES, SIR.
7    Q.   THERE ARE ALSO SOME THEFT CHARGES ASSOCIATED WITH THAT
8    CONVICTION?
9    A.   YES, SIR.
10   Q.   AND DO YOU HAVE SOME AUTO THEFT CHARGES IN ILLINOIS FROM
11   1993?
12   A.   YES, SIR.
13   Q.   AND SOME MORE AUTO THEFT CHARGES IN '94 IN SAVANNAH?
14   A.   YES, SIR.
15   Q.   AND DO YOU HAVE A PRIOR CONVICTION FOR BATTERY ON LAW
16   ENFORCEMENT IN DECEMBER OF '95?
17   A.   YES, SIR.
18   Q.   WAS THAT IN FLORIDA?
19   A.   YES, SIR.
20   Q.   DO YOU HAVE SOME MISDEMEANOR CONVICTIONS AS WELL?
21   A.   YES, SIR.
22   Q.   NOW, MR. PLANTE, HAVE YOU SPENT MUCH TIME IN PRISON IN
23   YOUR LIFETIME?
24   A.   PROBABLY HALF MY LIFE, SIR.
25   Q.   DO YOU KNOW THE DEFENDANT, ROBERT ETHAN MILLER, JR.?

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB  Document 153-2  Filed 07/14/06  Page 9 of 25

541

1    A.   YES, SIR.

2    Q.   HOW DID YOU FIRST COME TO KNOW THE DEFENDANT?

3    A.   THE COBB COUNTY JAIL.

4    Q.   CAN YOU EXPLAIN HOW YOU AND HE GOT TO KNOW EACH OTHER?

5    A.   PLAYING CARDS, JUST TALKING.

6    Q.   WHAT KIND OF GAMES WOULD YOU PLAY CARDS?

7    A.   SPADES, PARTNERS IN SPADES BASICALLY.  WE WAS PLAYING

8    CARDS TOGETHER AGAINST THE REST OF THE PEOPLE IN THE

9    DORMITORY.

10   Q.   AND DID YOU AND THE DEFENDANT BECOME FRIENDS?

11   A.   SOMEWHAT.

12   Q.   AND DID THERE COME A TIME WHEN THE DEFENDANT APPROACHED

13   YOU ABOUT DOING SOME THINGS FOR HIM IF YOU EVER GOT OUT OF

14   JAIL?

15   A.   YES, SIR.

16   Q.   WHEN DID HE FIRST APPROACH YOU ABOUT DOING ANYTHING FOR

17   HIM?

18        THE COURT:  DO YOU WANT TO TAKE A BREAK?  MRS. HANNA

19   HAS GONE TO LOCATE THE SOURCE OF THAT NOISE.

20        MR. WRAY:  MAYBE WE COULD PAUSE FOR JUST A MOMENT.

21        THE COURT:  THERE HAS BEEN A LOT OF RENOVATION GOING

22   ON IN THE COURTHOUSE, AND SOMETIMES IT TAKES A FEW MINUTES TO

23   FIGURE OUT WHERE THE NOISE IS COMING FROM.  IT'S PROBABLY

24   RIGHT BELOW US.

25        MR. WRAY:  IF IT IS GOING TO TAKE A LITTLE WHILE, I

PATTI ALLEN, COURT REPORTER

542

1   GUESS I WOULD WANT TO TAKE A BREAK.  I THINK MR. PLANTE'S

2   TESTIMONY IS IMPORTANT FOR THE JURY TO HEAR.  I DON'T WANT TOO

3   MUCH BANGING.

4           THE COURT:  LET'S TAKE A SHORT BREAK.

5           (RECESS TAKEN)

6           (WHEREUPON THE JURY WAS BROUGHT INTO THE COURTROOM.)

7           THE COURT:  MR. PLANTE, COME ON BACK UP.

8           MR. WRAY:  LET ME, IF I MIGHT, JUST ASK THE LAST TWO

9   OR THREE QUESTIONS THAT I ASKED BEFORE WE BROKE.

10          THE COURT:  SURE.

11                    - -- -

12                    TROY MARTIN PLANTE

13  BEING PREVIOUSLY DULY SWORN, RESUMED THE WITNESS STAND AND

14  TESTIFIED FURTHER AS FOLLOWS:

15                    DIRECT EXAMINATION (CONT'D)

16  BY MR. WRAY:

17  Q.   I BELIEVE I ASKED YOU HAVE YOU SPENT MUCH TIME IN PRISON?

18  A.   OVER HALF OF MY LIFE.

19  Q.   AND DO YOU KNOW THE DEFENDANT, ROBERT ETHAN MILLER, JR.?

20  A.   YES, SIR.

21  Q.   AND HOW DID YOU COME TO KNOW HIM?

22  A.   PLAYING SPADES TOGETHER, AND CARDS AND STUFF LIKE THAT IN

23  THE COBB COUNTY JAIL.

24  Q.   AND DID YOU AND HE START TO BECOME FRIENDS?

25  A.   YES, SIR.

543

1   Q.   AND DID THERE COME A TIME WHEN THE DEFENDANT APPROACHED
2   YOU ABOUT DOING SOME THINGS FOR HIM IF YOU EVER GOT OUT OF
3   JAIL?
4   A.   YES, SIR.
5   Q.   DO YOU RECALL ROUGHLY WHAT MONTH AND WHAT YEAR IT WAS
6   THAT HE FIRST APPROACHED YOU?
7   A.   HE FIRST APPROACHED ME ASKING ME ABOUT DOING SOMETHING,
8   OR TALKING TO ME IN GENERAL.
9   Q.   WHEN DID HE BEGIN TALKING TO YOU IN GENERAL ABOUT THINGS
10  YOU MIGHT BE WILLING TO DO FOR HIM ON THE OUTSIDE?
11  A.   THE BEGINNING OF 1998.
12  Q.   AN WHAT WAS THE FIRST THING THAT THE DEFENDANT BROUGHT UP
13  FOR YOU TO POSSIBLY DO FOR HIM?
14  A.   WELL, IT WASN'T POSSIBLY DO, BUT HE WAS TELLING ME ABOUT
15  HIS GIRLFRIEND, WHICH IS KATHERINE MILLER, HER PARENTS HAVE A
16  LOT OF MONEY, MONEY AND BANKS AND STUFF, OWN A LOT OF BANKS,
17  AND HE SAID HE WOULD LIKE TO ONE DAY HAVE HER INHERIT ALL OF
18  THAT STUFF, HAVE HER PARENTS AND ALL THEM COME UP MISSING OR
19  WHATEVER SO SHE WOULD INHERIT THE WHOLE THING.
20  Q.   WELL, DID HE DESCRIBE TO YOU IN ANY MORE DETAIL HOW HE
21  BELIEVED THIS COULD BE ACCOMPLISHED?
22  A.   DURING THE CHRISTMAS HOLIDAYS WHEN THE WHOLE FAMILY IS
23  OVER, HAVE EVERYBODY TOOKEN CARE OF AT ONE TIME.  THAT WAY
24  NOBODY ELSE IS LEFT, AND NOBODY ELSE IS IN THE WILL.
25  Q.   WHEN YOU SAY TOOKEN CARE OF ---

PATTI ALLEN, COURT REPORTER

544

1    A.   KILLED.

2    Q.   DID HE SAY TO YOU; THAT IS, DID THE DEFENDANT SAY TO YOU

3    WHETHER HE WANTED MS. MILLER'S FAMILY KILLED IMMINENTLY, OR AT

4    SOME LATER POINT?

5    A.   SOME LATER POINT.  THAT WASN'T REALLY RELEVANT RIGHT

6    THEN.  THAT IS SOMETHING THAT WOULD HAPPEN WHEN HE WAS ON THE

7    STREET, AND ALL OF US WERE OUT OF JAIL LIKE IN THE FUTURE.

8    THAT WASN'T SOMETHING THAT WAS GOING TO HAPPEN RIGHT THEN.

9    Q.   DID HE GIVE YOU ANY INDICATION OF WHY HE WAS BRINGING

10   THIS SUBJECT UP TO YOU IN PARTICULAR?

11   A.   NO, NOT REALLY.

12   Q.   DID YOU AND HE DISCUSS THE POSSIBILITY THAT YOU MIGHT BE

13   THE PERSON WHO COULD HELP HIM WITH THIS?

14   A.   POSSIBLY.

15   Q.   WELL, POSSIBLY HELP HIM?

16   A.   POSSIBLY HELP HIM.

17   Q.   WAS THERE ANYTHING ELSE LIKE THIS THAT THE DEFENDANT

18   ASKED YOU TO DO FOR HIM?

19   A.   LATER ON, PROBABLY AROUND, I WOULD SAY, MID FEBRUARY OF

20   1998.

21   Q.   OKAY.  WHAT DID HE ASK YOU TO DO?

22   A.   HE STARTED TO TELL ME ABOUT HIS COUNTERFEIT CASES HE HAD

23   WITH THE FEDERAL GOVERNMENT, AND THERE WAS ONE WITNESS AGAINST

24   HIM, WHICH WAS HIS EX-WIFE, AND I BELIEVE HER NAME TO BE

25   JENNIFER, AND HE SAID THAT IF SHE WAS TOOKEN CARE OF, HE

1  WOULDN'T HAVE ANY WITNESSES AGAINST HIM IN HIS FEDERAL CASE,

2  WHICH IS A COUNTERFEIT CASE.

3          SO, HE WOULD LIKE TO HAVE HER TOOKEN CARE OF, AND

4  WHEN I SAY TOOKEN CARE OF, I MEAN THE SAME THING AS LAST TIME,

5  WHICH IS KILLED SO HE WON'T HAVE NO ONE TO TESTIFY, AND

6  WOULDN'T BE FOUND GUILTY IN THE FEDERAL CASE, WHICH WAS A

7  COUNTERFEIT CASE.

8  Q.   AND DID HE GIVE YOU IN THIS CONVERSATION ANY INDICATION

9  OF WHY HE WAS TURNING TO YOU FOR THIS HELP?

10  A.   I LOOKED LIKE THE TYPE OF PERSON THAT WOULD DO THAT KIND

11  OF WORK.

12  Q.   IS THAT WHAT HE SAID TO YOU?

13  A.   YES.

14  Q.   DID HE TALK ABOUT ANYTHING IN PARTICULAR ABOUT YOU THAT

15  GAVE HIM THAT INDICATION?

16  A.   HIM AND EVERYONE ELSE KNEW IN THE JAIL WE WERE IN THAT I

17  BEEN IN GANGS ALL MY LIFE IN CHICAGO.  I GOT TATTOOS ALL OVER

18  MY BODY, SO I POSSIBLY WOULD BE THE TYPE OF PERSON THAT WOULD

19  DO SOMETHING LIKE THAT.

20  Q.   DO YOU HAVE TATTOOS ON YOUR ARMS?

21  A.   I GOT TATTOOS ON MY ARMS, STOMACH, BACK, CHEST.

22  Q.   I DON'T WANT YOU TO TAKE OFF YOUR SHIRT, SIR, BUT IF YOU

23  COULD JUST -- IF YOU WOULD, HOLD IT UP.  AND DO ANY OF THOSE

24  TATTOOS HAVE ANY PARTICULAR SIGNIFICANCE WITH RESPECT TO THE

25  GANG ACTIVITY THAT YOU MENTIONED?

546

1   A.   TWO OF THEM ON MY ARM.

2   Q.   I'M SORRY.  YOU MOVED AWAY FROM THE MICROPHONE.

3   A.   TWO ON MY ARM, AND THERE IS ONE BIG ONE ON MY WHOLE

4   STOMACH THAT COVERS MY WHOLE STOMACH AREA THAT REPRESENTS GANG

5   ACTIVITY.

6   Q.   AND WHEN YOU WERE WALKING AROUND THE COBB COUNTY JAIL,

7   WERE THOSE TATTOOS LARGELY VISIBLE?

8   A.   I WOULD SAY 80 PERCENT OF THE TIME, YES.

9   Q.   AND DID YOU AND THE DEFENDANT SPECIFICALLY DISCUSS YOUR

10  BACKGROUND AS FAR AS HAVING BEEN IN PRISON, AND IN GANGS, AND

11  WHATNOT?

12  A.   YES, SIR.

13  Q.   AND DISCUSSING THESE THINGS WITH YOU, DID THE DEFENDANT

14  EVER CALL HIMSELF BY ANY OTHER NAME OTHER THAN HIS OWN?

15  A.   JGJ IS THE INITIALS HE WENT BY.

16  Q.   DID HE EVER TELL YOU WHAT JGJ STOOD FOR?

17  A.   JOHN GOTTI, JR.

18  Q.   WHO DO YOU UNDERSTAND JOHN GOTTI TO BE?

19  A.   JOHN GOTTI I UNDERSTAND TO BE A NEW YORK CRIME BOSS.

20          MR. HARBIN:   OBJECTION.

21          THE COURT:   OVERRULED.

22  BY MR. WRAY:

23  Q.   I'M SORRY.  YOUR ANSWER WAS?

24  A.   NEW YORK CRIME BOSS.

25  Q.   DID HE INVOKE THIS NAME ONLY ONCE, OR WAS IT ON MULTIPLE

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-2   Filed 07/14/06   Page 15 of 25

547

1   OCCASIONS?

2   A.   MULTIPLE OCCASIONS.   HE HAD IT WROTE ON SOME MATERIALS.

3   Q.   I'M SORRY.   WHAT?

4   A.   HE HAD THE INITIALS ENGRAVED IN SOME MATERIALS HE HAD AT

5   THE JAIL LIKE CUPS AND STUFF LIKE THAT, DRINKING CUPS.

6   Q.   DID THE DEFENDANT OFFER TO COMPENSATE YOU IN ANY WAY FOR

7   KILLING MS. ASHFORD?

8   A.   HE WOULD MAKE MY BOND, AND THEN AFTER IT WAS DONE, I

9   WOULD SHOW HIM PROOF THAT IT WAS DONE, AND I WOULD BE TOOKEN

10  CARE OF AFTER THAT EVEN MORE.

11  Q.   SO, THE MONEY THAT HE WAS GOING TO PUT UP FOR YOUR BOND,

12  THAT MONEY YOU WERE GOING TO BE ENTITLED TO KEEP?

13  A.   YES, BUT, SEE, IT WAS A CASH BOND, NOT A 10 PERCENT BOND.

14  THERE WAS NO BONDING COMPANY INVOLVED, AND AFTER ALL THE COURT

15  DATES WERE OVER, I WOULD GET THE FULL CASH AMOUNT BACK AFTER

16  THE COURT DATE WAS OVER.

17  Q.   AND WAS THERE AN ADDITIONAL DISCUSSION, DISCUSSION OF

18  ADDITIONAL MONEY FURTHER DOWN THE LINE?

19  A.   FURTHER DOWN THE LINE I WOULD SO CALLED BE TOOKEN CARE

20  OF, WOULDN'T HAVE NOTHING TO WORRY ABOUT.

21  Q.   AND JUST BASICALLY DID THE DEFENDANT DESCRIBE TO YOU ANY

22  PARTICULAR PLAN AS TO HOW THE MURDER OF MS. ASHSFORD WAS TO

23  TAKE PLACE?

24  A.   THERE WAS SEVERAL DIFFERENT OPTIONS THAT WE TALKED ABOUT,

25  BUT WE CAME UP WITH ONE SOLID PLAN.   WE HAD A MAP DRAWN UP OF

548

1   IT AND EVERYTHING OF HOW IT WOULD BE DONE.

2   Q.   DID THE DEFENDANT HAVE ANY SORT OF CODE NAME OR NICKNAME

3   FOR THIS PLAN?

4   A.   PLAN A.

5   Q.   PLAN A?

6   A.   YES, SIR.

7   Q.   AND WHERE DID THE DEFENDANT ACTUALLY ASK YOU TO DO THE

8   KILLING?

9   A.   IN A PLACE CALLED THE HERB SHOP WHERE SHE SUPPOSEDLY

10  WORKED AT.

11  Q.   AND WHAT TIME OF DAY DID THE DEFENDANT SUGGEST YOU COMMIT

12  THE MURDER?

13  A.   AROUND 11:00 O'CLOCK A.M. AROUND WHEN IT FIRST OPENS IN

14  THE MORNING WHEN IT IS NOT THAT BUSY.

15  Q.   DID HE TELL YOU; THAT IS, DID THE DEFENDANT TELL YOU WHY

16  HE WANTED YOU TO COMMIT THIS MURDER AT THE SHOP AS OPPOSED TO

17  SOMEWHERE ELSE?

18  A.   BECAUSE HE DIDN'T WANT HIS KID --- YOU KNOW, SHE HAS GOT A

19  SON, AND SUPPOSEDLY HE DIDN'T WANT HIS KID TO WITNESS THE

20  MURDER OF HIS MOTHER, AND IT WOULD BE FAIRLY EASY AT THE HERB

21  SHOP, AND IT COULD ALSO LOOK LIKE A ROBBERY TOOK PLACE.

22  Q.   NOW, THIS HERB SHOP THAT YOU MENTIONED, HAVE YOU EVER

23  BEEN TO THAT SHOP?

24  A.   NOT EVER TO THIS DAY.

25  Q.   HAVE YOU EVER BEEN TO THE INTERSECTION WHERE THAT SHOP IS

PATTI ALLEN, COURT REPORTER

1  LOCATED?

2  A.   NO, SIR.

3  Q.   DID THE DEFENDANT START TO DRAW ANY SORT OF DIAGRAM TO

4  ILLUSTRATE HIS PLAN TO YOU?

5  A.   HE STARTED TO DRAW A DIAGRAM, AND THEN HE FIGURED HE

6  DIDN'T WANT HIS HANDWRITING ON ANY PAPER, SO HE BALLED IT UP

7  AND THREW IT TO THE SIDE.

8            THE COURT:  DO YOU RECALL ABOUT WHEN THAT WAS?

9            THE WITNESS:  THAT WAS AROUND THE END OF FEBRUARY,

10  TOWARDS MARCH THE 1ST.  I WOULD SAY AROUND FEBRUARY 27TH OR

11  28TH.

12  BY MR. WRAY:

13  Q.   WELL, LET ME ASK YOU THIS, MR. PLANTE, JUMPING AHEAD A

14  LITTLE BIT, DID YOU SUBSEQUENTLY AFTER HAVING THESE

15  CONVERSATIONS WITH THE DEFENDANT THAT YOU STARTED TALKING

16  ABOUT, DID YOU ATTEMPT TO CONTACT THE AUTHORITIES?

17  A.   YES, SIR.

18  Q.   AND AT THE TIME --

19            THE COURT:  JUST TELL US WHAT YOU DID.

20            THE WITNESS:  MA'AM?

21            THE COURT:  JUST TELL US WHAT YOU DID.

22            THE WITNESS:  AS FAR AS WHAT?

23            THE COURT:  CONTACTING THE AUTHORITIES.

24            THE WITNESS:  I WENT TO MY LAWYER AND TOLD HIM THE

25  SITUATION.  I HAD HIM COME VISIT ME.  I GAVE HIM ALL THE

PATTI ALLEN, COURT REPORTER

550

1   PAPERWORK AND THE DIAGRAM THAT WAS DRAWED UP OF EVERYTHING,

2   AND TOLD HIM TO CONTACT THE GOVERNMENT, AND THAT'S WHAT HE

3   DID.

4           THE COURT:   WHO IS YOUR LAWYER?

5           THE WITNESS:   JIM ANDERSON.

6           THE COURT:   AND WHEN DID YOU CONTACT HIM?

7           THE WITNESS:   I CONTACTED JIM ANDERSON ROUGHLY

8   AROUND THE 28TH OF FEBRUARY, OR THE 1ST OF MARCH.

9           THE COURT:   AND WHEN YOU CONTACTED HIM, WHAT DID YOU

10  SAY TO HIM?

11          THE WITNESS:   I TOLD HIM LOOK, I CAN'T TALK TO YOU

12  OVER THE PHONE.   I NEED YOU TO COME DOWN HERE AND VISIT YOU.

13  I HAVE STUFF I NEED TO SHOW YOU AND TALK TO YOU ABOUT, AND HE

14  DID COME AND VISIT ME LATER ON THAT AFTERNOON.

15  BY MR. WRAY:

16  Q.    AT THE TIME ON WHATEVER DAY IT WAS YOU CONTACTED YOUR

17  LAWYER IN THIS FASHION, HAD THE DIAGRAM YOU REFERRED TO A

18  MOMENT AGO IN RESPONSE TO MY QUESTION THAT THE DEFENDANT

19  BALLED UP, HAD THAT ALREADY OCCURRED?

20  A.    THAT HAD ALREADY OCCURRED, YES, SIR.

21          THE COURT:   NOW, LET ME ASK YOU THIS AT THIS POINT:

22  HOW DID THE MATTER OF MS. ASHFORD COME UP?   TELL ME WHAT

23  ACTUALLY WAS SAID.   HOW DID THAT COME UP?   WHO SAID WHAT ABOUT

24  IT?

25          THE WITNESS:   HE BROUGHT IT TO ME.   I NEVER KNEW HER

PATTI ALLEN, COURT REPORTER

551

1    BEFORE WHATSOEVER.

2           THE COURT:  WHAT WAS SAID ABOUT IT?  JUST TRY TO

3    REMEMBER WHAT WAS SAID.

4           THE WITNESS:  IN REFERENCE TO WHAT WAS SAID ABOUT

5    DOING IT, OR WHAT WAS SAID ABOUT IT HAPPENING?

6           THE COURT:  BOTH.

7           THE WITNESS:  REALLY WHAT WAS SAID WAS HE WANTED IT

8    TOOKEN CARE OF, AND, YOU KNOW, HE WOULD BOND ME OUT TO TAKE

9    CARE OF IT FOR HIM, AND I WAS BONDED OUT, AND I DID CONTACT

10   THE AUTHORITIES INSTEAD OF DOING WHAT, YOU KNOW, HE WANTED ME

11   TO DO.

12          THE COURT:  RIGHT, BUT TRY TO REMEMBER.  DO YOU

13   REMEMBER, FOR EXAMPLE, WHERE YOU ALL WERE WHEN THAT SUBJECT

14   MATTER CAME UP?

15          THE WITNESS:  WE WERE IN THE DORMITORY IN THE COBB

16   COUNTY JAIL NEAR OUR BUNKS.  YOU KNOW, IT IS SET UP WHERE IT'S

17   AN OPEN DORMITORY, BUT DOUBLE BUNK BEDS, AND THERE'S LIKE FOUR

18   BUNK BEDS ON EACH SIDE.

19          THE COURT:  JUST TELL ME HOW THE CONVERSATION WENT.

20   TRY TO REMEMBER EXACTLY WHAT WAS SAID.

21          THE WITNESS:  WHAT WAS SAID WAS JUST, YOU KNOW, GO

22   THERE IN THE MORNING WHEN SHE FIRST OPENS THE SHOP.  ACT LIKE

23   I'M AN EX FOOTBALL PLAYER.  TELL HER I'M INTERESTED IN GROWTH

24   AND DEVELOPMENT HERBS, YOU KNOW, CARRY ON A REGULAR

25   CONVERSATION LIKE YOU HAVE WITH AN EVERY DAY PERSON IN THE

1  STORE, AND THEN GO TO THE BACK.  ASK HER CAN I USE THE

2  RESTROOM, AND IN THE BACK WHERE THE RESTROOMS ARE LOCATED

3  THERE IS ALSO LIKE A MASSAGE TABLE OR SOMETHING WHERE THEY DO

4  MASSAGE THERAPY IN THE HERB SHOP.  I WAS TO, YOU KNOW, ASK HER

5  WHAT ARE THESE MASSAGE TABLES BACK HERE FOR, GET HER IN THE

6  BACK OF THE SHOP, AND WHEN I GET HER BACK THERE, I WAS

7  SUPPOSED TO BREAK HER NECK, AND THEN PUT A 15 MINUTE SIGN ON

8  THE DOOR, AND PUT HER IN AN ARMY FIELD BAG, AND CARRY HER, YOU

9  KNOW, OUT TO THE TRUNK OF THE CAR, AND TAKE HER CAR WITH ME

10  BACK TO SAVANNAH, GEORGIA, AND DROP HER BODY OFF, AND PUT HER

11  CAR IN THE ATLANTA AIRPORT, AND MAKE IT LOOK LIKE, IF

12  ANYTHING, WHEN THEY FIND OUT SHE WAS MISSING AND CAN'T FIND

13  HER, THEY FIND HER CAR IN THE AIRPORT PARKING LOT IN ATLANTA,

14  AND THEN THEY THINK SHE MIGHT HAVE JUST TOOK OFF WITH ALL THE

15  MONEY IN THE CASH REGISTER NEVER TO BE SEEN AGAIN.  THAT'S A

16  POSSIBILITY.

17         THE COURT:  WHEN THIS DISCUSSION CAME UP, WHAT WAS

18  SAID ABOUT WHAT YOU WERE GOING TO GET OUT OF THE DEAL?

19         THE WITNESS:  I WAS GOING TO GET THE THOUSAND

20  DOLLARS BACK FROM THE BOND, AND AFTER, YOU KNOW, I PROVED TO

21  HIM THAT SHE HAD BEEN TOOKEN CARE OF, WHICH I WAS SUPPOSED TO

22  BRING HER DRIVER'S LICENSE TO THE VISITATION BOOTH AT THE COBB

23  COUNTY JAIL AND SHOW HIM HER DRIVER'S LICENSE IN THE WINDOW,

24  THAT I WOULD BE COMPENSATED WITH MORE MONEY, AND I WOULDN'T

25  HAVE TO WORRY.  I WOULD HAVE A FRIEND FOR LIFE.  IN OTHER

Case 1:97-cr-00496-SDG-GGB  Document 153-2  Filed 07/14/06  Page 21 of 25

1   WORDS, I WOULD BE PUT IN ALL OTHER SORTS OF THINGS AND
2   CONNECTED.

3           THE COURT:   DID YOU HAVE ANY UNDERSTANDING OF HOW
4   MUCH MONEY YOU WOULD GET?

5           THE WITNESS:   JUST I WOULD BE REWARDED.   I DIDN'T
6   HAVE ANY IDEA EXACTLY OF THE AMOUNT, NO KNOWLEDGE OF THAT.

7           THE COURT:   GO AHEAD.

8   BY MR. WRAY:

9   Q.   IN CONNECTION WITH EXPLAINING TO YOU THE THINGS THAT YOU
10  HAVE JUST RELAYED TO JUDGE EVANS, DURING THE COURSE OF THOSE
11  DISCUSSIONS, DURING THE COURSE OF THOSE CONVERSATIONS DID THE
12  DEFENDANT DRAW A DIAGRAM OR START TO DRAW A DIAGRAM?

13  A.   YES, SIR.

14  Q.   AND IS THIS WHOLE CONVERSATION OCCURRING BEFORE YOU
15  CONTACTED YOUR LAWYER?

16  A.   YES, SIR.

17  Q.   ARE YOU POSITIVE OF THE EXACT DATE ON WHICH ALL OF THESE
18  VARIOUS THINGS HAPPENED?

19  A.   I'M NOT POSITIVE OF THE EXACT DATES, BUT IT IS AROUND THE
20  DATES I'M SAYING, NO MORE THAN A DAY OR TWO APART FROM THE
21  DATES I'M SAYING.

22  Q.   I SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS
23  GOVERNMENT'S EXHIBIT 48, AND ASK IF YOU RECOGNIZE THAT?

24  A.   THAT'S THE BALLED UP PAPER I PICKED UP AND STUCK UNDER MY
25  MATTRESS THAT HE DREW.

Case 1:97-cr-00496-SDG-GGB Document 153-2 Filed 07/14/06 Page 22 of 25

554

1  Q.   OKAY.  YOU HAVE SEEN THIS BEFORE?

2  A.   YES, SIR.

3  Q.   WHO DREW GOVERNMENT'S EXHIBIT 48?

4  A.   ROBERT MILLER.

5  Q.   AND WHAT DID HE DO WITH IT AFTER HE DREW IT?

6  A.   BALLED IT UP AND THREW IT ON THE FLOOR.

7  Q.   AND WHAT DID YOU DO?

8  A.   PICKED IT UP.

9  Q.   DID YOU SUBSEQUENTLY GIVE IT TO SOMEBODY?

10 A.   I GAVE IT TO THE UNITED STATES SECRET SERVICE.

11 Q.   AND DID YOU DO THAT WHEN YOU SPOKE WITH YOUR LAWYER, OR

12 LATER?

13 A.   LATER AFTER I WAS OUT.

14       MR. WRAY:   YOUR HONOR, WE WOULD TENDER GOVERNMENT'S

15 EXHIBIT 48.

16       MR. HARBIN:   NO OBJECTION, YOUR HONOR.

17       THE COURT:   IT'S ADMITTED.

18 BY MR. WRAY:

19 Q.   NOW, ON GOVERNMENT'S EXHIBIT 48 -- LET ME PUT THIS UP.

20 RIGHT UP HERE ARE THE CHARACTERS PH 66.  DO THOSE CHARACTERS

21 HAVE ANY PARTICULAR SIGNIFICANCE WITH RESPECT TO THIS PLAN?

22 A.   THE PHILLIPS 66 GAS STATION, THAT WOULD BE LIKE, I WOULD

23 SAY, AN OPTION OF PARKING WHILE I'M DOING WHATEVER I'M DOING.

24 THAT WOULD BE A SECOND OPTION IN PARKING.

25 Q.   NOW, YOU MENTIONED THAT THE DEFENDANT INTERRUPTED THIS

1   PARTICULAR DRAWING EXPRESSING CONCERN ABOUT HIS HANDWRITING.

2   A.  YES, SIR.

3   Q.  WAS THIS THE ONLY DIAGRAM THAT THE DEFENDANT PARTICIPATED

4   IN DRAWING IN CONNECTION WITH THIS PLAN TO MURDER MS. ASHFORD?

5   A.  THAT'S THE ONLY ONE, YES, SIR, AS FAR AS THAT GOES.

6   Q.  WELL, DID HE ALSO DRAW SOME LINES ON ANOTHER PLAN?

7   A.  YES, SIR.

8   Q.  I'M GOING TO SHOW WHAT YOU HAS BEEN MARKED FOR

9   IDENTIFICATION AS GOVERNMENT'S EXHIBIT 49-A, AND ASK IF YOU

10  HAVE SEEN THAT BEFORE?

11  A.  YES, SIR, I HAVE SEEN THAT BEFORE.

12  Q.  AND WHEN HAVE YOU SEEN THAT BEFORE?  WHEN IS THE FIRST

13  TIME YOU SAW IT?

14  A.  ME AND ROBERT MILLER DREW IT TOGETHER AND DISCUSSED IT

15  TOGETHER.

16  Q.  AND WAS THAT BEFORE YOU CONTACTED YOUR LAWYER?

17  A.  BEFORE I CONTACTED MY LAWYER.

18  Q.  YOU SAY YOU AND ROBERT MILLER DREW THIS TOGETHER.

19  A.  YES, SIR.

20  Q.  WHO DREW THE LINES ON IT?

21  A.  ROBERT MILLER.

22  Q.  AND WHO DREW MOST OF THE WORDS ON IT?

23  A.  I DID.

24  Q.  AND WHAT DID YOU DO WITH THIS DOCUMENT AFTER YOU RECEIVED

25  IT?

556

1  A.   I PUT IT UNDER MY MATTRESS AT THE COBB COUNTY JAIL.

2  Q.   DID YOU SUBSEQUENTLY GIVE IT TO SOMEONE?

3  A.   WHEN I WAS RELEASED.

4  Q.   WHO?

5  A.   THE UNITED STATES SECRET SERVICE.

6          MR. WRAY:   YOUR HONOR, WE WOULD TENDER GOVERNMENT'S

7  49-A.

8          MR. HARBIN:   NO OBJECTION.

9          THE COURT:   IT'S ADMITTED.

10  BY MR. WRAY:

11  Q.   I'M NOW SHOWING YOU WHAT HAS BEEN MARKED FOR

12  IDENTIFICATION AS GOVERNMENT'S EXHIBIT 49-B.   IS THIS A FAIR

13  AND ACCURATE ENLARGEMENT OF 49-A?

14  A.   YES, SIR.

15          MR. WRAY:   WE WOULD TENDER GOVERNMENT'S 49-B.

16          MR. HARBIN:   NO OBJECTION AS DEMONSTRATIVE.   I WOULD

17  OBJECT TO THE ADMISSION AS EVIDENCE.

18          THE COURT:   I'LL DEFER RULING ON IT, BUT YOU MAY

19  PROCEED.

20          MR. WRAY:   THANK YOU.   LET ME JUST GET THIS EASEL.

21          THE COURT:   BEFORE YOU GET STARTED, JUST TURN IT

22  AROUND SO I CAN SEE IT.

23          MR. WRAY:   OH, SURE.

24          THE COURT:   ALL RIGHT.   GO AHEAD.

25  BY MR. WRAY:



                PATTI ALLEN, COURT REPORTER

557

1   Q.   IF YOUR HONOR WOULD LIKE, I COULD ALSO PUT THE SMALLER
2   ONE ON THE DOCUMENT CAMERA, AND THEN YOU WOULD BE ABLE TO SEE.
3            THE COURT:   THAT WOULD BE HELPFUL.
4            MR. WRAY:   OKAY.
5   BY MR. WRAY:
6   Q.   MR. PLANTE, CAN YOU SEE THIS FROM WHERE YOU ARE SITTING?
7   A.   NOT REAL GOOD.   A LITTLE BIT.
8   Q.   HOW ABOUT NOW?
9   A.   I CAN SEE IT.
10  Q.   THIS IS A POINTER.   YOU CAN SQUEEZE IT, AND IT MAKES A
11  LITTLE RED DOT.
12           MR. WRAY:   MAYBE IT WOULD EASIER -- MAY THE WITNESS
13  STEP DOWN, AND WE CAN USE THE MICROPHONE?
14           THE COURT:   IF HE SPEAKS DIRECTLY INTO THE
15  MICROPHONE, IT WILL WORK.   YOU MAY DO THAT.
16           MR. WRAY:   THANK YOU, YOUR HONOR.
17  BY MR. WRAY:
18  Q.   WHY DON'T YOU STEP RIGHT UP CLOSE TO IT.   CAN YOU JUST
19  SAY SOMETHING FOR A SECOND?
20  A.   TESTING, TESTING.
21  Q.   OKAY.   ALL RIGHT.   NOW, MR. PLANTE, WHO DREW AGAIN THE
22  LINES ON THIS DIAGRAM, THE LONG HORIZONTAL AND VERTICAL LINES?
23  A.   ROBERT MILLER.
24  Q.   AND WHAT DOES THIS DIAGRAM PURPORT TO BE A MAP OF?
25  A.   THIS IS SUPPOSED TO BE THE WHOLE LAYOUT OF THE HERB SHOP

PATTI ALLEN, COURT REPORTER