1  AND THE SURROUNDING SHOPS AROUND THE HERB SHOP.

2  Q.  AND HAVE YOU EVER BEEN TO THIS INTERSECTION?

3  A.  NO, SIR.

4  Q.  WHO WROTE IN THE NAMES IN THE VARIOUS BLOCKS?

5  A.  I DID, SIR.

6  Q.  AND WHO ASKED YOU TO WRITE THOSE NAMES IN?

7  A.  ROBERT MILLER.

8  Q.  DID HE TELL YOU WHY YOU WERE TO WRITE THOSE NAMES IN?

9  A.  HE DIDN'T WANT HIS HANDWRITING ON ANYTHING.

10  Q.  NOW, YOU SAID YOU HAVE NEVER BEEN TO THIS SHOP OR THIS

11  VICINITY.  HOW DID THE DEFENDANT TELL YOU THAT YOU WERE

12  SUPPOSED TO BE ABLE TO SURVEY OR SCOPE OUT THE SCENE?

13  A.  WELL, HE WAS GOING TO HAVE A FRIEND OF HIS OR SOMEBODY

14  TAKE ME TO THE LANDMARK DINER, WHICH IS UP HERE IN THE CORNER,

15  AND I WAS SUPPOSED TO BE ABLE TO SEE EVERYTHING FROM THE

16  LANDMARK DINER.  SO, I WAS SUPPOSED TO TELL HIS FRIEND I WAS

17  GOING TO MEET A FRIEND AT THE LANDMARK DINER, AND I WAS TO

18  LOOK ACROSS THE STREET AND SEE THE LAYOUT FROM THE LANDMARK

19  DINER.

20  Q.  WOULD YOU POINT OUT WHERE THE LANDMARK DINER IS?

21  A.  THE RIGHT-HAND CORNER.

22  Q.  THE UPPER RIGHT-HAND CORNER.  NOW, WHAT WERE YOU SUPPOSED

23  TO DO FROM THE LANDMARK DINER?

24  A.  JUST SUPPOSED TO LOOK AT EVERYTHING, GET A BASIC LAYOUT,

25  AND BE FAMILIAR WITH THE LAYOUT ACROSS THE STREET FROM THE

559

1   LANDMARK DINER.

2   Q.   DID THE DEFENDANT GIVE YOU INSTRUCTIONS ABOUT WHAT TO

3   TELL THE PERSON, WHOEVER IT TURNED OUT TO BE, WHO DROVE YOU TO

4   THE DINER?

5   A.   THAT I WAS JUST TO MEET A FRIEND IN THE LANDMARK DINER

6   FOR A FEW MINUTES, AND TO WAIT OUTSIDE FOR ME A FEW MINUTES,

7   AND I WOULD BE OUT IN A MINUTE.

8   Q.   THAT'S WHAT THE DEFENDANT TOLD YOU TO SAY?

9   A.   YES, SIR.

10  Q.   NOW, WHAT, IF ANYTHING, DID THE DEFENDANT TELL YOU TO DO

11  ONCE YOU ACTUALLY GOT CLOSER TO THE SCENE OF THE HERB SHOP

12  ITSELF?

13  A.   OKAY.  I WAS SUPPOSED TO WALK AROUND DIFFERENT STORES

14  LIKE THE MUSIC STORE, THE CAFE, GO IN THERE AND EAT SOMETHING,

15  AND THAT WAY I WON'T LOOK OBVIOUS GOING STRAIGHT TO THE HERB

16  SHOP.  JUST WALK AROUND, GO SHOPPING, AND MY LAST STOP WOULD

17  BE GOING INTO THE HERB SHOP.

18  Q.   NOW, THAT MUSIC STORE YOU MENTIONED, CAN YOU POINT OUT

19  WHERE THAT IS IN RELATION TO THE HERB SHOP?

20  A.   THAT'S RIGHT HERE TWO DOORS DOWN FROM THE HERB SHOP ON

21  THE DIAGRAM.

22  Q.   HAVE YOU EVER BEEN TO THAT MUSIC STORE?

23  A.   NO, SIR.

24  Q.   AND YOU SAID YOU WERE TO GO TO A CAFE.  CAN YOU INDICATE

25  WHERE THE CAFE IS?

1    A.    RIGHT HERE NEXT TO THE HERB SHOP.

2    Q.    HAVE YOU EVER EATEN IN THAT CAFE?

3    A.    NO, SIR.

4    Q.    DID THE DEFENDANT TELL YOU HOW YOU WERE GOING TO BE ABLE

5    TO RECOGNIZE MS. ASHFORD ONCE YOU GOT IN THE SHOP?

6    A.    YES, SIR.    IF YOU LOOK AT THE TOP IN THE LEFT-HAND CORNER

7    OF THE DIAGRAM, HE GAVE ME A DESCRIPTION OF HER RIGHT HERE.

8    Q.    AND HOW DID THE DEFENDANT DESCRIBE MS. ASHFORD TO YOU?

9    A.    HE DESCRIBED HER RIGHT HERE AS SHORT, DARK HAIR, NARROW

10    ORIENTAL EYES, FIVE-SIX, PETITE.    HE SAID I WOULDN'T BE ABLE

11    TO MISS HER BECAUSE OF HER EYES, AND HEIGHT, AND WEIGHT.

12    Q.    DID HE INDICATE WHETHER THERE WAS LIKELY TO BE ANYBODY

13    ELSE IN THE SHOP?

14    A.    NOT TO HIS KNOWLEDGE.    SHE WOULD BE THE ONLY ONE IN THE

15    SHOP.

16    Q.    NOW, HAVE YOU EVER SEEN A PHOTOGRAPH OF MS. ASHFORD?

17    A.    NO, SIR.

18    Q.    WHAT, IF ANYTHING, DID THE DEFENDANT TELL YOU TO SAY TO

19    MS. ASHFORD ONCE YOU GOT INSIDE THE SHOP?

20    A.    I WOULD GO IN THERE, POSE AS AN EX-FOOTBALL PLAYER THAT

21    USED TO PLAY WITH THE CHICAGO BEARS, AND TELL HER I WANTED TO

22    GET BACK INTO FOOTBALL, AND I WANTED SOME GROWTH AND

23    DEVELOPMENT HERBS.

24    Q.    AND WHAT DID THE DEFENDANT TELL YOU TO DO AFTER YOU HAD

25    GIVEN HER THIS BUSINESS ABOUT BEING AN EX-FOOTBALL PLAYER?

1  A.   ASK TO USE THE RESTROOM.  IT WAS LOCATED IN THE BACK OF
2  THE HERB SHOP SUPPOSEDLY, AND WHEN I WOULD GET BACK FROM THE
3  RESTROOM, I WAS SUPPOSED TO NOTICE THE MASSAGE TABLE IN THE
4  BACK, AND ASK HER WHAT ARE THEY FOR, AND ASK HER COULD SHE
5  SHOW ME THE BACK OF THE STORE WHERE THE MASSAGES TAKE PLACE.
6  Q.   DID THE DEFENDANT TELL YOU WHY YOU WERE TO GO THROUGH
7  THIS EXERCISE OF GOING TO THE BATHROOM, AND LOOK AT THE
8  MASSAGE TABLE IN THE BACK OF THE SHOP?
9  A.   TO TRY TO GET HER INTO THE BACK OF THE STORE WHERE
10 ANYBODY PASSING BY COULDN'T SEE WHAT WAS GOING ON IF THEY WERE
11 LOOKING IN THE WINDOW.
12 Q.   DID THE DEFENDANT INDICATE TO YOU THAT YOU WOULD BE
13 BLOCKED FROM VIEW IN THE BACK OF THE SHOP?
14 A.   YES, SIR.
15 Q.   NOW, ONCE YOU WERE IN THE BACK OF THE SHOP WITH
16 MS. ASHFORD, WHAT DID THE DEFENDANT WANT YOU TO DO TO
17 MS. ASHFORD?
18 A.   THERE WAS TALK ABOUT USING A GUN, AND TALK ABOUT USING A
19 KNIFE, BUT IT WOULD BE TOO MESSY, SO HE CAME UP WITH JUST
20 BREAKING HER NECK.  HE SAID SHE DOESN'T WEIGH ANYTHING.  I
21 LOOK LIKE I'M STRONG ENOUGH TO DO IT.  IT SHOULD BE NO
22 PROBLEM.
23 Q.   AND WHAT, IF ANYTHING, DID THE DEFENDANT TELL YOU TO DO
24 WITH MS. ASHFORD'S BODY AFTER YOU HAD SNAPPED HER NECK?
25 A.   GO TO A SURPLUS STORE BEFORE I WAS TO GO TO THE HERB

1    SHOP, AND GET AN ARMY FIELD BAG, WHICH IS A BIG GREEN DUFFEL
2    BAG THAT THE MILITARY USES IN THE FIELD.  THAT SHOULD BE BIG
3    ENOUGH TO HOLD HER BODY INSIDE.  I WAS SUPPOSED TO PUT HER
4    INTO THAT, AND TAKE HER OUTSIDE DOWN THIS CATWALK RIGHT HERE
5    WHERE IT SAYS CATWALK AROUND THE HERB SHOP, GO THROUGH RIGHT
6    HERE, AND IT COMES, I THINK, TO AN OFFICE BUILDING THAT GOES
7    TO THIS APARTMENT COMPLEX THAT IS LOCATED IN THE BUILDING AT
8    THE BOTTOM.  I WAS SUPPOSED TO PARK IN THIS PARKING LOT OF THE
9    APARTMENT COMPLEX.

10              I WAS TO WALK OUT THE BACK DOOR.  THE CATWALK IS
11   LIKE THE SHIPPING AND DELIVERY ENTRANCE.  IT IS NOT REAL BIG,
12   NO CARS OR ANYTHING.  SO, HE EXPLAINED TO ME I WOULD WALK
13   THROUGH THERE WITH THE DUFFEL BAG ON MY SHOULDER LIKE IT WAS A
14   NORMAL DAY, AND GO TO THE CAR AND PUT HER IN THE TRUNK.
15   Q.   ONCE YOU HAD PUT THE BODY IN THE TRUNK, WHAT DID THE
16   DEFENDANT SAY YOU WERE TO DO WITH IT NEXT?
17   A.   TAKE IT BACK TO THE HOTEL ON 285 AND ROSWELL AT A HOTEL I
18   WAS SUPPOSED TO BE STAYING IN BY THEN.  ONCE I TOOK IT BACK
19   THERE, I WAS SUPPOSED TO GET A FRIEND OF HIS TO DRIVE ME BACK
20   TO THE HERB SHOP AND PICK HER CAR UP, WHICH IS SUPPOSED TO BE
21   A RED VOLKSWAGEN TO MY KNOWLEDGE.  I'M NOT SURE OF THE YEAR,
22   BUT HE SAID IT WOULD BE A RED VOLKSWAGEN, AND I WOULD HAVE HER
23   KEYS AND EVERYTHING BECAUSE SUPPOSEDLY SHE IS DEAD IN MY
24   TRUNK.

25              SO, I'M SUPPOSED TO GO GET HER CAR, TAKE IT BACK TO

1   THE HOTEL, AND THEN TRANSFER THE BODY FROM ONE TRUNK TO THE
2   OTHER, AND THEN DRIVE HER CAR TO SAVANNAH, GET RID OF THE
3   BODY, BRING THE CAR BACK UP HERE, AND PARK IT IN THE ATLANTA
4   AIRPORT.  THAT WAY IF SHE COMES UP MISSING, THEY NEVER FIND A
5   BODY, AND ALL THE MONEY IS GOING TO BE MISSING OUT OF THE CASH
6   REGISTER, AND SHE IS NOWHERE TO BE FOUND, AND HER CAR TURNS UP
7   AT THE ATLANTA INTERNATIONAL AIRPORT, AND THE POSSIBILITY IS
8   SHE COULD HAVE SKIPPED TOWN WITH ALL THE MONEY IN THE CASH
9   DRAWER.

10  Q.   WELL, DID THE DEFENDANT TELL YOU -- IT SEEMS LIKE A LOT
11  OF BACK AND FORTH.  DID THE DEFENDANT TELL YOU WHY NOT JUST
12  LEAVE THE BODY LYING IN THE SHOP?

13  A.   BECAUSE HE DIDN'T NEVER WANT IT TO BE FOUND.  IF THE BODY
14  IS NEVER FOUND, THEN THEY CAN NEVER CHARGE ANYBODY WITH MURDER
15  WAS HIS WORDS.

16  Q.   AND DID THE DEFENDANT TELL YOU WHY TO GO TO THIS LENGTH
17  OF SWITCHING CARS?  FOR INSTANCE, DID HE TELL YOU WHY NOT JUST
18  TAKE THE FIRST CAR ALL THE WAY TO SAVANNAH?

19  A.   BECAUSE HE WANTED HER CAR TO END UP IN THE AIRPORT
20  PARKING LOT SO THERE IS A POSSIBILITY SHE SKIPPED TOWN WITH
21  ALL THE MONEY IN THE CASH REGISTER WHEN SHE IS NOT FOUND.

22  Q.   AND DID THE DEFENDANT TELL YOU WHY YOU COULDN'T JUST PUT
23  HER BODY STRAIGHT INTO HER OWN CAR?

24  A.   BECAUSE IT WOULD BE KIND OF OBVIOUS, PEOPLE SEEING ME
25  TAKE HER CAR LIKE THAT FROM THE FRONT, WALKING OUT WITH A BIG

PATTI ALLEN, COURT REPORTER

564

1   DUFFEL BAG AND THROWING IT IN HER CAR. SO, HE WANTED ME TO
2   COME BACK AND GET HER CAR AFTER THE 15-MINUTE SIGN WAS ON THE
3   DOOR WHERE IT LOOKED LIKE THE HERB SHOP WAS CLOSED. THEN
4   SWITCH SOMEWHERE ELSE.
5   Q.   NOW, YOU MENTIONED THIS SIGN THAT YOU WERE TO PUT UP ON
6   THE DOOR.
7   A.   YES, SIR.
8   Q.   DID YOU WRITE DOWN ANYTHING ABOUT THAT SIGN?
9   A.   UP IN THE LEFT-HAND CORNER RIGHT HERE WHERE IT SAYS SIGN
10  OUT, THAT'S JUST A SMALL NOTE FOR ME TO REMEMBER THAT, AND
11  THAT'S A 15-MINUTE SIGN SAYING SHE IS OUT FOR 15 MINUTES SO
12  THAT IF ANYBODY COMES BY THERE AND SEES THE SIGN, THEY WILL
13  KEEP ON GOING.
14  Q.   NOW, ON THE MAP THERE ARE ALSO SOME DOTS --
15  A.   YES, SIR.
16  Q.   -- ON THE LOWER HALF OR LOWER THIRD OF THE MAP AROUND
17  WHERE THE CATWALK IS. CAN YOU EXPLAIN TO THE JURY WHAT THOSE
18  DOTS REPRESENT?
19  A.   THOSE DOTS COME OUT OF THE EXIT OF THE HERB SHOP THAT
20  GOES BACK TO THE CATWALK, AND I WAS SUPPOSED TO GO DOWN THE
21  CATWALK AND THROUGH THESE BUSHES RIGHT HERE TO THE CAR. THERE
22  IS ANOTHER DOTTED LINE. IT GOES ACROSS ROSWELL ROAD, AND WAS
23  SUPPOSED TO BE AN ALTERNATIVE PARKING PLACE IF THIS WAS FULL
24  OVER HERE, IF IN THE APARTMENT COMPLEX THERE WAS NO PLACE TO
25  PARK.

PATTI ALLEN, COURT REPORTER

1   Q.   AND WHAT DID THE DEFENDANT TELL YOU WAS ACROSS ROSWELL
2   ROAD AT THIS ALTERNATIVE SITE?
3   A.   ANOTHER SHOPPING CENTER WITH A PHILLIPS 66 GAS STATION.
4   Q.   IS THAT THE SAME PHILLIPS 66 GAS STATION THAT WAS
5   REFLECTED ON THE EARLIER ROUGH MAP THAT YOU IDENTIFIED
6   EARLIER?
7   A.   YES, SIR.
8   Q.   NOW, ALSO UP AT THE TOP OF THE DIAGRAM YOU HAVE WRITTEN
9   DOWN SOME PHONE NUMBERS.
10  A.   YES, SIR.
11  Q.   AND SOME NAMES.  CAN YOU TELL US WHAT THOSE WERE SUPPOSED
12  TO BE?
13  A.   WELL, THE FIRST ONE IS JODEE, AND THAT'S A FRIEND OF HIS,
14  A GIRL THAT USED TO COME VISIT UNDER MY NAME, AND HE WOULD
15  VISIT HER GOING UNDER MY NAME, AND SHE WAS SUPPOSED TO BE ABLE
16  TO GIVE ME A RIDE TO GO WHEREVER I NEEDED TO GO.  THAT IS WHAT
17  THAT FIRST NUMBER IS.
18          THE SECOND IS HER WORK NUMBER.  IF I CAN'T GET IN
19  TOUCH WITH HER AT HOME, I CAN GET IN TOUCH WITH HER AT WORK IF
20  I NEEDED A RIDE SOMEWHERE.
21          AND THE THIRD ONE IS KATHERINE, WHO IS HIS CURRENT
22  GIRLFRIEND, WHO I USUALLY USE TO GET IN TOUCH WITH HIM ON
23  THREE-WAY CONVERSATIONS.  THAT'S THE ONLY WAY I HAD TO GET IN
24  TOUCH WITH HIM WAS THROUGH HER.
25  Q.   DID THE DEFENDANT MENTION THIS JODEE AS SOMEONE WHO MIGHT

PATTI ALLEN, COURT REPORTER

566

1   BE ABLE TO TAKE YOU TO THE LANDMARK DINER?

2   A.   YES, SIR.

3   Q.   DID HE WANT YOU --- AGAIN, IN HIS WORDS, DID THE DEFENDANT

4   TELL YOU WHETHER OR NOT YOU SHOULD TELL JODEE ANYTHING ABOUT

5   WHY YOU WERE GOING TO THE LANDMARK DINER?

6   A.   IF I TOLD HER ANYTHING ABOUT GOING TO THE LANDMARK DINER,

7   IT WOULD BE JUST TAKE ME THERE TO MEET A FRIEND.

8   Q.   NOW, OVER TO THE FAR LEFT OF THE MAP ABOUT HALFWAY DOWN,

9   THERE IS A LITTLE DIAGRAM JUST DOWN AND TO THE LEFT OF THE

10  WORDS PARKING LOT.

11  A.   RIGHT HERE?

12  Q.   YES.   CAN YOU EXPLAIN WHAT THAT IS?

13  A.   THAT'S SUPPOSED TO BE A LAYOUT OF THE BACK ROOM INSIDE

14  THE HERB SHOP.

15  Q.   WHO DREW THAT?

16  A.   ROBERT MILLER.

17  Q.   CAN YOU EXPLAIN HOW IT CAME ABOUT THAT HE DREW THE BACK

18  ROOM OF THE HERB SHOP ALL THE WAY OVER THERE?

19  A.   I HAVE NO IDEA.   I GUESS THAT WAS JUST THE FIRST

20  AVAILABLE SPACE HE CHOSE.

21  Q.   WELL, THERE IS ANOTHER DIAGRAM OF THE HERB SHOP RIGHT

22  WHERE YOU SAY IT IS LOCATED.   DID YOU DRAW THAT ONE?

23  A.   YES, I DREW THAT ONE.

24  Q.   AND DID THE DEFENDANT TELL YOU WHETHER OR NOT YOU HAD

25  DONE A GOOD JOB OF DRAWING THAT PART?

PATTI ALLEN, COURT REPORTER

1   A.   FAIRLY.   IT WAS ALL RIGHT IN OTHER WORDS.

2   Q.   DID DID THE DEFENDANT TELL YOU WHAT SORT OF CAR -- I'M

3   NOT SURE IF YOU ANSWERED THIS ALREADY -- WHAT SORT OF CAR

4   MS. ASHFORD SUPPOSEDLY DROVE?

5   A.   A LATE MODEL VOLKSWAGEN, RED.   HE DIDN'T GIVE ME A

6   SPECIFIC YEAR, JUST LATE MODEL.

7   Q.   HAVE YOU EVER SEEN MS. ASHFORD'S CAR?

8   A.   NO, SIR.

9   Q.   AND YOU MENTIONED THAT THERE WOULD BE ANOTHER CAR THAT

10   YOU WOULD USE TO TAKE THE BODY AWAY FROM THE HERB SHOP IN THE

11   FIRST INSTANCE.

12   A.   YES, SIR.

13   Q.   DID THE DEFENDANT DISCUSS WITH YOU DIFFERENT CARS YOU

14   COULD USE FOR THAT?

15   A.   HE TOLD ME A FRIEND OF HIS NAMED TZEGAI HAD AN OLD VOLVO,

16   ABOUT AN '82 OR '83 VOLVO THAT COULD POSSIBLY BE USED.

17   Q.   AND DID HE MENTION ANY POSSIBILITY OF ANY OTHER CARS FOR

18   THAT LEG OF THE TRIP?

19   A.   HE ALSO MENTIONED THE POSSIBILITY OF A FRIEND OF MINE

20   THAT LIVES IN ROME, GEORGIA NAMED RUBEN THAT COULD GIVE ME A

21   1986 CUTLAS, AND WRITE OFF THE BOND MONEY TO HIM OF $1,000.

22   Q.   I SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS

23   GOVERNMENT'S EXHIBIT 56.

24        I THINK NOW YOU CAN GO AHEAD AND STEP BACK UP TO THE

25   WITNESS STAND.


PATTI ALLEN, COURT REPORTER

568

1              THE COURT:  ARE YOU THROUGH WITH THAT?

2              MR. WRAY:  YES, YOUR HONOR.

3    BY MR. WRAY:

4    Q.   I'M SHOWING YOU GOVERNMENT'S EXHIBIT 56 MARKED FOR

5    IDENTIFICATION, AND ASK IF YOU HAVE SEEN THAT DOCUMENT BEFORE?

6    A.   YES, SIR.

7    Q.   WHO WROTE THAT DOCUMENT?

8    A.   ROBERT MILLER.

9    Q.   AND DID YOU GET IT FROM HIM?

10   A.   YES, SIR.  I WAS SUPPOSED TO TAKE THAT TO MY FRIEND IN

11   ROME WHEN I GOT THE CAR FROM HIM SAYING I WOULD GIVE HIM THE

12   BOND MONEY AS SOON AS I WENT TO COURT.

13   Q.   CAN YOU EXPLAIN HOW IT CAME ABOUT THAT YOU WERE HAVING

14   THIS CONVERSATION WITH THE DEFENDANT ABOUT A CAR FROM YOUR

15   FRIEND IN ROME?

16   A.   WELL, BASICALLY I HAD BEEN TALKING A LOT ON THE PHONE

17   THAT DAY, YOU KNOW, AND HE ASKED ME WHO I WAS TALKING TO.  SO,

18   I TOLD HIM A FRIEND OF MINE IN ROME, GEORGIA.

19              AND HE SAID WHO?

20              AND I SAID RUBEN, AND I SAID HE HAS A CAR LOT UP

21   THERE IN ROME.

22              AND HE GOT ON THE PHONE AND STARTED TALKING, AND

23   THEY CAME UP WITH THE IDEA ABOUT A CAR FOR $1,000, AND RUBEN

24   SAID HE WANTED $1,000 CASH UP FRONT.  HE WASN'T INTERESTED IN

25   WAITING ON THE BOND MONEY.

PATTI ALLEN, COURT REPORTER

569

1        THE COURT:  WHEN WAS THE DATE HE TALKED TO THIS

2   INDIVIDUAL?

3        THE WITNESS:  NOT TO BE PRECISE ON THE DATE, BUT

4   IT'S PROBABLY AROUND MARCH 2ND, MARCH 1ST OR 2ND, OR IT MIGHT

5   EVEN HAVE BEEN THE 3RD, ABOUT THREE OR FOUR DAYS BEFORE I GOT

6   OUT.

7   BY MR. WRAY:

8   Q.  WELL, WHO WERE YOU TALKING TO WHEN YOU SAID YOU WERE

9   TALKING A LOT ON THE PHONE?

10  A.  I WAS TALKING TO MY LAWYER, AND I WAS TALKING TO THE

11  SECRET SERVICE.  THAT'S WHY I SAID IT HAD TO BE AROUND THE

12  3RD, ABOUT THREE OR FOUR DAYS BEFORE I GOT OUT.

13  Q.  AND DID YOU WANT THE DEFENDANT TO KNOW YOU HAD BEEN

14  TALKING TO YOUR LAWYER AND THE SECRET SERVICE?

15  A.  NO.  THAT'S WHY I SAID I WAS TALKING TO RUBEN.

16  Q.  AND COULD YOU HEAR THE DEFENDANT'S PORTION OF THE PHONE

17  CONVERSATION WITH THIS RUBEN?

18  A.  YES, SIR.

19  Q.  DID THE DEFENDANT SAY ANYTHING TO HIM ABOUT WHAT THIS CAR

20  WAS GOING TO BE USED FOR?

21  A.  HE TOLD HIM I WAS A FRIEND THAT WAS GOING TO BE GETTING

22  BONDED OUT, AND THAT I WOULD BE WORKING FOR HIM IN LIKE A

23  CONSTRUCTION COMPANY HERE IN ATLANTA, AND I NEEDED A CAR TO

24  GET BACK AND FORTH TO WORK.

25  Q.  AND WERE YOU GOING TO BE WORKING AS A CONSTRUCTION WORKER

1    FOR THE DEFENDANT?

2    A.    NO, SIR.

3    Q.    WHAT WERE YOU GOING TO BE DOING FOR THE DEFENDANT?

4    A.    ODD JOBS, MURDER.

5            THE COURT:  SO, YOU ARE SAYING THAT THERE WAS A

6    PARTICULAR DATE WHEN THE DEFENDANT SPOKE ON THE PHONE TO THIS

7    INDIVIDUAL NAMED RUBEN?

8            THE WITNESS:  YES, MA'AM.

9            THE COURT:  AND WHAT WAS THAT DATE?

10           THE WITNESS:  I'M THINKING IT'S AROUND THE 3RD OR

11   4TH OF MARCH.  IT WAS RIGHT BEFORE I GOT OUT OF JAIL ON THE

12   6TH.  I WOULD SAY THREE OR FOUR DAYS BEFORE I GOT OUT.  I

13   WOULD PLACE IT ANYWHERE FROM THE 2ND TO THE 4TH OF MARCH,

14   1998.

15   BY MR. WRAY:

16   Q.    DID YOU RECEIVE THIS DOCUMENT, GOVERNMENT'S EXHIBIT 56,

17   FROM THE DEFENDANT?

18   A.    YES, SIR.

19   Q.    DID YOU SEE HIM WRITE IT?

20   A.    YES, SIR.

21   Q.    WHAT DID YOU DO WITH IT AFTER YOU GOT IT FROM HIM?

22   A.    KEPT IT, PUT IT UNDER MY MATTRESS UNTIL I WAS RELEASED,

23   AND WHEN I WAS RELEASED, I TURNED IT OVER TO THE UNITED STATES

24   SECRET SERVICE.

25           MR. WRAY:  YOUR HONOR, WE WOULD TENDER GOVERNMENT'S

PATTI ALLEN, COURT REPORTER

571

1    EXHIBIT 56.

2              MR. HARBIN:  NO OBJECTION, YOUR HONOR.

3              THE COURT:  IT'S ADMITTED.

4    BY MR. WRAY:

5    Q.   NOW, IF YOU COULD JUST CLARIFY, WHAT WAS GOVERNMENT'S

6    EXHIBIT 56 SUPPOSED TO ACCOMPLISH ACCORDING TO THE DEFENDANT?

7    A.   THAT WAS SUPPOSED TO ACCOMPLISH GETTING A CAR.  THE

8    THOUSAND DOLLARS WOULD BE TURNED OVER AS SOON AS I WAS THROUGH

9    WITH MY MAGISTRATE COURT TO RUBEN.  LATER IT WOULDN'T REALLY

10   GET TURNED OVER TO HIM, BUT THAT WAS TO MAKE HIM THINK IT WAS

11   GOING TO GET TURNED OVER TO HIM.

12   Q.   AND YOU SAID YOU CALLED THIS RUBEN BACK AFTERWARDS?

13   A.   AND TOLD HIM DON'T WORRY ABOUT IT.

14   Q.   AND WHY DID YOU TELL HIM THAT?

15   A.   BECAUSE I KIND OF TOLD HIM REAL QUICK LIKE THAT I WAS

16   JUST, YOU KNOW, LETTING THE GUY TALK TO SOMEBODY BECAUSE HE

17   WANTED TO TALK TO SOMEBODY.  I SAID I DON'T WANT NO CAR.  I

18   DON'T THINK I WANT NO CAR.

19   Q.   DID YOU WANT THIS RUBEN -- IS RUBEN A FRIEND OF YOURS?

20   A.   HE'S NOT A REAL GOOD FRIEND OF MINE, BUT HE IS MORE OR

21   LESS A FRIEND OF MY FUTURE WIFE, FIANCE.  I MET HIM THROUGH

22   HER.

23   Q.   AND DID YOU WANT TO GET THIS RUBEN FELLOW INVOLVED IN ALL

24   THIS?

25   A.   NO, SIR.  THAT'S WHY I CALLED HIM BACK AND TOLD HIM DON'T

572

1  WORRY ABOUT IT.

2  Q.  NOW, DID THE DEFENDANT TELL YOU ANY PARTICULAR WAY YOU

3  WERE TO CONFIRM TO HIM THAT YOU HAD, IN FACT, MURDERED

4  JENNIFER ASHSFORD?

5  A.  OKAY.  I HAD AN OUT-OF-STATE FLORIDA DRIVER'S LICENSE, SO

6  THE COBB COUNTY JAIL DOESN'T HAVE SPECIFIC VISITATION RULES.

7  YOU DON'T HAVE TO BE ON A LIST OR ANYTHING.  I CAN JUST WALK

8  UP THERE RIGHT NOW WITH AN OUT-OF-STATE I.D. AND VISIT ANYBODY

9  IN THAT JAIL BECAUSE I'VE GOT OUT-OF-STATE I.D.  THERE IS NO

10 SPECIFIC TIME FOR ME.  SO, HE KNEW I WOULDN'T HAVE NO PROBLEM

11 GETTING IN THE JAIL TO VISIT HIM.

12      SO, WHAT I WAS TO DO WAS BRING HER I.D., HER

13 DRIVER'S LICENSE, AND SHOW IT TO HIM THROUGH THE VISITATION

14 WINDOW, AND THAT WAY HE WOULD KNOW I DID WHAT I HAD TO DO,

15 BECAUSE I HAD NO OTHER WAY TO GET HER DRIVER'S LICENSE BUT TO

16 DO WHAT I HAD TO DO, AND THAT WOULD BE TO KILL HER.

17 Q.  AND DID THE DEFENDANT TELL YOU WHY HE WANTED YOU TO

18 DEMONSTRATE THIS BY SHOWING HIM THE DRIVER'S LICENSE RATHER

19 THAN SAYING SOMETHING VERBALLY THERE AT THE COBB COUNTY JAIL?

20 A.  HE WAS IN FEAR THAT THEY WAS RECORDING EVERY CONVERSATION

21 THROUGH THE TELEPHONES AT THE VISITATION BOOTH IN THE COBB

22 COUNTY JAIL.

23 Q.  NOW, WHEN THE DEFENDANT FIRST ASKED YOU TO COMMIT THIS

24 MURDER, WHAT WAS YOUR RESPONSE INITIALLY?

25 A.  MY RESPONSE WAS I THOUGHT HARD ABOUT IT IN MY MIND, BUT I

PATTI ALLEN, COURT REPORTER

573

1   DECIDED I'M TRYING TO TURN MY LIFE AROUND AND GO A DIFFERENT

2   DIRECTION NOW.  I GOT KIDS ON THE WAY I NEED TO TAKE CARE OF,

3   AND THAT'S NOT FOR ME.

4            THE COURT:  WHAT WAS THAT DATE?

5            THE WITNESS:  THAT DATE WAS ABOUT -- I CAN'T GIVE

6   YOU AN EXACT DATE, MA'AM, BUT IT WAS AROUND THE MIDDLE OF

7   FEBRUARY, TOWARDS THE END OF FEBRUARY WHEN HE APPROACHED ME

8   ABOUT IT.

9   BY MR. WRAY:

10  Q.   YOU SAID YOU WERE SERIOUSLY CONSIDERING DOING IT.  WHY?

11  A.   BECAUSE I AM IN NEED OF MONEY.  I'M NOT FINANCIALLY

12  STABLE.  I WASN'T AT THE TIME FINANCIALLY STABLE, AND DIDN'T

13  HAVE ANYTHING GOING FOR MYSELF.

14  Q.   WHY DID YOU CHANGE YOUR MIND?

15  A.   BECAUSE I THOUGHT ABOUT, YOU KNOW, MY GIRLFRIEND AND MY

16  KIDS, YOU KNOW, HOW MY KIDS LOVE THEIR MOTHER, AND I COULDN'T

17  JUST PICTURE THEM BEING WITHOUT THEIR MOTHER, AND I KNOW THE

18  GIRL HE WANTED KILLED HAS A SON, AND WHAT IS THE SON GOING TO

19  DO IF HE IS IN JAIL AND SHE IS DEAD?  I DIDN'T WANT TO SEE MY

20  KID IN THAT SITUATION.  THAT'S ONE THING I THOUGHT ABOUT, AND

21  THE OTHER THING WAS TURNING MY LIFE AROUND AND GOING POSITIVE,

22  GETTING OUT OF NEGATIVE ACTIVITY BECAUSE I BEEN THERE MOST OF

23  MY LIFE, AND I DIDN'T WANT TO BE BACK IN PRISON AGAIN.

24  Q.   DID IT REFLECT IN YOUR MIND THAT IT WOULD REFLECT

25  FAVORABLY ON YOU WITH THE GOVERNMENT?

PATTI ALLEN, COURT REPORTER

574

1  A.    THAT WAS PART OF IT, BUT THAT WASN'T THE MAIN INCENTIVE.
2  THE MAIN INCENTIVE WAS BEING THERE FOR MY CHILDREN.
3          THE COURT:  DID YOU SAY JUST A MINUTE AGO THAT WHEN
4  YOU WERE FIRST APPROACHED, YOU DIDN'T WANT TO DO IT?
5          THE WITNESS:  NO, I THOUGHT ABOUT DOING IT WHEN I
6  WAS FIRST APPROACHED.
7          THE COURT:  YOU DID THINK ABOUT DOING IT WHEN YOU
8  WERE FIRST APPROACHED?
9          THE WITNESS:  YES.
10         THE COURT:  AND YOU THINK YOU WERE FIRST APPROACHED
11  SOMEWHERE BETWEEN THE MIDDLE AND THE END OF FEBRUARY?
12         THE WITNESS:  ABOUT HIS EX-WIFE, JENNIFER.  THE
13  OTHER ONE WAS AROUND DECEMBER WHEN I WAS APPROACHED ABOUT HER
14  FAMILY, KATHERINE'S FAMILY, BUT THAT WASN'T NO IMMEDIATE THING
15  HE WANTED DONE.
16         THE COURT:  THE TIME WHEN YOU WERE FIRST APPROACHED,
17  HOW DID THE CONVERSATION GO?
18         THE WITNESS:  HOW WOULD YOU FEEL ABOUT TAKING CARE
19  OF SOME BUSINESS FOR ME IF I GET YOU OUT OF HERE?
20         I SAID WHAT KIND OF BUSINESS ARE YOU TALKING ABOUT?
21         HE SAID, YOU KNOW, THAT JENNIFER IS THE ONLY WITNESS
22  I GOT AGAINST ME IN THIS FEDERAL CASE, COUNTERFEIT.  IF I CAN
23  GET HER TOOKEN CARE OF, AND GET THIS DROPPED, WE WILL BE ON
24  THE STREET, AND WE WILL GET STUFF CRUNK UP.  HE WAS LIKE ON AN
25  ORGANIZATION THING.  ONCE I DID THIS, I GOT A FRIEND FOR LIFE

PATTI ALLEN, COURT REPORTER

1    IS WHAT HE TOLD ME.  I WOULD HAVE NOTHING ELSE TO WORRY ABOUT.

2            THE COURT:  AND ON THAT PARTICULAR DATE WHEN YOU

3    WERE FIRST APPROACHED, WHAT DID YOU SAY?

4            THE WITNESS:  I SAID YEAH, NO PROBLEM, LET'S DO IT.

5    BY MR. WRAY:

6    Q.    WHEN YOU CHANGED YOUR MIND --

7    A.    WHEN DID I?

8    Q.    WELL, OKAY, LET'S START WITH WHEN DID YOU CHANGE YOUR

9    MIND?

10   A.    I THOUGHT ABOUT IT REAL HARD THAT NIGHT, AND THAT NIGHT I

11   CHANGED MY MIND, AND THE NEXT DAY I CONTACTED MY LAWYER.  I

12   LAID IN THE BED ALL NIGHT THINKING ABOUT IT FROM ABOUT 4:00

13   O'CLOCK TO MIDNIGHT.  I MADE A COPY OF EVERYTHING ON PAPER AND

14   GAVE IT TO MY LAWYER THE NEXT DAY.  I DIDN'T WANT TO GIVE MY

15   LAWYER THE ORIGINALS FOR THE SIMPLE FACT HE WOULD WONDER WHERE

16   THE ORIGINALS WENT TO IF HE EVER WANTED TO SEE THEM AGAIN.

17   SO, I MADE COPIES AND TURNED THEM OVER TO MY LAWYER SO THE

18   ORIGINAL COPIES WOULDN'T BE MISSING, AND HE WOULD BE WONDERING

19   WHERE THEY WERE AT.

20   Q.    AND AS A RESULT OF TURNING OVER THOSE COPIES OF THE MAP,

21   AND WHEN YOU SAY THE COPIES, WHAT DID YOU COPY?

22   A.    I COPIED THE WHOLE LAYOUT OF THAT MAP THERE.  I WROTE

23   EVERYTHING DOWN IN DETAIL OF HOW HE WANTED IT DONE ON BOTH

24   SIDES OF THE PAPER, AND I ALSO DREW A LAYOUT OF THE BACK ROOM

25   IN THE HERB SHOP, BASICALLY EVERYTHING WE DREW TOGETHER, BUT A

576

1   SMALLER VERSION.

2   Q.   AND YOU GAVE THOSE TO YOUR LAWYER?

3   A.   I GAVE THOSE TO MY LAWYER.

4   Q.   AND AS A RESULT OF TURNING THOSE THINGS OVER TO YOUR

5   LAWYER, DID YOU END UP MEETING WITH ANYBODY IN PARTICULAR?

6   A.   IT WAS A DAY LATER I MET WITH THE UNITED STATES SECRET

7   SERVICE.

8   Q.   TELL ME AGAIN WHY YOU DIDN'T JUST TURN OVER THE ORIGINAL?

9   A.   BECAUSE IF I WOULD HAVE TURNED OVER THE ORIGINAL, ROBERT

10  MILLER WOULD HAVE WONDERED WHAT DID YOU DO WITH IT?  WHERE IS

11  IT AT?  WHAT AM I GOING TO SAY, I THREW IT OUT?  HE MIGHT

12  START THINKING THINGS ABOUT ME IF STUFF STARTS DISAPPEARING.

13          SO, I LEFT IT UNDER THE MATTRESS WHERE WE PUT IT

14  BECAUSE, YOU KNOW, I DIDN'T KNOW I WAS GOING TO BE GETTING OUT

15  SOON, OR LATER, THE NEXT YEAR, THE NEXT DAY, THE NEXT MONTH.

16  SO, YOU KNOW, IT'S POSSIBLE WE WOULD LOOK OVER THOSE SAME

17  DIAGRAMS AGAIN BEFORE I WAS RELEASED.  SO, I WANTED TO HOLD

18  ONTO THE ORIGINALS.

19  Q.   NOW, YOU SAID THAT THE DEFENDANT HAD OFFERED TO PAY TO

20  GET YOU BONDED OUT OF JAIL.

21  A.   YES, SIR, IF MY BOND COULD BE LOWERED.  MY BOND WAS AT

22  $16,000.  IF IT COULD BE LOWERED TO $5,000 OR UNDER, HE SAID

23  HE COULD GET ME OUT.

24  Q.   AND IS THERE A DIFFERENCE BETWEEN A PERCENT BOND AND A

25  CASH BOND?

PATTI ALLEN, COURT REPORTER

1   A.   YES, SIR.   LIKE, SAY, ON A $5,000 BOND, IF I GO THROUGH A

2   BONDING COMPANY AND PAY 10 PERCENT, I GIVE THEM $500, AND THEY

3   BOND ME OUT, YOU KNOW, WITH PROPERTY AND STUFF LIKE THAT FOR

4   THE REST OF THE $4,500.   THEY KEEP THE $500.   YOU DON'T GET

5   NOTHING BACK AT THE END OF THE COURT CASE.

6            ON A CASH BOND, YOU PAY THE FULL CASH AMOUNT.   LIKE

7   IF I HAD SOMEBODY COME IN WITH $5,000 CASH AND PUT IT UP, YOU

8   KNOW, ON MY BOND, WHEN I FINISH ALL MY COURT CASES AND

9   EVERYTHING, I GET THAT FULL CASH AMOUNT BACK BECAUSE I PUT THE

10  FULL CASH AMOUNT UP INSTEAD OF GOING THROUGH A BONDING

11  COMPANY, PLUS MY BOND WAS ALSO DEMANDED TO BE A CASH BOND.

12  THEY WOULDN'T LET ME GO THROUGH A BONDING COMPANY.

13  Q.   WERE YOU SUBSEQUENTLY BONDED OUT?

14  A.   YES, SIR.

15  Q.   AND WHO PROVIDED AT LEAST MOST OF THE MONEY THAT PAID FOR

16  YOUR BOND?

17  A.   ROBERT MILLER SUPPLIED $1,000 AND I SUPPLIED $150.   MY

18  BOND WAS A $1,150 CASH BOND.

19            THE COURT:   SO, WAS THE BOND LOWERED?

20            THE WITNESS:   IT WAS LOWERED, YES, MA'AM.

21            THE COURT:   HOW DID THAT GET DONE?

22            THE WITNESS:   THROUGH THE COBB COUNTY COURT SYSTEM.

23  MY LAWYER GOT IT LOWERED THROUGH THEM.

24            THE COURT:   WHAT IS THE DATE WHEN YOU GOT BONDED

25  OUT?

PATTI ALLEN, COURT REPORTER

578

1          THE WITNESS:  MARCH THE 6TH OF 1998.

2          THE COURT:  THAT'S THE DATE YOU ULTIMATELY LEFT?

3          THE WITNESS:  YES, MA'AM.

4   BY MR. WRAY:

5   Q.   I'M GOING TO SHOW WHAT YOU HAS BEEN MARKED FOR

6   IDENTIFICATION AS GOVERNMENT'S EXHIBITS 63, 64, AND 65, AND

7   STARTING WITH 63 ASK IF YOU HAVE SEEN GOVERNMENT'S EXHIBIT 63

8   BEFORE?

9   A.   YES, SIR.

10  Q.   WHAT DO YOU RECOGNIZE THAT TO BE?

11  A.   THIS IS WHERE I WAS BONDED OUT, AND MY CONDITIONS OF MY

12  BOND, WHAT I AM TO DO AND NOT TO DO OUT ON BOND.

13  Q.   IS THAT PAPERWORK THAT WAS GENERATED WHEN YOU GOT OUT ON

14  BOND?

15  A.   YES, SIR.

16          MR. WRAY:  YOUR HONOR, WE WOULD TENDER GOVERNMENT'S

17  EXHIBIT 63.

18          MR. HARBIN:  OBJECTION.

19          THE COURT:  IT'S ADMITTED.

20  BY MR. WRAY:

21  Q.   WHAT ABOUT GOVERNMENT'S EXHIBIT 64?

22  A.   YES, SIR, I ALSO RECOGNIZE THIS.  THIS IS JUST WHERE I

23  SIGNED FOR MY BOND, AND IT IS GIVING ME MORE CONDITIONS OF MY

24  BOND TO LET ME KNOW MY CHARGES AND EVERYTHING.

25  Q.   WAS THIS ALSO GENERATED WHEN YOU BONDED OUT?

PATTI ALLEN, COURT REPORTER

579

1    A.    YES, SIR.

2    Q.    IS THIS YOUR SIGNATURE ON THAT DOCUMENT?

3    A.    YES, SIR.

4          MR. WRAY:  WE WOULD TENDER GOVERNMENT'S 64.

5          MR. HARBIN:  NO OBJECTION.

6          THE COURT:  IT'S ADMITTED.

7          SOMEWHERE ALONG IN HERE WE NEED TO TAKE A BREAK.

8          MR. WRAY:  I THINK WE ARE ABOUT TWO MINUTES FROM A

9    GOOD STOPPING POINT, JUDGE.

10   BY MR. WRAY:

11   Q.    WHAT ABOUT GOVERNMENT'S EXHIBIT 65?

12   A.    YES, SIR, THAT IS A RECEIPT OF MY BOND SHOWING THE AMOUNT

13   I PAID, AND IT'S JUST A RECEIPT BASICALLY IS WHAT THAT IS.  I

14   RECEIVED THAT WHEN I WAS RELEASED.

15         MR. WRAY:  I WILL TENDER GOVERNMENT'S 65.  IT IS

16   JUST A RECEIPT.

17         MR. HARBIN:  NO OBJECTION.

18         THE COURT:  IT'S ADMITTED.

19   BY MR. WRAY:

20   Q.    AFTER GETTING OUT ON BOND, DID YOU SUBSEQUENTLY MAKE A

21   COURT APPEARANCE THAT THE BOND WAS FOR?

22   A.    SIR?

23   Q.    THAT WAS NOT A GOOD QUESTION.  AFTER GETTING OUT ON BOND,

24   DID YOU SUBSEQUENTLY MAKE A COURT APPEARANCE IN COBB COUNTY?

25   A.    OH, YES, SIR, I DID TAKE CARE OF THE CASE THAT I WAS

PATTI ALLEN, COURT REPORTER

580

1  BONDED OUT ON.

2  Q.  AND AT THAT APPEARANCE, DID YOU COLLECT THE CASH ON THE

3  BOND THAT YOU JUST TESTIFIED ABOUT?

4  A.  YES, SIR, AFTER THAT APPEARANCE, I COLLECTED THE THOUSAND

5  DOLLARS, AND I TURNED IT OVER TO THE UNITED STATES SECRET

6  SERVICE.  IT WAS A CHECK FOR $1,150.

7  Q.  I SHOW WHAT YOU HAS BEEN MARKED FOR IDENTIFICATION AS

8  GOVERNMENT'S EXHIBIT 66.  HAVE YOU SEEN THAT BEFORE?

9  A.  YES, SIR.

10  Q.  WHAT IS GOVERNMENT'S 66?

11  A.  THAT'S THE CHECK I RECEIVED FROM THE COURT AFTER I

12  BROUGHT THEM ALL MY PAPERWORK, AND THAT IS THE $1,150 THEY

13  GAVE ME BACK FOR SHOWING UP IN COURT.  IT WAS POSTED FOR MY

14  BOND.

15  Q.  AND WHAT IS THE DATE ON THAT CHECK?

16  A.  MAY 14TH, 1998.

17  Q.  HAS THIS CHECK BEEN CASHED?

18  A.  NO, SIR.

19         MR. WRAY:  WE WOULD TENDER GOVERNMENT'S 66.

20         MR. HARBIN:  NO OBJECTION.

21         THE COURT:  IT'S ADMITTED.

22  BY MR. WRAY:

23  Q.  ACCORDING TO YOUR DISCUSSIONS WITH THE DEFENDANT, WHO WAS

24  ENTITLED TO KEEP THE MONEY FROM THAT CHECK?

25  A.  THAT WAS MY CHECK.  IT WAS TO GO IN MY POCKET AFTER

VOL 4 - JUN 23, 1998

581

1   EVERYTHING WAS DONE, AFTER ALL THE COURT CASES WERE DONE.

2           MR. WRAY:  YOUR HONOR, I CAN BREAK HERE.  I'VE GOT

3   SOME MORE.

4           THE COURT:  LET'S STOP FOR LUNCH.  MR. PLANTE, WE

5   ARE GOING TO TAKE A BREAK FOR LUNCH.  YOU ARE INSTRUCTED NOT

6   TO DISCUSS THIS CASE OR YOUR TESTIMONY WITH ANYONE DURING THE

7   LUNCH BREAK.

8           THE WITNESS:  NO PROBLEM.

9           THE COURT:  EXCEPT FOR COUNSEL FOR EITHER SIDE OR

10  THE CASE AGENTS.  AND, MEMBERS OF THE JURY, WE WILL BE IN

11  RECESS FOR LUNCH UNTIL 1:45.

12              -- -- --

13          (COURT RECESSED FOR LUNCH)

14

15

16

17

18

19

20

21

22

23

24

25

PATTI ALLEN, COURT REPORTER