Case 1:97-cr-00496-SDG-GGB   Document 153-4   Filed 07/14/06   Page 1 of 25

582

1        (ATLANTA, FULTON COUNTY, GEORGIA, TUESDAY AFTERNOON, JUNE

2    23, 1998, IN OPEN COURT.)

3                        -- -- --

4            THE COURT:  WE ARE READY.

5            (WHEREUPON THE JURY WAS BROUGHT INTO THE COURTROOM.)

6            THE CLERK:  HAVE A SEAT IN THE WITNESS BOX, AND YOU

7    ARE REMINDED YOU ARE STILL UNDER OATH.

8                        -- -- --

9                    TROY MARTIN PLANTE

10   BEING PREVIOUSLY DULY SWORN, RESUMED THE WITNESS STAND AND

11   TESTIFIED FURTHER AS FOLLOWS:

12                DIRECT EXAMINATION (CONT'D)

13   BY MR. WRAY:

14   Q.   MR. PLANTE, BEFORE THE LUNCH BREAK YOU WERE DESCRIBING AT

15   ONE POINT WHAT THE DEFENDANT WANTED YOU TO DO INSIDE THE HERB

16   SHOP.

17   A.   YES, SIR.

18   Q.   I NEGLECTED TO ASK YOU WHAT DID THE DEFENDANT TELL YOU TO

19   DO INSIDE THE HERB SHOP AFTER YOU HAD KILLED MS. ASHFORD?

20   A.   HE EXPLAINED TO ME WHERE THE VCR CAMERA WAS INSIDE THE

21   HERB SHOP.  HE SAID NINE TIMES OUT OF TEN THEY DON'T USE IT,

22   BUT JUST IN CASE TO GRAB THE VIDEOTAPE OUT OF THE VIDEO

23   CASSETTE PLAYER, AND THEN WHEN I GOT READY TO LEAVE, TURN THE

24   BURGLAR ALARM ON AND EXIT OUT THE BACK DOOR.

25   Q.   DID HE TELL YOU WHERE THE TAPE ITSELF FROM THE

1    SURVEILLANCE CAMERA WOULD BE?

2    A.    HE SAID IT WOULD BE LOCATED IN ONE OF THE BACK ROOMS NEXT

3    TO A STEREO.   I WOULD SEE A VCR ON A TABLE.

4    Q.    NOW, I THINK THE LAST THING I ASKED YOU BEFORE WE BROKE

5    FOR LUNCH WAS ABOUT YOUR HAVING GOTTEN OUT ON BOND.  AFTER YOU

6    BONDED OUT, DID YOU GO SOMEWHERE?

7    A.    I WAS TRANSPORTED FROM THE COBB COUNTY JAIL TO A HOTEL

8    ROOM ON 285 AND ROSWELL ROAD BY JODEE, A GIRLFRIEND OF HIS

9    NAMED JODEE.

10   Q.    IS THIS ON MARCH 6TH OF '98?

11   A.    YES, SIR.

12   Q.    AND WHO TOLD YOU TO GET A RIDE WITH JODEE?

13   A.    SHY IS THE ONE THAT BROUGHT THE BOND MONEY TO THE JAIL

14   FOR HIM, AND HE TOLD ME TO WAIT ON HER, AND SHE WOULD GIVE ME

15   A RIDE TO THE HOTEL, AND SHE DID GIVE ME A RIDE.

16   Q.    I MEAN WHAT PERSON TOLD YOU TO GET A RIDE WITH JODEE?

17   A.    ROBERT MILLER.

18   Q.    NOW, SHORTLY BEFORE YOU ACTUALLY GOT OUT ON BOND, DID THE

19   DEFENDANT ASK YOU TO DO SOME OTHER THINGS FOR HIM AS WELL?

20   A.    YES, SIR.

21   Q.    WHILE YOU WERE OUT ON BOND?

22   A.    YES, SIR.

23   Q.    HOW CLOSE TO THE TIME THAT YOU GOT OUT ON BOND ON MARCH

24   6TH OF '98 DID HE BRING UP THOSE THINGS TO YOU?

25   A.    ONE OF THEM WAS A LAST MINUTE THING, AND ONE OF THEM

Case 1:97-cr-00496-SDG-GGB   Document 153-4   Filed 07/14/06   Page 3 of 25

584

1   HAPPENED ABOUT A WEEK BEFORE I WAS RELEASED.

2   Q.   OKAY.   WELL, LET'S START WITH THE ONE THAT WAS ABOUT A

3   WEEK BEFORE YOU WERE RELEASED.   WHAT WAS THAT?

4   A.   ALL RIGHT.   FOR HIM TO GET A THOUSAND DOLLARS TO BOND ME

5   OUT, HIS GIRLFRIEND, KATHERINE, WOULD HAVE TO --- SHE LEFT

6   MONEY ON HIS ACCOUNT, WHICH WAS A LITTLE BIT OVER $1,000.   SO

7   FOR HIM TO GIVE ME THAT THOUSAND DOLLARS, HE WOULD HAVE TO

8   EXPLAIN TO HER WHERE THAT MONEY WENT TO, BECAUSE SHE PUT IT

9   THERE FOR HIS LAWYER, ALL RIGHT?

10          SO, IF HE NEEDS TO ASK HER FOR MORE MONEY FOR THE

11   LAWYER, AND HE DOESN'T HAVE THAT THOUSAND DOLLARS ANYMORE, HE

12   NEEDS TO EXPLAIN WHERE IT WENT.

13          SO, I WAS SUPPOSED TO GO GET A DIAMOND RING.   HE

14   WANTED ME TO LOOK THROUGH THE ATLANTA CONSTITUTION AND FIND A

15   DIAMOND RING ANYWHERE IN THE THREE CARAT AND ABOVE RANGE, SET

16   UP A MEETING WITH THE PERSON ABOUT THE RING, TELL THEM I WANT

17   TO BRING AN APPRAISER BY, AND GO OUT THERE TO SEE THE RING,

18   BUT WHEN I GO OUT THERE, I'M NOT REALLY GOING TO SEE THE RING.

19   I'M GOING TO ROB AND TAKE THE RING FROM THEM, AND THEN HE

20   WANTS TO GIVE HER THE RING SO SHE IS HAPPY AND SATISFIED, AND

21   NOT WORRYING ABOUT THE MONEY, AND I WAS GOING TO GET PAID FOR

22   THAT TOO.

23   Q.   SO, THE DEFENDANT SUGGESTED TO YOU THAT THE THOUSAND

24   DOLLARS THAT HE RECEIVED FROM KATHERINE MILLER HE WAS GOING TO

25   SAY WAS FOR THIS RING?

Case 1:97-cr-00496-SDG-GGB    Document 153-4    Filed 07/14/06    Page 4 of 25

585

1   A.   YES, SIR.

2   Q.   AND DID THE DEFENDANT ASK YOU TO OBTAIN ANYTHING OTHER

3   THAN A RING IN THIS MANNER AT SOME POINT?

4   A.   THERE WAS A COUPLE THINGS THROUGH THE NEWSPAPER LIKE

5   STAMP COLLECTIONS, CARD COLLECTIONS, LIKE BASEBALL CARD

6   COLLECTIONS.  HE SAID ANYTHING I COULD GET TO THAT EXTENT,

7   THAT HE WOULD GET RID OF IT FOR ME, AND I WOULD MAKE SOME

8   MONEY THAT WAY.  ALSO, AT THE LAST MINUTE --

9   Q.   WELL, BEFORE YOU GET TO THE OTHER, LET'S JUST STICK WITH

10  THE BASEBALL CARDS OR WHATEVER IT IS.

11  A.   BASEBALL CARDS, STAMP COLLECTIONS, PISTOLS.

12  Q.   WHAT DID THE DEFENDANT SAY TO YOU ABOUT HOW YOU WERE

13  SUPPOSED TO OBTAIN THESE ITEMS?  WHAT PLAN DID HE DESCRIBE TO

14  YOU?

15  A.   BASICALLY TO CALL THE PEOPLE UP AND ASK TO COME BY AND

16  SEE THEM.  WHEN I GO BY THERE TO SEE THEM, I WAS TO ROB THEM,

17  TAKE THE MERCHANDISE.

18  Q.   DID THIS BUSINESS WITH THE RING, THE DIAMOND RING THAT

19  YOU MENTIONED, DID THE DEFENDANT HAVE ANY NICKNAME FOR THAT

20  PART OF THIS PLAN?

21  A.   THE FINGER THING.

22  Q.   THE WHAT?

23  A.   THE FINGER THING.

24  Q.   OKAY.  NOW, YOU SAID THERE WAS SOMETHING ELSE THAT THE

25  DEFENDANT ASKED YOU TO DO AT THE LAST MINUTE.

586

1    A.    YES, SIR.

2    Q.    CAN YOU DESCRIBE WHAT THAT WAS?

3    A.    THERE WAS A MEXICAN INDIVIDUAL LOCKED UP WITH US, AND HE

4    DIDN'T HAVE A GREEN CARD, AND THEY SET HIS BOND AT $5,000,

5    OKAY?

6           SO, HE HAS A GIRLFRIEND THAT REALLY WANTS TO GET HIM

7    OUT BAD THAT WILL DO BASICALLY ANYTHING TO GET HIM OUT OF

8    THERE.  SO, WHAT HE DID WAS SET UP THROUGH THIS MEXICAN GUY

9    AND HIS GIRLFRIEND, HE TOLD THEM THAT I KNEW SOMEBODY THAT

10   WORKED AT A BONDING COMPANY, AND I WAS SUPPOSED TO CONTACT

11   THEM WHEN I GOT RELEASED AND TELL THEM MY UNCLE WAS GOING TO

12   BOND HIM OUT ILLEGALLY FOR $1,100.

13          I WAS TO OBTAIN THE $1,100 FROM HER, AND TELL HER TO

14   WAIT RIGHT HERE, THAT I'M GOING DOWN DO THE JAIL TO BOND HIM

15   OUT.

16          I REALLY WASN'T GOING DOWN TO THE JAIL TO BOND HIM

17   OUT.  I WAS TO SPLIT WITH THE $1,100.  THAT WAS SET UP TO

18   HAPPEN THE NIGHT I GOT OUT, OR THE NEXT DAY.

19   Q.    SO, WHAT WERE YOU SUPPOSED TO DO WITH THE $1,100 YOU GOT

20   FROM THIS WOMAN?

21   A.    WELL, JODEE, I WAS SUPPOSED TO GIVE HER PROBABLY $400 OF

22   IT TO $500 OF IT FOR RUNNING AROUND.  HE WANTED TO MAKE HER

23   HAPPY FOR DOING ALL THE RUNNING AROUND, AND HE WANTED ME TO

24   PUT AT LEAST $200 TO $300 BACK ON HIS ACCOUNT SO HE WOULD HAVE

25   MONEY FOR THE STORE AT THE JAIL, AND I COULD KEEP THE REST.

587

1  Q.   AND DID THIS WOMAN, THIS MEXICAN WOMAN OUTSIDE THE JAIL,
2  YOU SAID IT WAS HER HUSBAND?
3  A.   NOT HUSBAND, BUT PROBABLY FUTURE HUSBAND.
4  Q.   THE WOMAN OUTSIDE, DID SHE HAVE A FIRST NAME OF
5  GABRIELLE?
6  A.   GABRIELLE.
7  Q.   DID THE DEFENDANT PROVIDE TO YOU A SPECIFIC STORY THAT
8  YOU WERE SUPPOSED TO TELL THIS GABRIELLE?
9  A.   DID HE DOCUMENT ON PAPER EXACTLY WHAT TO TELL HER?
10 Q.   LET ME SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION
11 AS GOVERNMENT'S EXHIBIT 57, AND ASK IF YOU HAVE SEEN THIS
12 GREEN DOCUMENT BEFORE?
13 A.   YES, SIR.
14 Q.   AND WHERE HAVE YOU SEEN THIS BEFORE?
15 A.   ROBERT MILLER GAVE IT TO ME IN THE COBB COUNTY JAIL.
16 Q.   AND WHO WROTE WHAT IS ON THIS DOCUMENT?
17 A.   ROBERT MILLER.
18 Q.   AND AFTER HE GAVE IT TO YOU, WHAT DID YOU DO WITH IT?
19 A.   PUT IT UP WITH THE REST OF THE DOCUMENTS UNDER MY
20 MATTRESS.
21 Q.   DID YOU EVENTUALLY TURN IT OVER TO SOMEONE?
22 A.   I TURNED IT OVER TO THE UNITED STATES SECRET SERVICE WHEN
23 I WAS RELEASED.
24        MR. WRAY:   YOUR HONOR, WE WOULD TENDER GOVERNMENT'S
25 EXHIBIT 57.

PATTI ALLEN, COURT REPORTER

588

1          MR. HARBIN:  NO OBJECTION.

2          THE COURT:  IT'S ADMITTED.

3          MR. WRAY:  LET'S SEE IF THIS WILL WORK ON THE

4    CAMERA.  PROBABLY NOT IS THE SHORT ANSWER.

5    BY MR. WRAY:

6    Q.   MR. PLANTE, CAN YOU FIRST READ WHAT IS ON GOVERNMENT'S

7    57, AND THEN EXPLAIN IT?

8    A.   IT SAYS CALL HER BETWEEN 6:30 AND 8:30.  SHE'LL BE HOME

9    NO MATTER WHAT.  HOME BOY WILL BE THERE.  THAT'S WHAT HE'S

10   SAYING.  HER HUSBAND WILL BE THERE, AND SHE WILL BASICALLY BE

11   HOME BETWEEN THOSE HOURS.  THEN IT SAYS TO TELL HER MY FRIEND

12   WAS VERY BUSY.  HIS GIRLFRIEND IS GOING TO TAKE ME TO HIM.  I

13   NEED THREE PAY STUBS AND $1,000.  HE WASN'T GOING TO DO THIS,

14   BUT HE'S A GOOD FRIEND OF MINE, AND I BEGGED HIM BECAUSE I

15   WANT TO GET YOUR BOYFRIEND OUT.

16          BASICALLY WHAT THIS IS SAYING IS ASKING HER FOR

17   THREE PAYCHECK STUBS OR THREE, YOU KNOW, RENT BILLS, OR

18   TELEPHONE BILLS TO MAKE IT LOOK PROFESSIONAL BECAUSE MOST BOND

19   COMPANIES ASK TO SEE STUFF LIKE THAT.  THEY WANT TO KNOW YOU

20   HAVE BEEN RESIDING AT A CERTAIN ADDRESS SO LONG, OR WHATEVER,

21   AND GET THE $1,000 FROM HER.

22          NOW, HE WAS GOING TO HAVE JODEE DRIVE ME OVER THERE,

23   AND THAT'S WHERE THE GIRL THING CAME IN.  THE GIRL WAS

24   SUPPOSED TO BE WAITING FOR ME IN THE CAR TO TAKE ME TO THE

25   COBB COUNTY JAIL TO GET HER BOYFRIEND OUT AFTER I RECEIVED THE

1  MONEY.

2  Q.    THAT GIRL IS GABRIELLE?

3  A.    GABRIELLE, YES.

4  Q.    AND THE WORDS THAT ARE WRITTEN ON THERE, WHO WAS SUPPOSED

5  TO SAY THOSE WORDS?

6  A.    I WAS SUPPOSED TO SAY THOSE WORDS.

7  Q.    AND AGAIN, WHO WROTE THESE?

8  A.    ROBERT MILLER.

9  Q.    AT THE TIME THAT YOU FIRST CONTACTED THE SECRET SERVICE

10 THROUGH YOUR LAWYER, HAD THE DEFENDANT BROUGHT UP THIS BOND

11 THING WITH THE MEXICAN WOMAN?

12 A.    I WOULD SAY TWO DAYS BEFORE, AROUND MARCH THE 4TH.  IT

13 WAS LIKE A LAST MINUTE THING.  IT REALLY WOULD GO INTO EFFECT

14 LIKE AROUND MARCH 6TH BECAUSE I WAS RELEASED REAL LATE ON

15 MARCH 6TH, OR THE EARLY MORNING HOURS OF MARCH 6TH, AND IT WAS

16 REALLY THE WHOLE NIGHT OF MARCH 5TH.

17 Q.    DURING ALL THIS TIME IN FEBRUARY AND MARCH OF '98, DID

18 YOU IN TALKING TO SOME OF THESE PEOPLE CALL YOURSELF BY

19 ANOTHER FIRST NAME?

20 A.    JOSE.  IT'S A NICKNAME I HAVE BEEN CALLED SINCE I WAS A

21 KID.

22 Q.    AND THIS JODEE WOMAN, DO YOU KNOW JODEE'S LAST NAME?

23 A.    NOT RIGHT OFFHAND.

24 Q.    CAN YOU DESCRIBE WHAT SHE LOOKS LIKE?

25 A.    I WOULD SAY SHE IS ABOUT FIVE-TEN, LONG STRAIGHT BLOND

1   HAIR, KIND OF SLIM.

2   Q.   AND DID THE DEFENDANT TELL YOU WHETHER OR NOT YOU COULD

3   SPEAK FREELY TO JODEE ABOUT YOUR PLANS OR THE DEFENDANT'S

4   PLANS TO MURDER MS. ASHFORD?

5   A.   DO NOT SPEAK FREELY TO HER.

6   Q.   HE SAID NOT TO?

7   A.   NOT TO SPEAK TO NOBODY ABOUT THAT REALLY EXCEPT ME AND

8   HIM, AND THAT'S WHY I WAS SUPPOSED TO GIVE HER THE STORY ABOUT

9   MEETING A FRIEND AT THE LANDMARK DINER.

10  Q.   NOW, AFTER YOU GOT OUT OF JAIL ON BOND, DID YOU HAVE

11  OCCASION TO HAVE SOME PHONE CONVERSATIONS?  I DON'T MEAN AT

12  THE JAIL, BUT DID YOU HAVE JUST TELEPHONIC CONVERSATIONS WITH

13  THE DEFENDANT?

14  A.   YES, SIR, I BELIEVE IT WAS ANYWHERE FROM FOUR TO SIX

15  PHONE CONVERSATIONS.

16  Q.   DID YOU SPEAK WITH -- WELL, WERE THOSE CONVERSATIONS

17  RECORDED?

18  A.   YES, SIR, EVERY ONE OF THEM.

19  Q.   WAS THAT WITH YOUR CONSENT?

20  A.   YES, SIR.

21  Q.   AND DID YOU SPEAK WITH THE DEFENDANT BY TELEPHONE ON

22  MARCH 8TH OF '98?

23  A.   YES, SIR.

24  Q.   I'M GOING TO SHOW YOU WHAT HAS PREVIOUSLY BEEN ADMITTED

25  AS GOVERNMENT'S EXHIBIT 58-A, WHICH IS A TAPE RECORDING OF

591

1   CONVERSATIONS MADE ON MARCH 8TH, '98.  HAVE YOU LISTENED TO

2   THIS TAPE?

3   A.   YES, SIR.

4   Q.   DOES IT FAIRLY AND ACCURATELY REFLECT THE CONVERSATIONS

5   YOU HAD WITH THE DEFENDANT ON THAT DAY?

6   A.   YES, SIR.

7   Q.   I'M ALSO SHOWING YOU WHAT HAS PREVIOUSLY BEEN ADMITTED AS

8   GOVERNMENT'S EXHIBIT 58-B, AND ASK YOU IF YOU HAVE READ THAT

9   BEFORE?

10  A.   YES, SIR, I HAVE.

11  Q.   DID YOU READ THAT ALONG WITH 58-A?

12  A.   YES, SIR.

13  Q.   IS IT A VERBATIM TRANSCRIPTION OF THE CONVERSATIONS YOU

14  HAD WITH THE DEFENDANT THAT ARE RECORDED ON 58-A?

15  A.   YES, SIR.

16          MR. WRAY:  YOUR HONOR, AT THIS POINT WE WOULD

17  PROPOSE TO PLAY THE TAPE, 58-A, AND I HAVE GOT TRANSCRIPTS FOR

18  EVERYONE.

19          THE COURT:  YOU MAY PROCEED.

20          MR. WRAY:  IT IS GOING TO TAKE JUST A SECOND HERE.

21  WHAT WE HAVE ARE HEADSETS FOR DEFENSE COUNSEL AND THE

22  DEFENDANT AND THE JURORS.

23          THE COURT:  THE COURT SECURITY OFFICER WILL PASS

24  THOSE OUT.

25          MR. WRAY:  MAY I PASS THE TRANSCRIPTS OUT?



                PATTI ALLEN, COURT REPORTER

592

1               THE COURT:  THE COURT SECURITY OFFICER WILL DO IT
2       FOR YOU.
3               MR. WRAY:  AND THE AGENT NEEDS TO GIVE ABOUT A
4       10-SECOND EXPLANATION ABOUT HOW THE HEADPHONES WORK.
5               THE COURT:  ALL RIGHT.  GO AHEAD AND DO THAT, SIR.
6               MR. WRAY:  YOU MAY NEED TO USE THE MICROPHONE.
7               AGENT WISNIEWSKY:  ON THE FRONT OF THE HEADSET THERE
8       IS A LITTLE BUBBLE TO THE FRONT.  IF YOU COULD HAVE THE BUBBLE
9       FACING OUT, AND THERE IS A LITTLE DIAL.  THE DIAL RIGHT HERE,
10      IF YOU LOOK AT IT, IT WILL TURN TO GREEN WHEN YOU TURN IT ON,
11      AND FOR VOLUME YOU CAN ADJUST IT.  IF YOU TURN IT ON RIGHT
12      NOW, YOU SHOULD HEAR A HISS IF YOU TURN THE VOLUME UP ALL THE
13      WAY, AND EVERYBODY'S HEADSET SHOULD BE ON THE S.  THE LITTLE
14      SWITCH ON THE FRONT SHOULD BE ON THE S.
15              THE COURT:  THIS MAY HAVE BEEN TESTIFIED TO BEFORE,
16      BUT WHAT IS THE DATE ON WHICH THIS RECORDING WAS MADE?
17              MR. WRAY:  MARCH 8TH OF '98.  AGENT WISNIEWSKY
18      TESTIFIED ABOUT IT.
19              THE COURT:  ALL RIGHT.
20      BY MR. WRAY:
21      Q.  MR. PLANTE, WHEN YOU SPOKE TELEPHONICALLY WITH THE
22      DEFENDANT, WAS SOMEONE ELSE CONNECTING YOU?
23      A.  KATHERINE MILLER CONNECTED ALL OUR CALLS ON THREE-WAY.
24      Q.  YOU SAY ON THREE-WAY.  AND IS THAT TRUE OF THESE
25      CONVERSATIONS TOO?

PATTI ALLEN, COURT REPORTER

593

1   A.   YES, SIR.

2          (WHEREUPON GOVERNMENT'S EXHIBIT 58-A WAS PLAYED FOR

3   THE COURT AND JURY AT THIS TIME).

4   BY MR. WRAY:

5   Q.   NOW, MR. PLANTE, THIS PHONE CONVERSATION HERE, PRIOR TO

6   THIS HAD YOU AND THE DEFENDANT HAD A CONVERSATION ABOUT

7   WHETHER OR NOT YOU COULD SPEAK FREELY TO EACH OTHER OVER THE

8   TELEPHONE?

9   A.   YES, SIR.

10  Q.   WHAT DID THE DEFENDANT SAY TO YOU?

11  A.   DON'T SAY ANYTHING OVER THE TELEPHONE THAT WILL

12  JEOPARDIZE WHAT WE ARE TALKING ABOUT.

13  Q.   AND DID THE DEFENDANT INDICATE TO YOU WHETHER KATHERINE

14  MILLER, THE WOMAN WHO YOU SAID CONNECTED THE THREE-WAY CALL,

15  MIGHT ALSO BE LISTENING IN ON THE PHONE CONVERSATIONS?

16  A.   YES, AND HE WAS REALLY NOT WANTING ME TO SAY JODEE'S NAME

17  OVER THE PHONE AT ALL BECAUSE OF THAT.  THAT'S WHY SOMEWHERE

18  IN THAT CONVERSATION I USED THE NAME JASON.  THAT WAS JODEE.

19  THAT WAS JUST TELLING HIM TO CALL JODEE BECAUSE I COULDN'T SAY

20  HER NAME OVER THE PHONE BECAUSE KATHERINE WOULD GET MAD THAT

21  HE IS TALKING TO JODEE.

22  Q.   NOW, THIS WHOLE CONVERSATION THAT WE HAVE JUST HEARD,

23  WERE YOU AND THE DEFENDANT SPEAKING ABOUT ANY ONE ASPECT OF

24  THE PLAN AT ALL, OR ALL OF THE PLAN?

25  A.   ALL THREE.


PATTI ALLEN, COURT REPORTER

594

1   Q.   NOW, REFERRING TO THE TRANSCRIPT ON PAGE 2 ABOUT HALFWAY

2   DOWN THE PAGE, THERE IS A MENTION OF A WOMAN YOU ARE SUPPOSED

3   TO CALL.

4   A.   THAT WOULD BE GABRIELLE.

5   Q.   THAT WOULD BE THIS MEXICAN BOND THING?

6   A.   YES.

7   Q.   A LITTLE BELOW THAT THERE IS A REFERENCE TO MABEL.   WHO

8   IS MABEL?

9   A.   THAT'S MY SOON TO BE WIFE.

10  Q.   IS THAT WHO YOU ARE LIVING WITH RIGHT NOW IN FLORIDA?

11  A.   YES, SIR.

12  Q.   IS THAT THE MOTHER OF YOUR CHILDREN?

13  A.   YES, SIR.

14  Q.   NOW, ON PAGE 3 ABOUT HALFWAY DOWN THE PAGE YOU MAKE A

15  REFERENCE TO WHAT I ASKED YOU FOR IN VISITATION TODAY.   WHAT

16  DID YOU ASK FOR?

17  A.   A CAR TO GET ABOUT SO I WOULDN'T HAVE TO WALK.

18  Q.   AND WHAT WAS THE CAR FOR?

19  A.   TO DO ALL THREE OF THE THINGS THAT HE WANTED DONE.

20  Q.   AND AGAIN, THE THREE THINGS ARE WHAT?

21  A.   TO TAKE CARE OF HIS EX-WIFE, DO THE BOND THING, AND TO

22  GET A DIAMOND RING FOR HIS GIRLFRIEND.

23  Q.   THERE ARE A NUMBER OF REFERENCES IN THIS CONVERSATION TO

24  TRYING TO GET AHOLD OF TZEGAI HINSON.

25  A.   YES, SIR.


PATTI ALLEN, COURT REPORTER

1   Q.   WHAT IN YOUR CONVERSATION WITH THE DEFENDANT BOTH BEFORE
2   AND DURING THIS WAS THE POINT OF GETTING AHOLD OF TZEGAI
3   HINSON?

4   A.   HE HAD AN OLD VOLVO THAT HE WAS SUPPOSED TO GIVE TO ME,
5   AND THAT WOULD BE MY TRANSPORTATION.

6   Q.   NOW, ON PAGE 10, YOU SAID "I WAS TRIPPING, AND SHIT,
7   SHE'S TRIPPING."  WHAT DID YOU MEAN BY THAT?

8   A.   I WAS JUST TRIPPING.

9   Q.   WHAT WAS HAPPENING?

10  A.   IT'S SLANG EXPRESSION FOR LIKE SHE IS TALKING CRAZY, YOU
11  KNOW, ABOUT ME COMING HOME, AND SHE MISSES ME, AND I WAS
12  TALKING CRAZY BACK TO HER TELLING HER I CAN'T COME.  IT'S JUST
13  AN EXPRESSION, SLANG EXPRESSION.

14  Q.   AND ABOUT TWO LINES BELOW THAT YOU MAKE A REFERENCE TO
15  THE OTHER THING WE TALKED ABOUT AT VISITATION, PLAN A.

16  A.   THAT'S REFERRING TO THE MURDER.

17  Q.   PLAN A IS WHAT?

18  A.   THE MURDER.

19  Q.   WHEN YOU SAY, "I WANT TO GET THAT DONE.  I'M PSYCHED UP
20  AND EVERYTHING.  I'M READY TO DO IT.  I GOT MY MIND SET.  I'M
21  GOING TO GET THAT SHIT OUT OF THE WAY TOMORROW AND DO THAT
22  SHIT TUESDAY AFTER I GET BACK, AND GOD DAMN HAUL ASS TO
23  FLORIDA AND BE THE FUCK OUT OF HERE."  WHAT IS THAT A
24  REFERENCE TO?

25  A.   I WAS TRYING TO TELL HIM THAT I WANTED TO PUT THE RING

1  THING AND THE BOND THING TO THE SIDE, AND GET THE MAIN THING

2  OUT OF THE WAY, WHICH WAS PLAN A, AND THAT IS THE MURDER OF

3  HIS EX-WIFE.

4  Q.   DID YOU FEEL THE NEED TO GET YOURSELF PSYCHED UP TO DO

5  THE BOND THING?

6  A.   NOT REALLY.   THAT WOULDN'T TAKE NOTHING, NO.   THE SAME

7  WITH THE FINGER THING.   I DIDN'T HAVE TO GET PSYCHED UP TO DO

8  THAT.   THAT'S JUST GO THERE, AND I WAS THERE.   I WAS REFERRING

9  TO PLAN A.

10  Q.   A COUPLE LINES DOWN TALKING ABOUT GOING TO SAVANNAH AND

11  BACK --

12  A.   THAT WAS TALKING ABOUT TAKING THE BODY AND DROPPING IT

13  OFF AND COMING BACK.   THE REASON FOR PICKING SAVANNAH IS

14  BECAUSE I HAVE RELATIVES THAT STAY THERE, AND I KNOW SAVANNAH

15  REAL WELL, AND I TOLD HIM I KNEW PLENTY OF PLACES IN SAVANNAH

16  WHERE A BODY COULD BE PUT AND WOULD NEVER BE FOUND BECAUSE I'M

17  FAMILIAR WITH THE AREA AROUND SAVANNAH.

18  Q.   GAIN ON TO THE TOP OF PAGE 13.   THERE IS A REFERENCE TO

19  PLAN A.   WHAT IS PLAN A?

20  A.   PLAN A IS THE MURDER.

21  Q.   ON PAGE 16 WHEN YOU SAY, "ALL RIGHT, WELL, I KNOW THE

22  MAIN THING YOU ARE WORRIED ABOUT IS PLAN A."

23         MR. MILLER SAYS, "YEAH."

24         AND YOU SAY, "CAUSE THAT'S GOING TO HELP YOU MORE

25  THAN THIS OTHER BULLSHIT IS."

```
1            WHAT IS THE OTHER BULLSHIT?

2     A.    THE OTHER BULLSHIT IS REFERRING TO THE RING THING AND THE

3     BOND SCAM THING.  I WAS TELLING HIM PLAN A IS GOING TO HELP

4     YOU MORE THAN THAT BECAUSE YOU ARE GOING TO BE GETTING OUT OF

5     A FEDERAL CASE IF SHE COMES UP MISSING.  SO, PUT ALL THIS

6     OTHER STUFF TO THE SIDE, AND GET ON WITH THE MAIN THING IS

7     WHAT I WAS TRYING TO TELL HIM.

8     Q.    THEN A LITTLE FURTHER DOWN THAT PAGE THERE IS A REFERENCE

9     TO MENDOZA.

10    A.    MENDOZA IS THE MEXICAN GUY THAT WAS IN THE JAIL WHOSE

11    WIFE WAS SUPPOSED TO GIVE ME MONEY TO BOND HIM OUT.

12    Q.    NOW, ON PAGE 18 THERE IS A DISCUSSION ABOUT THE CAR, IN

13    WHICH YOU MENTION A CAR, AND MR. MILLER RESPONDS, "OH, JESUS

14    CHRIST."

15          AND YOU SAY, "OH, SHIT, YOU KNOW WHAT I'M SAYING."

16    WHAT DID YOU MEAN?

17    A.    HE GOT KIND OF UPSET BECAUSE I SAID THE WORD "CAR" OVER

18    THE PHONE.  THAT'S LETTING WHOEVER IS LISTENING, LETTING THEM

19    KNOW I WAS SUPPOSED TO BE GETTING A CAR, AND I'M SAYING OH,

20    SHIT, YOU KNOW WHAT I'M SAYING.

21    Q.    ON THE TOP OF PAGE 19 YOU SAY, "WELL, I GOT MY MIND SET

22    ON DOING THAT ABOUT 11:00 O'CLOCK TOMORROW MORNING.  SO, I

23    NEED IT BEFORE THEN."

24          TO WHICH MR. MILLER RESPONDS, "BELIEVE ME, I FEEL

25    YOU.  I FEEL YOU."
```

598

1           YOU HAD YOUR MIND SET ON DOING WHAT AT ABOUT 11:00
2   O'CLOCK TOMORROW MORNING?
3           MR. HARBIN:  OBJECTION.  IT WILL SPEAK FOR ITSELF.
4           THE COURT:  COME UP TO THE BENCH.
5           (AT THE BENCH)
6           THE COURT:  WOULD YOU READ THE QUESTION BACK?
7           (REPORTER READ THE QUESTION BACK)
8           THE COURT:  WHAT IS THE OBJECTION?  READ IT BACK.
9           (REPORTER READ THE OBJECTION BACK)
10          MR. HARBIN:  UNLESS THEY DISCUSSED WHAT HE DID, IT
11  IS GIVING THE JURY WHAT IS NOT IN HIS WORDS.
12          THE COURT:  THE WAY I INTERPRETED THE QUESTION, I
13  THOUGHT YOU WERE ASKING THE WITNESS WHAT HE THOUGHT MR. MILLER
14  MEANT.
15          MR. WRAY:  THERE IS A STATEMENT BY MR. PLANTE IN
16  RESPONSE, AND I'M ASKING THE WITNESS WHAT HE IS REFERRING TO.
17          THE COURT:  WHAT THE WITNESS WAS REFERRING TO?
18          MR. WRAY:  YES, AS WELL AS WHAT HE UNDERSTOOD.  I'M
19  NOT ASKING HIM TO READ THE DEFENDANT'S MIND.
20          THE COURT:  I THINK IT IS IRRELEVANT HOW THE WITNESS
21  WAS INTERPRETING MR. MILLER'S STATEMENTS.  WHAT MR. MILLER
22  SAYS IS OBVIOUSLY RELEVANT, BUT THE WITNESS' INTERPRETATION OF
23  WHAT MR. MILLER IS SAYING IS NOT RELEVANT.
24          MR. WRAY:  MAY I ASK WHAT HE REFERRED TO?
25          THE COURT:  ANY OBJECTION?


                    PATTI ALLEN, COURT REPORTER

599

1              MR. HARBIN:  I MEAN UNLESS THEY HAD SOME AGREED

2    CODE, THIS IS LIKE TRYING TO COME UP WITH A NEW TRANSCRIPT FOR

3    THE JURY UNLESS HE IS SAYING THIS IS WHAT WAS AGREED TO MEAN

4    THIS.

5              THE COURT:  WHAT DO YOU MEAN WHEN YOU SAY THIS WAS

6    AGREED TO MEAN THIS?

7              MR. HARBIN:  UNLESS HE IS GOING TO SAY THE AGREED

8    LANGUAGE WAS THAT THE PLAN WAS THIS, AND HE SAID WHAT HE SAID,

9    AND I KNEW THIS.

10             MR. WRAY:  I DON'T UNDERSTAND WHAT THE OBJECTION IS

11   AT THAT POINT.

12             THE COURT:  I AGREE THE WITNESS IS BEING ASKED TO

13   CLARIFY WHAT HE MEANT.

14             WHILE YOU ARE UP HERE AT THE BENCH, I THINK THERE

15   ARE TOO MANY LEADING QUESTIONS.  YOU NEED TO ASK MORE

16   OPEN-ENDED QUESTIONS.

17             MR. HARBIN:  THANK YOU, JUDGE.

18             (END OF BENCH CONFERENCE)

19   BY MR. WRAY:

20   Q.   MR. PLANTE, ON THE TOP OF PAGE 19, CAN YOU CLARIFY WHAT

21   YOU MEANT IN THE STATEMENT, YOUR FIRST STATEMENT AT THE TOP OF

22   PAGE 19?

23   A.   WHAT I MEANT BY THAT IS I WAS PLANNING ON GOING TO THE

24   HERB SHOP AROUND 11:00 O'CLOCK IN THE MORNING BECAUSE IT OPENS

25   UP RIGHT BEFORE THEN, GET THAT OUT OF THE WAY, YOU KNOW, AND I

600

1   WAS TELLING HIM I NEEDED THE CAR SO I COULD DO THAT.

2   Q.   ON PAGE 23 ABOUT TWO THIRDS OF THE WAY DOWN THE PAGE

3   THERE IS A STATEMENT BY YOU THAT BEGINS WITH "YEAH."  DO YOU

4   SEE WHERE I'M REFERRING TO?

5   A.   YES, SIR.

6   Q.   CAN YOU EXPLAIN WHAT YOU MEANT WHEN YOU SAY, "YEAH, I

7   NEED TO GET THE SURPLUS TOO"?

8   A.   I WAS SAYING I NEED TO GET TO THE SURPLUS STORE TO BUY

9   THE ARMY FIELD BAG THAT THE BODY WAS SUPPOSED TO GO INTO.

10  Q.   NOW, ON THE LAST PAGE, OR SECOND TO THE LAST PAGE, PAGE

11  24, ABOUT TWO THIRDS OF THE WAY DOWN YOU REFER TO DAISY.

12  A.   THAT'S GABRIELLE -- NO, NO, NO, THAT'S JODEE.  MY FAULT.

13  I COULDN'T SAY JODEE OVER THE PHONE.  THAT'S WHY I SAID DAISY.

14  Q.   AND WHY?

15  A.   TRANSPORTATION.  THAT'S THE REASON I NEEDED A CAR.

16  Q.   WAS THIS THE ONLY EVENING ON WHICH YOU MADE TELEPHONE

17  CONVERSATIONS TO THE DEFENDANT THAT WERE RECORDED?

18  A.   NO, SIR.

19  Q.   DID YOU ALSO SPEAK WITH THE DEFENDANT BY TELEPHONE THE

20  NEXT NIGHT?

21  A.   YES, SIR.

22  Q.   WHICH IS WHAT DATE?

23  A.   IT WOULD BE MARCH THE 9TH.

24  Q.   I'M GOING TO SHOW WHAT YOU HAS PREVIOUSLY BEEN ADMITTED

25  AS GOVERNMENT'S EXHIBIT 59-A, AND ASK IF YOU RECOGNIZE THAT?

PATTI ALLEN, COURT REPORTER

601

| | |
|---|---|
| 1 | A. YES, SIR. I INITIALED IT. |
| 2 | Q. AND HAVE YOU LISTENED TO THIS TAPE? |
| 3 | A. YES, SIR. |
| 4 | Q. IS IT A FAIR AND ACCURATE RECORDING OF CONVERSATIONS YOU |
| 5 | HAD WITH THE DEFENDANT? |
| 6 | A. YES, SIR. |
| 7 | Q. AND WHAT DATE? |
| 8 | A. MARCH THE 9TH, 1998. |
| 9 | Q. AND ON 59-B, HAVE YOU SEEN THAT BEFORE? |
| 10 | A. YES, SIR. |
| 11 | Q. WHAT IS 59-B? |
| 12 | A. A TRANSCRIPT OF THE TAPE, 59-A. |
| 13 | Q. IS IT A VERBATIM REFLECTION OF WHAT IS ON THE TAPE IN |
| 14 | 59-A? |
| 15 | A. YES, SIR. |
| 16 | MR. WRAY: AT THIS POINT WE WOULD PROPOSE TO PLAY |
| 17 | THE NEXT TAPE. |
| 18 | THE COURT: YOU MAY, BUT FIRST, MEMBERS OF THE JURY, |
| 19 | WOULD YOU ALL PASS THE FIRST TRANSCRIPT BACK TO YOUR LEFT? |
| 20 | MR. WRAY: MR. PLANTE, DO YOU HAVE A TRANSCRIPT OF |
| 21 | 59? |
| 22 | THE COURT: DO WE HAVE ONE LEFT OVER HERE? |
| 23 | SECURITY OFFICER: WE HAVE THREE OR FOUR. |
| 24 | THE COURT: WE HAVE GOT EXTRAS. |
| 25 | (WHEREUPON GOVERNMENT'S EXHIBIT 59-A WAS PLAYED FOR |

PATTI ALLEN, COURT REPORTER

602

1    THE COURT AND JURY AT THIS TIME).

2    BY MR. WRAY:

3    Q.   MR. PLANTE, ON THE FIRST PAGE OF GOVERNMENT'S 59-B,

4    LOOKING AT THE LAST STATEMENT YOU MAKE AT THE BOTTOM OF THAT

5    PAGE, IT STARTS WITH "YEAH." CAN YOU EXPLAIN WHAT YOU ARE

6    REFERRING TO IN THAT STATEMENT?

7    A.   I TOLD HIM I HAD ALREADY CALLED UP TO THE PLACE, AND IT

8    CLOSED AT 6:00 O'CLOCK.  I WAS REFERRING TO THE HERB SHOP.

9    Q.   ON THE TOP OF PAGE 2, THE FIRST STATEMENT YOU MAKE AT THE

10   TOP OF PAGE 2, CAN YOU EXPLAIN WHAT YOU MEANT THERE?

11   A.   I WAS SAYING I WANTED TO GO AHEAD AND GET PLAN A OUT OF

12   THE WAY.  I HAD TO GO TO THE SURPLUS STORE TO GET THE DUMP

13   BAG, AND I WANTED TO GO AHEAD WITH PLAN A.

14   Q.   AND ON PAGE 8 AT THE BOTTOM, YOU MAKE A REFERENCE TO

15   SAVANNAH.  CAN YOU EXPLAIN OR CAN YOU CLARIFY YOUR STATEMENT?

16   A.   HE WAS TELLING ME I HAD TO BE BACK BY A CERTAIN TIME.  I

17   HAD TO DROP THIS HOME BOY OFF AT WORK AND PICK HIM BACK UP,

18   AND I TOLD HIM I WAS GOING TO GO AHEAD WITH PLAN A, AND I WAS

19   REFERRING TO DID I HAVE ENOUGH TIME TO GO ALL THE WAY TO

20   SAVANNAH AND DROP THE BODY, AND COME BACK ALL THE WAY TO GET

21   THE BOY AT WORK BEFORE I HAD TO RETURN THE CAR.

22   Q.   ON PAGE 16 ABOUT HALFWAY DOWN THE PAGE THERE IS A

23   STATEMENT BY YOU THAT BEGINS "THIS IS ALL I WANT TO DO," AND

24   IT ENDS WITH THE WORD DINER.

25   A.   WHAT PAGE ARE YOU ON?

PATTI ALLEN, COURT REPORTER

1    Q.    PAGE 16.   THIS IS IN THE MIDDLE OF PAGE 16.

2    A.    OKAY.

3    Q.    IT STARTS WITH, "THIS IS ALL I WANT TO DO."

4    A.    I TOLD HIM ALL I WANTED TO DO IS PLAN A.   I NEEDED

5    SOMEBODY TO TAKE ME BY THE DINER.

6    Q.    WHAT DINER?

7    A.    LANDMARK DINER ON THE DIAGRAM.

8    Q.    THIS REFERENCE TO HOME BOY, WHAT ARE YOU REFERRING TO

9    THERE?

10   A.    THAT WAS THE IMAGINARY PERSON I WAS SUPPOSED TO GO TO THE

11   LANDMARK DINER AND MEET.   THAT IS WHAT I WAS SUPPOSED TO TELL

12   WHOEVER WAS TAKING ME, THAT I WAS GOING THERE TO MEET SOMEONE

13   WHEN I WAS REALLY GOING THERE TO LOOK ACROSS THE STREET.

14   Q.    DID YOU HAVE ANY CONVERSATIONS WITH THE DEFENDANT IN

15   WHICH HE TOLD YOU WHETHER OR NOT MR. HINSON WAS ENTHUSIASTIC

16   ABOUT PROVIDING HIS CAR?

17   A.    REPEAT THAT, PLEASE.

18   Q.    DID YOU HAVE ANY CONVERSATIONS WITH THE DEFENDANT ABOUT

19   MR. HINSON'S CAR?

20   A.    YES, WE DID.   DO YOU WANT TO KNOW BEFORE I LEFT THE JAIL,

21   OR AFTERWARDS?

22   Q.    LET'S START WITH BEFORE YOU LEFT THE JAIL.

23   A.    HE TOLD ME HIS HOME BOY HAD LIKE A 1982 OR 1983 GRAY

24   COLORED VOLVO, KIND OF AN OLDER CAR THAT HE WOULD PROBABLY

25   SELL TO ME OR GIVE TO ME BECAUSE HE OWED HIM SOME MONEY.

604

1    Q.    OKAY.   THE THREE PARTS OF THIS PLAN ARE WHAT, AGAIN,
2    ACCORDING TO THE DEFENDANT?

3    A.    YOU WANT THE ORDER OF HOW IT WAS SUPPOSED TO HAPPEN?

4    Q.    THE ORDER IN WHICH THE DEFENDANT SAID THESE THINGS WERE
5    TO OCCUR.

6    A.    OKAY.   THE FIRST NIGHT I WAS SUPPOSED TO GET OUT THE BOND
7    SCAM.   THAT WAS SUPPOSED TO HAPPEN.   THE MONEY WAS SUPPOSED TO
8    BE PUT ON HIS BOOKS.   JODEE WAS SUPPOSED TO BE PAID.   I WAS
9    SUPPOSED TO KEEP SOME MONEY.

10           THE SECOND THING WAS THE FINGER THING, AND THAT WAY
11   HE COULD EXPLAIN TO KATHERINE WHY THE MONEY CAME OFF THE
12   BOOKS.

13           AND THE NEXT THING WAS PLAN A, THE MURDER OF HIS
14   EX-WIFE, AND THEN GO ON MY WAY BACK TO FLORIDA.

15   Q.    AND AT THE CONCLUSION OF THIS PHONE CONVERSATION WE JUST
16   LISTENED TO ON THE TAPE, DID SOMEBODY TRANSPORT YOU ANYWHERE?

17   A.    DID SOMEBODY TRANSPORT ME ANYWHERE?

18   Q.    YES.

19   A.    YES, KATHERINE MILLER CAME AND PICKED ME UP AT THE
20   COUNTRY HEARTH PARKING LOT AND TRANSPORTED ME TO TZEGAI'S
21   WORK, AND TZEGAI TURNED OVER A VOLVO TO ME, AND I TOOK THE
22   VOLVO TO DOWNTOWN ATLANTA AND DELIVERED IT TO THE SECRET
23   SERVICE OFFICE.

24   Q.    DID YOU SPEAK AT ALL WITH MS. MILLER IN THE CAR?

25   A.    WE BASICALLY TALKED ABOUT JODEE.   SHE WAS REAL SKEPTICAL

605

1  ABOUT JODEE, EVEN TALKING TO JODEE, EVEN SEEING JODEE,

2  BASICALLY CONVERSATION LIKE THAT.

3  Q.  DID THE DEFENDANT TELL YOU WHETHER OR NOT YOU COULD SPEAK

4  FREELY TO MS. MILLER ABOUT THE PLAN?

5  A.  DO NOT SPEAK FREELY WITH MS. MILLER.

6  Q.  I SHOW YOU WHAT HAS PREVIOUSLY BEEN ADMITTED AS

7  GOVERNMENT'S EXHIBITS 60 AND 61, AND ASK IF YOU RECOGNIZE WHAT

8  IS IN THOSE PICTURES?

9  A.  THAT'S THE VOLVO THAT WAS TURNED OVER TO ME BY TZEGAI.

10  Q.  THE CAR THAT WAS IDENTIFIED IN THOSE PICTURES, WHAT WERE

11  YOU SUPPOSED TO DO WITH THAT CAR?

12  A.  I WAS SUPPOSED TO USE THAT CAR TO TAKE AND COMMIT THE

13  BOND SCAM, THE FINGER THING, AND THEN I WAS SUPPOSED TO TAKE

14  IT TO LANDMARK DINER AND SCOPE EVERYTHING OUT ONE MORE TIME,

15  GO BY THE HERB SHOP, AND TAKE CARE OF MY BUSINESS, AND DRIVE

16  THAT CAR BACK TO THE HOTEL, AND HAVE TZEGAI DROP ME BACK OFF

17  OVER AT THE HERB SHOP, AND PICK HER CAR UP, AND FROM THERE

18  HAVE HER CAR.  THEN I WAS SUPPOSED TO BE ABLE TO KEEP THAT CAR

19  IN THE LONG RUN AFTER I CAME BACK UP HERE WITH HER CAR PARKED

20  AT THE AIRPORT.

21          MR. WRAY:  THAT'S ALL I HAVE, YOUR HONOR.

22          THE COURT:  LET'S TAKE A 15-MINUTE BREAK.

23          (RECESS TAKEN)

24          THE COURT:  BRING THE JURY IN.

25          (WHEREUPON THE JURY WAS BROUGHT INTO THE COURTROOM.)

606

1                THE COURT:   YOU MAY PROCEED.

2                MR. HARBIN:   THANK YOU, YOUR HONOR.

3                        TROY MARTIN PLANTE

4    BEING PREVIOUSLY DULY SWORN, RESUMED THE WITNESS STAND AND

5    TESTIFIED FURTHER AS FOLLOWS:

6                        -- -- --

7                        CROSS-EXAMINATION

8    BY MR. HARBIN:

9    Q.   MR. PLANTE, MY NAME IS JOHN HARBIN, AND I REPRESENT

10   ROBERT MILLER.   THIS IS THE FIRST TIME WE HAVE SPOKEN, ISN'T

11   IT?

12   A.   YES, SIR.

13               THE COURT:   GET UP REAL CLOSE TO THE MICROPHONE.

14               THE WITNESS:   YES, SIR.

15   BY MR. HARBIN:

16   Q.   WHERE IS THE HOSPITAL THAT YOU ARE EMPLOYED AT?

17   A.   I WOULD RATHER NOT REPEAT THAT OUT LOUD FOR EVERYBODY

18   BECAUSE I DON'T WANT THE ADDRESS GETTING OUT FOR CERTAIN

19   PEOPLE, YOU KNOW, IF THAT'S ALL RIGHT.   IT'S IN FLORIDA.

20               MR. WRAY:   YOUR HONOR, I'M NOT SURE THE NAME OF THE

21   HOSPITAL IS PARTICULARLY RELEVANT.

22               THE WITNESS:   I WOULD RATHER HAVE CERTAIN PEOPLE NOT

23   KNOWING MY WHEREABOUTS AFTER I LEAVE HERE TODAY.

24               MR. HARBIN:   YOUR HONOR, I BELIEVE WE ARE ENTITLED

25   TO THAT.   I WOULD LIKE TO INQUIRE ABOUT THAT.   WE CAN APPROACH

PATTI ALLEN, COURT REPORTER