VOL 4 - JUN 23, 1998

607

1 | THE BENCH IF YOU LIKE.

2 | THE COURT: COME UP AND TALK TO ME ABOUT IT FOR JUST

3 | A MINUTE.

4 | (AT THE BENCH)

5 | MR. HARBIN: MY PLAN IS, FRANKLY, TO HAVE AN

6 | INVESTIGATOR TOMORROW MORNING CHECK IT OUT AND SEE IF HE IS

7 | WORKING THERE. FRANKLY, THE STORY ABOUT HE HAS TURNED HIS

8 | LIFE AROUND, I WOULD LIKE TO CHECK IT OUT.

9 | MR. WRAY: DO YOU HAVE SOME GOOD FAITH BASIS FOR

10 | BELIEVING HE IS LYING?

11 | MR. HARBIN: OTHER THAN HIS EXTENSIVE CRIMINAL

12 | HISTORY, AND I HAVE NOT EVER BEEN ABLE TO TALK TO HIM.

13 | THE COURT: DID HE SAY HE WAS LIVING IN ST.

14 | AUGUSTINE?

15 | MR. HARBIN: RIGHT.

16 | THE COURT: I'LL ALLOW IT.

17 | (END OF BENCH CONFERENCE)

18 | THE COURT: REPEAT THE QUESTION, AND WOULD YOU

19 | ANSWER THE QUESTION, PLEASE?

20 | BY MR. HARBIN:

21 | Q. WHERE IS THE HOSPITAL WHERE YOU CLAIM YOU WORK?

22 | A. ST. AUGUSTINE, FLAGLER HOSPITAL.

23 | Q. FLAGLER, ALL RIGHT. IS TROY PLANTE YOUR REAL NAME?

24 | A. YES, SIR.

25 | Q. AND YOU HAVE OPERATED UNDER OTHER NAMES BEFORE, HAVEN'T

PATTI ALLEN, COURT REPORTER

608

1   YOU?

2   A.   YES, SIR.

3   Q.   IN 1993 IN CHICAGO?

4   A.   THE NAME DANNY COWAN.

5   Q.   YES.  YOU WERE CONVICTED FOR THE UNLAWFUL POSSESSION OF A

6   STOLEN VEHICLE?

7   A.   YES.

8   Q.   YOU WERE USING THE ALIAS DANNY COWAN?

9   A.   YES, SIR.

10  Q.   ARE YOU SURE YOU WENT THROUGH ALL YOUR CRIMINAL RECORD?

11  YOU PLED GUILTY TO THEFT IN CHATHAM COUNTY, SAVANNAH?

12  A.   NO, SIR, I'M NOT DENYING MY RECORD AT ALL.  I HAVE A VERY

13  LONG CRIMINAL RECORD.

14          THE COURT:  LET ME INTERRUPT YOU IF I COULD.  WHAT

15  IS THAT NOISE?  DOES ANYBODY KNOW?

16          MR. LION:  IS IT SOMETHING THAT CAN BE TURNED OFF?

17          MR. WRAY:  ACTUALLY, YOUR HONOR, I THINK IT MIGHT BE

18  THE LIGHTS.

19          THE COURT:  WE HAVEN'T HEARD THAT IN QUITE A WHILE.

20          MR. WRAY:  THE LIGHTS ARE ALWAYS HERE.

21          THE COURT:  ALL RIGHT.  WELL, LET'S GO AHEAD.  DOES

22  ANYBODY STILL HAVE A HEADSET THAT IS TURNED ON?  DID EVERYBODY

23  TURN THEIR HEADSET OFF?  HOW ABOUT AT YOUR TABLE, MR. HARBIN,

24  ARE THE HEADSETS ALL TURNED OFF?

25          MR. HARBIN:  YES.

1          THE COURT:  OKAY.  IT MUST BE THE LIGHTS.

2    BY MR. HARBIN:

3    Q.   YOU PLED GUILTY AND WERE SENTENCED TO FOUR YEARS FOR

4    BEING A FELON IN POSSESSION OF A FIREARM ON MAY 18, 1991?

5    A.   YES, SIR.

6    Q.   AND THAT WAS ONE MONTH AFTER YOUR CONVICTION OF ENTERING

7    AN AUTO FOR THEFT?

8    A.   YES, SIR.

9    Q.   YOU PLED GUILTY TO RECEIVING A STOLEN GATLIN GUN, BEE--BEE

10   GUN, GUN AND OTHER AMMUNITION IN MAY OF 1991?

11   A.   YES, SIR.

12   Q.   YOU WERE CONVICTED BY A PLEA TO THE FELONY OF INTERFERING

13   WITH THE CUSTODY OF A MINOR ON AUGUST 11, 1992, AND SENTENCED

14   TO THREE YEARS?

15   A.   YES, SIR.

16   Q.   IN SEPTEMBER, 1994 YOU PLED GUILTY TO ENTERING A VEHICLE

17   WITH INTENT TO COMMIT A THEFT?

18   A.   YES, SIR.

19   Q.   YOU WERE SENTENCED TO FIVE YEARS, THREE YEARS TO SERVE

20   WITH TWO YEARS PROBATED?

21   A.   YES, SIR.

22   Q.   YOU ARE STILL ON PROBATION?

23   A.   NOT FROM THAT.

24   Q.   BUT YOU ARE STILL ON PROBATION?

25   A.   ONLY ON PROBATION FROM THE RECENT COBB COUNTY CASE.

610

1   Q.   IN SEPTEMBER OF 1994 YOU PLED GUILTY TO RECEIVING ANOTHER

2   VEHICLE AS STOLEN PROPERTY, THE '94 DODGE VAN, AND OBSTRUCTION

3   OF LAW ENFORCEMENT BY FLEEING?

4   A.   YES, SIR.

5   Q.   YOU WERE JAILED IN COBB COUNTY FOR BEING IN POSSESSION OF

6   A STOLEN AUTO?

7   A.   YES, SIR.

8   Q.   AND NO PROOF OF INSURANCE, AND NO DRIVER'S LICENSE?

9   A.   THAT WAS DROPPED.

10  Q.   WHAT?

11  A.   I WAS CHARGED WITH THAT, BUT THAT WAS DROPPED.

12  Q.   BUT YOU DID NOT HAVE A DRIVER'S LICENSE AT THE TIME, DID

13  YOU?

14  A.   YES, SIR.

15  Q.   YOU HAD AN OUT-OF-STATE I.D. BUT NOT A DRIVER'S LICENSE?

16  A.   YES, SIR, WITH ME, THAT IS WHAT I HAD, OUT-OF-STATE I.D.

17  Q.   EXCUSE ME?

18  A.   WHEN I WAS ARRESTED I HAD AN OUT-OF-STATE I.D.  THAT'S

19  WHAT I WAS ARRESTED WITH.

20  Q.   WHEN YOU WERE ARRESTED, YOU HAD AN OUT-OF-STATE I.D. ON

21  YOU, BUT IT WAS NOT AN OUT-OF-STATE DRIVER'S LICENSE?

22  A.   NO, IT WAS NOT AN OUT-OF-STATE DRIVER'S LICENSE.

23  Q.   AND WHEN YOU WERE BONDED OUT OF COBB COUNTY, WHEN YOU

24  LEFT THE JAIL YOU DID NOT HAVE A DRIVER'S LICENSE?  YOU HAD AN

25  OUT-OF-STATE I.D.?

VOL 4 - JUN 23, 1998

611

1    A.    YES.

2    Q.    IS THAT CORRECT?

3    A.    YES.

4    Q.    SO, IF YOU TOLD THIS JURY BEFORE ON DIRECT EXAMINATION

5    THAT YOU HAD AN OUT-OF-STATE LICENSE WHEN YOU WERE IN COBB

6    COUNTY, OR WHEN YOU GOT OUT, THAT WAS INCORRECT?

7    A.    OUT-OF-STATE I.D., OUT-OF-STATE LICENSE, IT DOESN'T

8    MATTER.   I CAN STILL VISIT WITH EITHER ONE OF THOSE AT THE

9    VISITATION.   I DID VISIT HIM THREE TIMES WITH OUT-OF-STATE

10   I.D.

11   Q.    I DIDN'T ASK WHETHER YOU COULD.

12   A.    THAT'S WHAT YOU ARE REFERRING TO.

13   Q.    IF YOU CAN ANSWER THE QUESTION, WHAT I'M REFERRING TO IS

14   THERE IS THIS PLAN FOR YOU TO DRIVE TO SAVANNAH?

15   A.    YES.

16   Q.    AND YOU WERE WORRIED ABOUT HAVING A VALID LICENSE;

17   CORRECT?

18   A.    NO, I WASN'T WORRIED ABOUT IT.   I HAVE DROVE PLENTY OF

19   TIMES WITHOUT A VALID LICENSE.   IF I WAS GOING TO DO WHAT I

20   DID, I WASN'T REALLY WORRIED ABOUT A DRIVER'S LICENSE.

21   Q.    ISN'T IT TRUE, SIR, THAT EVERYONE WHO COMMITS ILLEGAL

22   ACTIVITY, DRUG DEALING, POSSESSION OF STOLEN CARS, WORRIES

23   ABOUT THE TAGS ON THE CAR?

24   A.    THAT'S IF THE POLICE GETS BEHIND YOU, YES, SIR.

25   Q.    WORRIES ABOUT A DRIVER'S LICENSE?

PATTI ALLEN, COURT REPORTER

1   A.   NOT REALLY, BECAUSE I'M NOT A RECKLESS DRIVER.  I HAVE

2   NEVER HAD A SPEEDING TICKET.  I DON'T SPEED.  I DON'T RUN RED

3   LIGHTS, NORMAL THINGS THAT GET YOU PULLED OVER.  THAT'S WHY I

4   DON'T REALLY WORRY ABOUT IT.

5   Q.   SO, YOU WERE TALKING ABOUT TAKING A BODY TO SAVANNAH, ALL

6   THE WAY TO SAVANNAH AND BACK, BUT YOU WOULDN'T BE WORRIED

7   ABOUT NOT HAVING A VALID LICENSE?

8   A.   NO, BECAUSE I HAVE DROVE THAT ROAD A HUNDRED TIMES, AND

9   THERE'S NO TROOPERS FROM STATE ROUTE 16 ALL THE WAY FROM

10  MACON, GEORGIA TO SAVANNAH, GEORGIA.

11  Q.   THE FACT IS -- YOUR STORY IS THAT YOUR MESSAGE TO

12  MR. MILLER THAT THIS JOB WAS DONE WAS GOING TO BE YOU GOING TO

13  SEE HIM AND SHOWING A LICENSE?

14  A.   YES.

15  Q.   NOW, WE WILL GET TO THAT LATER, BUT THE FACT IS AT THE

16  END OF YOUR ATTEMPT -- YOUR'S AND THE SECRET SERVICE'S ATTEMPT

17  FOR PROOF OF THIS PLAN, YOU DIDN'T DO THAT, DID YOU?

18  A.   NO, I DID NOT.

19  Q.   YOU TRIED TO CALL THE JAIL; CORRECT?

20  A.   I TRIED TO CALL THE JAIL?

21  Q.   YOU TRIED THROUGH KATHERINE MILLER TO GET IN TOUCH WITH

22  ROBERT MILLER?

23  A.   I DID GET IN TOUCH WITH ROBERT MILLER THROUGH KATHERINE

24  MILLER.

25  Q.   YOU TRIED THROUGH KATHERINE MILLER ON MARCH 10, 1998?

PATTI ALLEN, COURT REPORTER

613

1   A.   I TRIED ONE LAST TIME TO GET IN TOUCH WITH HIM, AND SHE

2   COULDN'T GET IN TOUCH WITH HIM.

3   Q.   AND YOU GAVE A MESSAGE TO HER, DIDN'T YOU?

4   A.   YES.

5   Q.   AND THE MESSAGE WAS, "I'VE GOT THE LICENSE.  PLAN A IS

6   DONE.  I'M GOING TO SAVANNAH."  ISN'T THAT RIGHT?

7   A.   YES, THAT WAS THE MESSAGE.

8   Q.   AND THAT MEANT YOU HAD A DRIVER'S LICENSE FOR YOURSELF,

9   DIDN'T IT?

10  A.   NO.  THAT MEANT I HAD THE LICENSE FOR THE VICTIM THAT WAS

11  SUPPOSED TO BE MURDERED.

12  Q.   TELL THE JURY WHAT YOU SAID AGAIN AT THE END OF DIRECT

13  EXAMINATION ABOUT THIS PLAN TO HOOK UP WITH TZEGAI WHERE YOU

14  WERE GOING TO USE MS. ASHFORD'S CAR, BUT YOU WERE ALSO GOING

15  TO GET TZEGAI'S CAR AND GO BACK AND FORTH.  WILL YOU TELL THAT

16  AGAIN?

17  A.   ALL RIGHT.  WHAT I SAID WAS TZEGAI WAS SUPPOSED TO MEET

18  ME AND GIVE ME HIS CAR.  ARE YOU TALKING ABOUT THE TIME TZEGAI

19  WAS TO MEET ME, OR THE TIME HE REFERRED TO DROPPING TZEGAI OFF

20  AT WORK?  YOU HAVE TO MAKE IT CLEAR.

21  Q.   MY REFERENCE IS TO YOUR TESTIMONY ON DIRECT EXAMINATION,

22  SIR, WHATEVER YOU WERE REFERRING TO.

23  A.   I REFERRED TWICE TO THE CAR IN DIRECT EXAMINATION.

24          MR. WRAY:   YOUR HONOR, IF MR. HARBIN COULD JUST

25  CLARIFY WHICH QUESTION.  IT WAS A FAIRLY LENGTHY DIRECT

614

1   EXAMINATION, AND THERE WERE SEVERAL QUESTIONS ABOUT MR. HINSON

2   AND ABOUT CARS.  I DON'T HAVE ANY OBJECTION TO THE SUBJECT

3   MATTER.  I JUST THINK THE QUESTION NEEDS TO BE CLEARER AS TO

4   WHAT HE IS ASKING ABOUT.

5   BY MR. HARBIN:

6   Q.   AT THE VERY END OF YOUR DIRECT EXAMINATION YOU MENTIONED

7   SOMETHING ABOUT TZEGAI PICKING YOU UP, AND THEN USING HIS CAR,

8   AND USING JENNIFER'S CAR.

9   A.   SEE, THE WAY I WAS TO MAKE THAT HAPPEN IS I HAVE TO DROP

10  TZEGAI OFF AT WORK.  I'M GOING TO HAVE TO DRIVE ALL THE WAY TO

11  THE SOUTH END, DRIVE ALL THE WAY BACK DOWN HERE TO THE HOTEL,

12  LEAVE THE CAR THERE, AND WALK BACK DOWN TO THE SHOP, OR TAKE A

13  TAXI BACK TO THE SHOP TO PICK HER CAR UP.  BY THE TIME I WOULD

14  GET BACK TO THE ATLANTA AIRPORT AND GET BACK TO TZEGAI'S CAR,

15  I WOULDN'T HAVE TIME TO PICK HIM UP FROM WORK.  SO, I'M ASKING

16  HIM HOW AM I GOING TO GET TO SAVANNAH AND BACK AND PICK HIM UP

17  TOO, AND THAT'S HOW AM I GOING TO GET AROUND THAT?

18  Q.   WASN'T THERE A PLAN WHERE TZEGAI WAS GOING TO DROP YOU

19  OFF?

20  A.   THAT WAS SUPPOSED TO BE THE ORIGINAL PLAN, BUT LIKE HE

21  SAID, PLANS DON'T ALWAYS GO THE WAY THEY ARE SUPPOSED TO.

22  Q.   TELL ME THE ORIGINAL PLAN.

23  A.   THE ORIGINAL PLAN WAS TO HAVE TZEGAI TAKE ME BACK TO THE

24  HERB SHOP AND DROP ME OFF TO PICK THE CAR UP, AND THEN MEET ME

25  BACK AT THE HOTEL.

1   Q.   WELL, GO INTO MORE DETAIL.  THIS IS IN DAYLIGHT; CORRECT?

2   A.   THIS IS IN THE MORNING TIME BEFORE 12:00 O'CLOCK NOON.

3   Q.   ON ROSWELL ROAD?

4   A.   ON ROSWELL ROAD.

5   Q.   A LITTLE MORE DETAIL, PLEASE, ABOUT WHAT THE PLAN WAS.

6   A.   THE PLAN WAS FOR ME TO TAKE HIS CAR AND LEAVE HIM AT MY

7   HOTEL ROOM.  I GO THERE.  I TAKE CARE OF WHAT I GOT TO TAKE

8   CARE OF.  I PUT THE BODY IN THE DUFFLE BAG, GO OUT THE BACK ON

9   THE CATWALK TO THE APARTMENT COMPLEX.  AFTER I DO THAT, I DROP

10  THE BODY IN TZEGAI'S CAR, GO BACK TO MY HOTEL, AND THEN I TELL

11  TZEGAI LOOK, I NEED YOU TO DRIVE ME BACK UP TO THE LANDMARK

12  DINER AND DROP ME OFF.  HE DON'T EVEN KNOW THERE IS A BODY IN

13  HIS TRUNK.  I SAY, MAN, BE HERE AT THE HOTEL.  I BE RIGHT BACK

14  FROM THE LANDMARK DINER.

15          SO, FROM THE LANDMARK DINER HE GOES BACK TO MY

16  HOTEL.  I WALK OVER THERE TO THE HERB SHOP, GET HER CAR, DRIVE

17  BACK TO THE HOTEL, AND THEN I TRANSFER BODIES FROM TRUNK TO

18  TRUNK, AND THEN GO ON ABOUT MY WAY IN HER CAR.

19  Q.   SO, YOU MOVE A BODY IN BROAD DAYLIGHT ON ROSWELL ROAD?

20  A.   IN A DUFFLE BAG, FIELD BAG.

21  Q.   AND YOU TRANSFER IT FROM CAR TO CAR?

22  A.   IN A HOTEL PARKING PLOT.

23  Q.   AND THEN THE PLAN WAS TO DRIVE THE VICTIM'S CAR ALL THE

24  WAY TO SAVANNAH AND BACK TO THE AIRPORT?

25  A.   BACK TO THE ATLANTA AIRPORT PARKING LOT.

PATTI ALLEN, COURT REPORTER

616

1   Q.   HOW LONG DOES THAT TAKE TO DRIVE TO SAVANNAH?

2   A.   FROM HERE IT TAKES ANYWHERE FROM FIVE AND A HALF TO SIX

3   HOURS.

4   Q.   SO, YOUR TESTIMONY IS YOU AND ROBERT MILLER DISCUSSED

5   DRIVING THE VICTIM'S CAR, AND LEAVING THE HERB SHOP VACANT

6   FROM THIS ALLEGED ACT ON?

7   A.   THAT IS THE WHOLE REASON FOR PUTTING THE 15 MINUTE SIGN

8   UP THERE.   EVEN THOUGH SOMEBODY CAME BY IN 15 MINUTES, IF THEY

9   COME BACK AND THE PERSON IS NOT THERE, YOU'VE GOT A GOOD HOUR

10  OR TWO BEFORE SOMEBODY WORRIES ABOUT THIS 15 MINUTE SIGN

11  HANGING UP THERE ALL DAY.

12  Q.   YOU WERE AWARE OF HER FRIENDS WORKING NEXT DOOR?

13  A.   I WAS NOT AWARE OF THAT.

14  Q.   THE CAFE NEXT DOOR?

15  A.   I WAS NOT AWARE HER FRIENDS WORKED AT THE CAFE.

16  Q.   BUT YOUR TESTIMONY IS MR. MILLER WAS COMFORTABLE WITH YOU

17  DRIVING THE ALLEGED VICTIM'S CAR TO SAVANNAH AND ALL THE WAY

18  BACK TO THE AIRPORT?

19  A.   IT WASN'T REALLY WHAT HE WAS COMFORTABLE WITH.   HE DIDN'T

20  CARE AS LONG AS I GOT THAT CAR BACK TO THE AIRPORT AND PARKED

21  IT.   HE NEVER WAS CONCERNED ABOUT HOW I DID IT.   IT WAS JUST

22  GET IT THERE, AND GET IT BACK.

23  Q.   YOUR TESTIMONY IS THAT WAS THE PLAN?

24  A.   THAT WAS THE PLAN WE MADE, BUT IT WASN'T REALLY THAT HE

25  CARED, YOU KNOW.

PATTI ALLEN, COURT REPORTER

617

1   Q.   NOW, WHERE DID YOU TELL HIM YOU WERE GOING TO TAKE THE
2   BODY?

3   A.   TO SAVANNAH.

4   Q.   WHERE DID YOU TELL HIM?

5   A.   I NEVER GAVE HIM A SPECIFIC PLACE IN SAVANNAH.  I JUST
6   SAID, "I CAN TAKE IT TO SAVANNAH."

7        HE SAID, "OH, GOOD.  JUST GET RID OF IT WHERE IT
8   WILL NEVER BE SEEN."

9   Q.   SO, YOU NEVER TOLD HIM ABOUT A SPECIFIC PLACE?

10  A.   NO, I NEVER TOLD HIM A SPECIFIC PLACE.

11  Q.   THERE WERE SEVERAL OTHER PEOPLE IN THE CELL WITH YOU,
12  WEREN'T THERE --

13  A.   YES.

14  Q.   -- IN COBB DETENTION?  AND YOU SAID A LOT OF TIMES YOU
15  WERE SHOWING YOUR TATTOOS, AND A LOT OF TIMES YOU WORE A
16  SHIRT.

17  A.   80 PERCENT OF THE TIME I WAS WITHOUT A SHIRT.

18  Q.   AND 20 PERCENT, THEN, WITH A SHIRT?

19  A.   WITH A SHIRT.

20  Q.   PARTICULARLY THAT FIRST WEEK IN MARCH OF 1998, IT WAS
21  COLD, WASN'T IT?

22  A.   PRETTY MUCH.

23  Q.   AND THE COBB COUNTY TAXPAYERS WEREN'T PAYING A LOT TO
24  WARM UP THE JAIL THERE?

25  A.   COBB COUNTY IS PROBABLY ONE OF THE RICHEST TAXPAYING

1   COUNTIES IN ATLANTA. THEY KEEP THE HEAT ON. YOU DON'T HAVE
2   TO WORRY ABOUT THAT.

3   Q.   IT WAS COLD OUTSIDE, AND IT WAS COLD IN THE JAIL?
4   A.   NO, IT WASN'T COLD IN THE JAIL. IT WAS COLD OUTSIDE.
5   Q.   NOW, YOU MENTIONED YOUR CHARGES IN FLORIDA THAT YOU
6   EXPECT ASSISTANCE ON.

7   A.   I DON'T EXPECT NO ASSISTANCE ON THEM. THAT CASE IS SO
8   OLD AND SO WEAK. THEY DON'T HAVE ANYTHING AGAINST ME ANYWAY
9   IN FLORIDA. THAT'S GOING TO GET THROWN OUT WHEN I GO TO COURT
10  ON THE 14TH. I HAVE ALREADY FOUND THAT OUT THROUGH MY LAWYER.

11  Q.   I THOUGHT YOU TESTIFIED ON DIRECT YOU ARE HOPING FOR
12  ASSISTANCE FROM THE GOVERNMENT, A GOOD WORD ON THAT CASE?
13  A.   IF IT HAPPENS, IT HAPPENS. IF IT DOESN'T, IT DOESN'T.
14  IT'S NOT REALLY THAT I AM HOPING FOR ANYTHING ON THAT CASE.

15  Q.   IN FACT, IT IS SCHEDULED FOR TRIAL IN JULY?
16  A.   JULY 14TH.

17  Q.   IT HAS NOT BEEN DISMISSED AT THIS TIME?
18  A.   IT WILL BE DISMISSED ON JULY 14TH.

19  Q.   IF YOU CAN ANSWER THE QUESTION, IT HAS NOT BEEN DISMISSED
20  AT THIS TIME?

21  A.   NO, SIR.

22  Q.   NOW, ROBERT MILLER TALKED TO YOU ABOUT DELIVERING DRUGS
23  FOR TZEGAI HINSON; CORRECT?

24  A.   ONE TIME HE MENTIONED SOMETHING ABOUT DELIVERING SOME
25  WEED FROM ONE PLACE TO ANOTHER AFTER ALL THIS OTHER STUFF WAS

1    TOOKEN CARE OF.  HE SAID HE HAD SOME FRIENDS IN HIGH PLACES,

2    FOOTBALL PLACES OR WHATEVER THAT DEALT IN WEED AND EVERYTHING,

3    AND HE COULD GET ME IN THAT TOO SOONER OR LATER.

4    Q.   AND WHERE WERE THE FOOTBALL PLAYERS?

5    A.   HE DIDN'T SAY WHAT TEAM OR ANYTHING.  HE SAID HE'S GOT A

6    FEW PLAYERS.

7    Q.   WHERE DID THEY LIVE?

8    A.   HERE IN ATLANTA SOMEWHERE.

9    Q.   DIDN'T HE TALK ABOUT MOVING MARIJUANA BETWEEN ATLANTA AND

10   SAVANNAH?

11   A.   NO.

12   Q.   NO?

13   A.   NO.

14   Q.   YOU WERE INTERVIEWED BY THE SECRET SERVICE ON MARCH 3RD

15   WHILE YOU WERE STILL IN JAIL, WEREN'T YOU?

16   A.   YES.

17   Q.   AND THEN YOU WERE INTERVIEWED BY THE SECRET SERVICE IN A

18   HOTEL ON MARCH 6TH?

19   A.   AROUND THAT TIME, YES.

20   Q.   ISN'T IT TRUE THAT ON MARCH 3RD IN THE JAIL, YOU TOLD THE

21   SECRET SERVICE, "AFTER THAT, HE WAS SUPPOSED TO GIVE ME

22   SOMETHING ELSE TO DO.  SOME GUY NAME TZEGAI, ONE OF HIS

23   FRIENDS, OR A GUY NAME TZEGAI, A BLACK GUY THAT WAS SUPPOSED

24   TO BE AFFILIATED WITH HIM, HE WAS SUPPOSED TO GIVE ME FIVE

25   POUNDS OF WEED, OR SOMETHING LIKE TO TAKE TO SAVANNAH AND

1   SELL AND COME BACK WITH THE MONEY."

2   A.    THAT WAS SOMETHING HE PROBABLY MENTIONED TO ME, BUT THAT

3   WAS SUPPOSED TO BE LIKE AFTER EVERYTHING HAPPENED IN THE

4   FUTURE.   THAT WASN'T LIKE SOMETHING TO HAPPEN AFTER I GOT OUT

5   OF JAIL.

6   Q.    SIR, IF YOU CAN ANSWER THE QUESTION, THE QUESTION IS

7   ROBERT MILLER TALKED TO YOU ABOUT DELIVERING MARIJUANA TO

8   SAVANNAH?

9   A.    ROBERT MILLER DIDN'T TALK TO ME ABOUT IT.  HE MENTIONED

10  SOMETHING ABOUT IT.   I HEARD HIM SAYING SOMETHING ABOUT IT.

11  HE DIDN'T TALK TO ME LIKE IT WAS GOING TO HAPPEN, THOUGH.

12  YES, HE DID TALK TO ME IF THAT'S WHAT YOU WANT TO KNOW, BUT

13  NOT TO THE EXTENT IT WAS GOING TO HAPPEN.  HE JUST MENTIONED

14  IT.

15  Q.    THAT WAS THE QUESTION.  HE DID TALK TO YOU ABOUT IT?

16  A.    YEAH, BUT I DON'T WANT TO MAKE IT SOUND LIKE HE TALKED TO

17  ME LIKE THAT WAS GOING TO HAPPEN.  THAT WASN'T GOING TO

18  HAPPEN.

19  Q.    WELL, AGAIN, I WOULD ASK THAT YOU ANSWER THE QUESTION,

20  SIR.  HE TOLD YOU ON MARCH 6TH, 1998 -- LET ME ASK YOU THIS:

21  ISN'T IT TRUE THAT ROBERT TOLD YOU HE THOUGHT THAT THE SECRET

22  SERVICE OR THE AUTHORITIES WERE REALLY AFTER TZEGAI, AND THEY

23  WANTED HIM TO TURN IN TZEGAI?

24  A.    HE DID TELL ME THAT.

25  Q.    AND HE TOLD YOU THEY MOVED A LOT OF MARIJUANA?

PATTI ALLEN, COURT REPORTER

621

1    A.   HE DID TELL ME THAT TOO.

2    Q.   AND YOU TOLD THE SECRET SERVICE THAT ON MARCH 6TH?

3    A.   YES.

4    Q.   NOW, WHEN YOU WERE USING THE PEN, DID YOU GO OVER YOUR

5    TESTIMONY?  DID YOU PRACTICE YOUR TESTIMONY WITH THE

6    GOVERNMENT?

7    A.   WHAT DO YOU MEAN BY THAT?  HAVE I EVER USE THAT PEN ON

8    THAT BOARD BEFORE?

9    Q.   PRACTICE THE QUESTIONS AND ANSWERS?

10   A.   I HAVE WENT OVER A COUPLE QUESTIONS AND ANSWERS, BUT I

11   DIDN'T PRACTICE ANYTHING WITH A PEN ON THAT BOARD RIGHT THERE.

12   Q.   YOU WENT OVER ALL YOUR QUESTIONS?

13   A.   ALL I DID WAS TAKE THE CASSETTE TAPES AND LISTEN TO THIS

14   RIGHT HERE, AND THAT WAS IT.

15   Q.   AND THEN YOU WENT OVER THE QUESTIONS YOU WERE GOING TO BE

16   ASKED, AND YOUR ANSWERS?

17   A.   SOME OF THEM, YES.

18   Q.   ISN'T IT TRUE MR. MILLER ALSO TOLD YOU THAT TZEGAI WAS

19   BEING WATCHED BY THE AUTHORITIES IN FEBRUARY AND MARCH OF

20   1998?

21   A.   YES, SIR.

22   Q.   AND DUFFEL BAGS ARE GOOD FOR CARRYING MARIJUANA, AREN'T

23   THEY?

24   A.   YES, SIR.  NOT FIELD BAGS, THOUGH.

25   Q.   FIELD BAGS ARE GOOD.  MARIJUANA IS OFTEN OBTAINED IN 50

PATTI ALLEN, COURT REPORTER

622

1  AND 100 POUND PACKAGES?

2  A.    IT COULD BE.

3  Q.    WHAT I WOULD LIKE TO DO IS GO OVER THE TAPES AGAIN.  IF

4  WE CAN HAVE THE TRANSCRIPTS FOR THE FIRST TAPE, GOVERNMENT

5  EXHIBIT 58-A, AND I GUESS THE TRANSCRIPTS ARE 58-B, IF THEY

6  COULD BE REDISTRIBUTED.

7         MR. WRAY:  DO YOU PROPOSE TO PLAY THE ENTIRE TAPE

8  AGAIN?

9              MR. HARBIN:  YES.

10             MR. WRAY:  I WAS JUST GOING TO SUGGEST THAT PERHAPS

11  WE COULD GO THROUGH THE QUESTIONING BY REFERRING TO THE

12  TRANSCRIPT, AND IT MIGHT MOVE THINGS ALONG RATHER THAN PLAYING

13  THE ENTIRE TAPE AGAIN.

14             THE COURT:  IT DOESN'T MATTER.  WHATEVER YOU PREFER

15  IS FINE.  GO AHEAD AND PASS OUT THE TRANSCRIPTS.

16             MR. HARBIN:  I'LL TELL YOU WHAT.  SINCE I'M GOING TO

17  START AND STOP, LET'S TRY USING THE SPEAKERS.

18             THE WITNESS:  EXCUSE ME.  BEFORE YOU START, CAN YOU

19  GIVE ME A COPY OF 58-B?

20             MR. HARBIN:  SURE.  I THOUGHT YOU HAD IT.  I'LL GO

21  AHEAD AND GIVE YOU BOTH OF THEM.

22             (WHEREUPON A PORTION OF GOVERNMENT'S EXHIBIT 58-A

23  WAS PLAYED FOR THE COURT AND JURY).

24  BY MR. HARBIN:

25  Q.    AS YOU SAID ON DIRECT, THAT IS THE VERY FIRST REFERENCE

PATTI ALLEN, COURT REPORTER

623

1    TO THE BOND WITH GABRIELLE?

2    A.   YES.

3            (ANOTHER PART OF GOVERNMENT'S EXHIBIT 58-A WAS

4    PLAYED FOR THE COURT AND JURY).

5    BY MR. HARBIN:

6    Q.   WHERE MR. MILLER IS REFERRING TO WHAT IS IMPERATIVE, HE'S

7    REFERRING TO THE BOND DEAL; CORRECT?

8    A.   THAT STATEMENT, YES.

9    Q.   SO, YOU HAVE GOTTEN A PHONE NUMBER FOR TZEGAI HINSON;

10   CORRECT?

11   A.   YES, SIR.

12   Q.   AND HIS 800 NUMBER?

13   A.   YES, SIR.

14   Q.   IS THAT IN THE PAPERWORK YOU PRODUCED?

15   A.   YES, SIR.

16   Q.   IN THE EXHIBITS?

17   A.   NOT THE EXHIBITS WE HAVE SEEN YET, BUT THERE IS A PAPER

18   SOMEWHERE THAT HAS HIS NUMBER ON IT.

19   Q.   YOU HAVE GIVEN THAT TO THE GOVERNMENT?

20   A.   I'M NOT SURE IF I DID OR NOT, BUT THE GOVERNMENT WAS WITH

21   ME WHEN I MADE THE PHONE CALLS TO TZEGAI.

22   Q.   BUT YOU MAY HAVE OTHER PAPERWORK YOU DIDN'T GIVE TO THE

23   GOVERNMENT?

24   A.   NO, I DON'T HAVE ANY PAPERWORK.

25   Q.   NOW, THE ATTORNEY THING, MR. MILLER YOU KNEW WAS TRYING

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-5   Filed 07/14/06   Page 18 of 25

624

1  TO HIRE A PAID ATTORNEY TO DEFEND HIM IN THIS COUNTERFEITING
2  CASE?

3  A.   YES.

4  Q.   CORRECT?

5  A.   YES.

6  Q.   AND HE WAS TRYING TO GET YOU OUT TO GET HIM MONEY FOR
7  THAT PURPOSE?

8  A.   NO, HE WASN'T TRYING TO GET ME OUT FOR THAT PURPOSE.  HE
9  WAS TRYING TO GET ME OUT TO GET MONEY SO HE COULD GET, YOU
10  KNOW, SOME MONEY FOR COMMISSARY, AND HE WAS TRYING TO GET ME
11  TO GET THAT DIAMOND RING SO HE CAN GIVE IT TO KATHERINE.
12  KATHERINE IS WORTH SO MUCH MONEY, HE CAN GET MONEY FROM HER
13  FOR AN ATTORNEY.  THAT'S MY UNDERSTANDING.  THAT'S THE REASON
14  HE WANTED THE RING SO BAD, BECAUSE HE COULD IMPRESS HER, AND
15  SHE WOULD THROW HIM MORE MONEY TO GET AN ATTORNEY.

16  Q.   THIS IS A REFERENCE TO THE ATTORNEY?

17           MR. WRAY:  COULD WE APPROACH?

18           THE COURT:  YES.

19           (AT THE BENCH)

20           MR. WRAY:  BEFORE WE GET TOO FAR INTO THESE
21  TRANSCRIPTS, I WOULD LIKE SOME CLARIFICATION.  MY
22  UNDERSTANDING OF YOUR RULING BEFORE WAS THAT THE WITNESS WAS
23  NOT GOING TO BE ALLOWED TO TESTIFY AS TO WHAT MR. MILLER WAS
24  THINKING OR MEANT.  AT LEAST THAT WAS THE RULING ON DIRECT.
25  SO, IT SEEMS THE ME THE SAME RULING APPLIES TO

Case 1:97-cr-00496-SDG-GGB   Document 153-5   Filed 07/14/06   Page 19 of 25

625

1   CROSS-EXAMINATION.  IF HE WANTS TO CROSS-EXAMINE MR. PLANTE
2   ABOUT WHAT MR. PLANTE SAID, THAT'S THE SAME RULING ON DIRECT
3   AND CROSS.  OTHERWISE IT IS ESSENTIALLY HAVING HIS CLIENT
4   TESTIFY.
5           THE COURT:  I THOUGHT WHAT MR. HARBIN WAS SEEKING TO
6   DO WAS FIND OUT WHAT WAS IN MR. PLANTE'S MIND.
7           MR. WRAY:  WHAT HE WAS ASKING IS WHAT WAS IN
8   MR. MILLER'S MIND.
9           MR. HARBIN:  IN THE DISCUSSIONS.
10          THE COURT:  I JUST DON'T RECALL THAT QUESTION.  I DO
11  THINK IT IS CORRECT THAT MR. HARBIN IS ENTITLED TO ASK
12  MR. PLANTE WHAT HE THOUGHT MR. MILLER MEANT.
13          (END OF BENCH CONFERENCE)
14  BY MR. HARBIN:
15  Q.   NOW, I THOUGHT YOU TESTIFIED EARLIER THAT THE RING WAS
16  JUST TO EXPLAIN TO MS. MILLER WHERE THE THOUSAND DOLLARS WENT.
17  A.   AND IF YOU WILL REMEMBER, EARLIER THE THOUSAND DOLLARS HE
18  PAID ME WITH WAS FOR HIS LAWYER, AND HE USED THAT THOUSAND
19  DOLLARS TO PAY MY BOND.  SO, NOW HE NEEDS A REASON WHERE THAT
20  THOUSAND DOLLARS WENT TO.  SO, NOW HE HAS GOT TO GET THE RING
21  TO EXPLAIN TO KATHERINE MILLER WHERE THE THOUSAND DOLLARS FOR
22  HIS LAWYER WENT TO.
23  Q.   BUT MR. MILLER DISCUSSED WITH YOU OTHER WAYS SUCH AS
24  TAKING POUNDS OF MARIJUANA TO SAVANNAH FOR RAISING MONEY FOR
25  YOU AND HIM?

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB Document 153-5 Filed 07/14/06 Page 20 of 25

626

1   A.   NO, SIR, HE NEVER SAID ANYTHING ABOUT RAISING MONEY FOR A
2   LAWYER LIKE THAT.

3   Q.   BUT HE TALKED TO YOU ABOUT RAISING MONEY THAT WAY?

4   A.   NO, SIR, HE NEVER PLANNED THAT.  THAT WAS JUST SOMETHING
5   HE SAID JUST OUT OF THE BLUE ONE DAY, BUT HE NEVER PLANNED IT.
6   HE NEVER HAD A PLAN TO IT.

7            (WHEREUPON A PORTION OF GOVERNMENT'S EXHIBIT 58-A
8   WAS PLAYED FOR THE COURT AND JURY).

9   BY MR. HARBIN:

10  Q.   NOW, IN RESPONDING TO MR. MILLER SAYING YOU WILL DO WHAT
11  YOU CAN DO ABOUT BOTH OF THOSE THINGS, YOU ARE TALKING ABOUT
12  THE RING AND GABRIELLE, THE BOND MATTER?

13  A.   YES.

14  Q.   AND THAT WAS A REFERENCE TO THE RING AS WELL?  THAT WAS
15  THE THING FOR KATHERINE?

16  A.   YES.

17           (WHEREUPON A PORTION OF GOVERNMENT'S EXHIBIT 58-A
18  WAS PLAYED FOR THE COURT AND JURY).

19  BY MR. HARBIN:

20  Q.   THE REFERENCE TO THE $1,100, YOU HAD CALLED GABRIELLE
21  ABOUT THE BOND THERE; IS THAT CORRECT?  THAT'S ANOTHER
22  REFERENCE TO THAT?

23  A.   YES.

24  Q.   NOW, VISITATION IS A REFERENCE TO WHEN YOU HAD GONE --

25  A.   TO THE COBB COUNTY JAIL AND SAW MR. MILLER.

627

1   Q.   IF YOU WILL, LET ME FINISH THE QUESTION FIRST.  THIS WAS

2   AFTER YOU WERE BONDED OUT; CORRECT?

3   A.   YES.

4   Q.   BUT YOUR TESTIMONY IS YOU TALKED ABOUT PLAN A FOR WEEKS;

5   ISN'T THAT RIGHT?

6   A.   YES.

7   Q.   YOU HAD TALKED TO TZEGAI, HADN'T YOU?

8   A.   NO, I HAD NOT TALKED TO TZEGAI ABOUT THE AIRPORT.

9   Q.   DIDN'T YOU HEAR THAT VOICE AND THINK IT WAS TZEGAI?

10  A.   IT MIGHT HAVE BEEN.  I DON'T KNOW.

11  Q.   THERE IS A REFERENCE TO TALK TO HER, AND SHE SAID HE WAS

12  SUPPOSED TO CALL HER BACK.  THAT IS ANOTHER REFERENCE TO THE

13  BOND DEAL.  YOU SAID I'M GOING TO DRIVE TO SAVANNAH.

14  A.   YES, THAT'S TALKING ABOUT THE BOND DEAL WHEN I CAME BACK

15  FROM SAVANNAH.

16           (WHEREUPON A PORTION OF GOVERNMENT'S EXHIBIT 58-A

17  WAS PLAYED FOR THE COURT AND JURY).

18  BY MR. HARBIN:

19  Q.   I BELIEVE YOUR TESTIMONY ON DIRECT WAS THE FINGER PIECE

20  IS A REFERENCE TO THE RING?

21  A.   YES, SIR.

22  Q.   AND DID YOU UNDERSTAND MR. MILLER TO BE SAYING HE MIGHT

23  PAY YOU SOME EXTRA FOR THE RING?

24  A.   YES.

25  Q.   SO, HE'S FOCUSING RIGHT HERE ON THE BOND DEAL AND THE

1    RING?

2    A.   YES.

3    Q.   NOW, WITH REGARD TO THE BOND DEAL, MR. MENDOZA, DID YOU

4    SAY, WAS FROM MEXICO?

5    A.   YES, SIR.

6    Q.   AND HE DIDN'T HAVE A GREEN CARD?

7    A.   HE DIDN'T HAVE A GREEN CARD.

8    Q.   AND YOU SPOKE SPANISH, AND HE SPOKE SPANISH?

9    A.   YES.

10   Q.   DID MR. MENDOZA SPEAK ENGLISH?

11   A.   VERY, VERY LITTLE, MAYBE THREE OR FOUR WORDS.

12   Q.   AND MR. MILLER DID NOT SPEAK SPANISH?

13   A.   NO, HE DOES NOT.

14   Q.   SO, COMMUNICATION ABOUT THIS PLAN WITH MR. MENDOZA WAS

15   PRIMARILY BETWEEN YOU AND MR. MENDOZA?

16   A.   NO, IT WAS PRIMARILY BETWEEN HIM AND MRS. MENDOZA,

17   GABRIELLE.  SHE CAN SPEAK ENGLISH VERY GOOD.  HE TALKED TO HER

18   ON THE PHONE EVERY TIME.

19   Q.   BUT YOU TALKED TO MR. MENDOZA IN PRISON ABOUT IT?

20   A.   YES, I TALKED TO MR. MENDOZA TOO.

21              (WHEREUPON A PORTION OF GOVERNMENT'S EXHIBIT 58-A

22   WAS PLAYED FOR THE COURT AND JURY).

23   Q.   WHEN YOU STATE AT THE BOTTOM OF PAGE 12 MR. MILLER SAID

24   WE MIGHT BE ABLE TO WORK SOMETHING OUT FOR THAT, AND YOU SAID

25   I TOLD YOU I'M GOING TO DO ALL THAT TUESDAY, AND THEN YOU

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB    Document 153-5    Filed 07/14/06    Page 23 of 25

629

1   REFER TO TUESDAY AGAIN AT THE BOTTOM OF THE PAGE, I'M GOING TO
2   DO THAT, AND I'M GOING TO DO THE MEXICAN THING TUESDAY, THOSE
3   ARE REFERRING TO THE RING AND THE BOND THING?
4   A.   YES, THAT'S WHEN I CAME BACK TUESDAY FROM SAVANNAH.
5   Q.   NOW, AGAIN, YOU SAY YOU HAVE BEEN TALKING ABOUT PLAN A
6   FOR WEEKS?
7   A.   UH-HUH.
8   Q.   AND WHO WAS JIM?
9   A.   JIMMY IS SUPPOSED TO BE JODEE, AND HE'S SUPPOSED TO SAY
10  HIS NAME IS JASON BECAUSE HIM AND JODEE HAD A LITTLE THING
11  GOING ON BEHIND KATHERINE'S BACK, AND HE COULDN'T SAY JODEE'S
12  NAME IN FRONT OF KATHERINE.
13  Q.   I THOUGHT YOU SAID JODEE'S NAME IS JASON.
14  A.   NO, HE WAS SUPPOSED TO SAY HIS NAME WAS JASON.  JIMMY WAS
15  JODEE.  JODEE'S SISTER DOESN'T LIKE HIM, SO HE CAN'T CALL HER
16  HOUSE AND SAY IT'S HIM.  I MIGHT HAVE MIXED THEM UP EARLIER,
17  BUT IT'S JASON AND JIMMY, BUT IT WAS JODEE.
18  Q.   YOU WERE TALKING ABOUT A THIRD PERSON THAT WAS IN PRISON.
19  A.   THAT WAS JODEE.  SHE WAS IN VISITATION WITH ME THAT DAY.
20  WE WENT UP TOGETHER.
21  Q.   BUT YOU ARE SAYING JODEE WAS CALLED JASON?
22  A.   JODEE I CALLED JIMMY.  HE WAS SUPPOSED TO SAY HIS NAME
23  WAS JASON WHEN HE CALLED JODEE'S HOUSE BECAUSE HE CAN'T SAY
24  HIS NAME IN FRONT OF JODEE'S SISTER IF SHE ANSWERED THE PHONE.
25  Q.   AND LATER ON YOU SAID JODEE IS CALLED SOMETHING ELSE, A

1   WOMAN'S NAME.

2   A.   WHAT IS THAT?

3   Q.   WE WILL COME TO IT.

4   Q.   WHEN MR. MILLER IS REFERRING ON PAGE 15 TO WE CAN HANDLE

5   IT, YOU UNDERSTOOD THERE WERE OTHER PEOPLE INVOLVED IN THIS,

6   DIDN'T YOU?

7   A.   WHAT DO YOU MEAN AS FAR AS OTHER PEOPLE INVOLVED?

8   Q.   OTHER THAN YOU AND MR. MILLER?

9   A.   INVOLVED IN ANY OF THE STUFF WE HAD PLANNED?

10   Q.   THE PLANS YOU WERE WORKING ON.

11   A.   NO, NOBODY ELSE WAS INVOLVED EXCEPT TO DRIVE ME

12   SOMEPLACE, AND THAT WAS IT.

13   Q.   NOW, AT THE BOTTOM OF PAGE 15, DO YOU SEE WHERE YOU SAID,

14   "YOU KNOW WHY I REALLY WANT TO MAKE THE TUESDAY THING," YOU

15   ARE REFERRING HERE TO DOING THE BOND DEAL ON TUESDAY?

16   A.   I WAS REFERRING TO DOING THE BOND AND THE FINGER THING

17   TUESDAY AFTER I HAD COME BACK FROM SAVANNAH, WHICH HAD BEEN

18   DELIVERING THE BODY TO SAVANNAH.

19   Q.   AND YOU TOLD MR. MILLER THAT YOUR CONCERN WAS, "IF

20   ANYTHING GOES WRONG AND THEY DO FIND OUT MY NAME, I'M OUT OF

21   THE STATE."

22   A.   THAT'S WITH THE BOND THING.

23   Q.   THE BOND THING AND THE RING THING?

24   A.   NOT THE RING THING SO MUCH, BUT THE BOND THING BECAUSE,

25   SEE, THEY KNEW ME.  I'M IN THERE WITH MENDOZA.  SO, ALL HE HAS


PATTI ALLEN, COURT REPORTER

1    GOT TO DO IS FIND OUT WHAT MY NAME IS, THE GUY LOCKED UP WITH

2    HIM.   I'M THINKING IF MY NAME COMES UP, I'M OUT OF HERE.

3    Q.    BUT YOU WERE TELLING MR. MILLER THAT YOU WERE COMFORTABLE

4    DOING A MURDER ON MONDAY, BUT YOU ARE WORRIED ABOUT YOUR NAME

5    BEING DROPPED ON THE BOND THING ON TUESDAY?

6    A.    NO, I NEVER DID STATE NOTHING ABOUT MONDAY.   IF YOU HAVE

7    READ THIS PHONE CONVERSATION, IT WAS MADE ON MONDAY, AND

8    TUESDAY I WAS PLANNING ON DOING THAT STUFF THAT MORNING, AND

9    COMING BACK UP HERE TUESDAY NIGHT AND HANDLING THE REST OF THE

10   STUFF.   I WAS PLANNING ON DRIVING FROM HERE TO SAVANNAH

11   TUESDAY MORNING OR TUESDAY AFTERNOON.

12   Q.    THIS CALL WAS SUNDAY, ISN'T IT?

13   A.    IT COULD BEEN HAVE BEEN, BUT IF YOU LOOK, THERE WAS

14   ANOTHER CALL MONDAY.   SO, I HAD NO PLANS TO DO ANYTHING ON

15   MONDAY.

16   Q.    BUT YOUR TESTIMONY IS YOU ARE TELLING MR. MILLER I'LL DO

17   A MURDER MONDAY, BUT I DON'T WANT TO DO A THEFT OF $1,000 FOR

18   A BOND UNTIL TUESDAY SO THAT IF I GET CAUGHT ON THE THEFT OF A

19   THOUSAND DOLLARS, I'M OUT OF THE STATE?

20   A.    NO, THAT'S NOT WHAT I WAS SAYING, TO ANSWER YOUR

21   QUESTION.

22   Q.    NOW, ARE YOU TRYING TO CREATE EVIDENCE WITH THAT

23   STATEMENT?

24   A.    NO, I WAS NOT.   I'M JUST TRYING TO TELL HIM TO QUIT

25   PESTERING ME ABOUT THIS BOND THING AND THIS RING THING, AND