632

1   LET'S GET ON WITH PLAN A IF WE ARE GOING TO GET ON AND DO PLAN
2   A.
3   Q.   MR. MILLER IS MORE INTERESTED IN THE BOND PLAN AND THE
4   RING PLAN?
5   A.   HE WAS INTERESTED IN THAT TO MAKE HIMSELF LOOK GOOD IN
6   FRONT OF HIS GIRLFRIEND, YES, BECAUSE SHE IS ALWAYS ON THE
7   TELEPHONE AND TALKING, AND THAT COULD REFLECT ON WHY HE IS
8   ALWAYS STRESSING THE TWO POINTS, BECAUSE HE IS ALWAYS TALKING
9   IN FRONT OF HER.
10  Q.   SO, YOU WERE TRYING TO GET HIM FROM THOSE TWO PLANS ONTO
11  THIS PLAN A?
12  A.   YEAH.
13  Q.   THAT YOU SAY IS MURDER OF A WITNESS?
14  A.   YES.
15  Q.   NOW, DID MR. MILLER TELL YOU -- YOU TESTIFIED HE SAID SHE
16  WAS THE ONLY WITNESS.
17  A.   HE TOLD ME THAT WAS THE ONLY WITNESS HE KNEW OF THAT HAD
18  ANY INFORMATION AGAINST HIM THAT COULD HURT HIM.
19  Q.   DID HE TELL YOU THAT HIS GIRLFRIEND KATHERINE WHO IS ON
20  THE PHONE HAD SEEN HIM PRINT MONEY 30 OR 40 TIMES?
21  A.   HE NEVER TOLD ME THAT.
22  Q.   DID HE TELL YOU THAT THE EQUIPMENT THAT THE GOVERNMENT
23  SEIZED WAS SEIZED FROM HIS CURRENT GIRLFRIEND, KATHERINE
24  MILLER'S APARTMENT?
25  A.   HE NEVER TOLD ME THAT.  THE ONLY THING HE TOLD ME

PATTI ALLEN, COURT REPORTER

VOL 4 - JUN 23, 1998

633

1    ANYTHING ABOUT HIS COUNTERFEIT IS HE USED A LASER PRINTER

2    BECAUSE IT WAS CHEAPER THAN USING PLATES.

3    Q.   DID HE TELL YOU THAT PEOPLE TO WHOM HE PASSED COUNTERFEIT

4    IN GAINESVILLE HAD BEEN CAUGHT?

5    A.   NO, HE NEVER TOLD ME ANY OF THAT.

6    Q.   DID HE TELL YOU THAT TZEGAI HINSON HAD SEEN HIM PRINT

7    MONEY?

8    A.   HE NEVER TOLD ME THAT EITHER.  HE NEVER TALKED ABOUT HIS

9    COUNTERFEIT CASE IN DETAIL MUCH AT ALL.  HE SAID HE HAD ONE

10   WITNESS HE WANTED OUT OF THE WAY.

11   Q.   BUT YOU WERE TRYING TO GET MR. MILLER TO SAY HERE ON A

12   RECORDED CONVERSATION YOU WERE RECORDING WITH THE GOVERNMENT

13   THAT PLAN A IS MORE IMPORTANT?

14   A.   YEAH, PLAN A WOULD BE MORE IMPORTANT TO SOMEBODY LIKE

15   THAT.  HE'S SAYING WHAT IT IS FOR IS --

16   Q.   I'M NOT ASKING YOU ABOUT YOUR TESTIMONY OR A SPEECH OF

17   WHAT IT WOULD BE.  I'M ASKING YOU ABOUT WHAT YOU WERE TRYING

18   TO DO RIGHT HERE.  WERE YOU TRYING TO PUT WORDS IN THE

19   TRANSCRIPT THAT PLAN A WAS MORE IMPORTANT TO MR. MILLER?

20   A.   YES.

21   Q.   BUT THE FACT IS YOU WERE HAVING TO DIVERT HIS ATTENTION

22   FROM THE RING DEAL AND THE BOND DEAL?

23   A.   NO, NOT REALLY.

24   Q.   THAT'S WHAT YOU JUST SAID, ISN'T IT?

25   A.   BUT I WASN'T JUST TRYING TO DIVERT HIS ATTENTION.

PATTI ALLEN, COURT REPORTER

1   Q.   NOW, DID YOU TALK TO THE SECRET SERVICE ABOUT COMING UP
2   WITH CONCRETE EVIDENCE THROUGH THIS AUDIO TAPE AND VIDEOTAPE
3   SURVEILLANCE THAT THIS WAS, INDEED, A PLOT TO KILL JENNIFER
4   ASHFORD?
5   A.   REPHRASE THAT, PLEASE.
6   Q.   DID YOU TALK TO THE SECRET SERVICE ABOUT HOW TO COME UP
7   WITH CONCRETE EVIDENCE THROUGH THESE RECORDED TELEPHONE
8   CONVERSATIONS?
9   A.   I NEVER STATED TO THEM THAT I WAS GOING TO COME UP WITH
10  CONCRETE EVIDENCE, NO.
11  Q.   DID YOU TALK ABOUT HOW TO DO IT?
12  A.   ABOUT HOW TO DO WHAT?  WHAT ARE YOU REFERRING TO?
13  Q.   COME UP WITH CONCRETE EVIDENCE ON THESE AUDIO TAPES THAT
14  YOU AND THE SECRET SERVICE ARE MAKING?
15  A.   NO, I NEVER STATED THAT, NO.
16  Q.   YOU DIDN'T TALK WITH MR. WISNIEWSKY ABOUT HOW TO DO THAT?
17  A.   ABOUT HOW TO COME UP WITH CONCRETE EVIDENCE?
18  Q.   YES, SIR.
19  A.   NO.   I JUST TOLD HIM I WOULD TALK TO HIM ON THE PHONE
20  ABOUT WHAT WE HAD PLANNED IN JAIL, AND THAT'S IT.
21  Q.   AND YOU DID MENTION SPECIFIC THINGS ON THE TAPES?
22  A.   I MENTIONED A LOT OF SPECIFIC THINGS.
23  Q.   YOU MENTIONED GOING TO SAVANNAH?
24  A.   YES.
25  Q.   YOU MENTIONED JODEE'S NAME?

635

1  A.  YES.

2  Q.  YOU MENTIONED THE RING DEAL VERY SPECIFICALLY?

3  A.  YES.

4  Q.  YOU MENTIONED THE BOND DEAL REPEATEDLY?

5  A.  YES.

6  Q.  BUT YOU NEVER MENTIONED JENNIFER ASHFORD?

7  A.  NO, I NEVER MENTIONED THAT NAME.

8  Q.  YOU NEVER MENTIONED THE HERB SHOP?

9  A.  NO, FOR THE SIMPLE FACT I KNOW IF I HAD MENTIONED THAT

10 OVER THE TELEPHONE, HE WOULD HAVE HUNG UP AND NEVER HAD

11 ANYTHING OTHER TO SAY BECAUSE WE ALREADY TALKED ABOUT NOT

12 DOING THAT BEFORE I LEFT THE JAIL.

13 Q.  BUT YOU MENTIONED OTHER THINGS.  HE WAS UPSET ABOUT YOU

14 MENTIONING JODEE, BUT HE STAYED ON THE PHONE.

15 A.  NONE OF THEM HAD NOTHING TO DO WITH WHAT I WAS DOING

16 ILLEGALLY, THOUGH.

17 Q.  HE WAS CONCERNED ABOUT YOU MENTIONING A CAR TO TAKE TO

18 SAVANNAH, BUT HE STAYED ON THE PHONE AND TALKED TO YOU?

19 A.  YEAH, I BROUGHT THAT UP.

20 Q.  YOU DIDN'T MENTION HAVING TO DISPOSE OF A PACKAGE IN

21 SAVANNAH?

22 A.  NO.

23 Q.  OR OF HAVING TO DISPOSE OF A BODY IN SAVANNAH?

24 A.  NO, NEVER, NOT OVER THE TELEPHONE.

25 Q.  AND YOU SAY YOU TALKED ABOUT THAT SPECIFICALLY IN THE

Case 1:97-cr-00496-SDG-GGB   Document 153-6   Filed 07/14/06   Page 5 of 25

636

1  JAIL CELL?

2  A.  YES.

3  Q.  BUT YOU DIDN'T GET ANY RECORDING OF THAT IN THE JAIL

4  CELL?

5  A.  NO, SIR.

6  Q.  AND YOU MENTIONED THE SURPLUS SPECIFICALLY, AND

7  MR. MILLER KEPT TALKING?

8  A.  YES.

9  Q.  THIS IS NOW TALKING ABOUT GETTING A CAR MONDAY AFTERNOON

10  YOU ARE SAYING?

11  A.  YES, THIS IS TALKING ABOUT GETTING A CAR WHEN HE SAID

12  I'LL GET YOU WHAT YOU NEED.  HE'S REFERRING TO A CAR.

13  Q.  AND THERE WAS NO URGENCY OF DOING ANYTHING ON THIS

14  ALLEGED SCHEME FRIDAY NIGHT, WAS THERE, BECAUSE IT IS NOW

15  SUNDAY?

16  A.  ON WHAT FRIDAY NIGHT?  WHAT SCHEME ARE YOU TALKING ABOUT?

17  Q.  THIS ALLEGED SCHEME TO KILL JENNIFER ASHFORD?

18  A.  NO.  THE FIRST THING HE WANTED DONE WAS THE BOND THING.

19  THE SECOND THING WAS THE RING THING, AND THE THIRD THING HE

20  WANTED TO DO RIGHT BEFORE I LEFT WAS THE JENNIFER ASHFORD

21  THING.

22  Q.  NOW, MR. MILLER TOLD YOU HE NEEDED TO SHOW SOME SIGNS;

23  CORRECT?

24  A.  YES, SIR.

25  Q.  THE TRUTH IS THERE WERE OTHER PEOPLE INVOLVED IN THIS

Case 1:97-cr-00496-SDG-GGB    Document 153-6    Filed 07/14/06    Page 6 of 25

637

1   PLAN?

2   A.    THERE WAS NO OTHER PEOPLE INVOLVED IN THIS PLAN.  WHEN HE

3   IS SAYING THAT RIGHT THERE, HE'S SAYING HE NEEDS TO SHOW

4   KATHERINE THAT HE HAS GOT THE MONEY BACK ON THE BOOKS OR A

5   RING.  THAT'S WHAT HE IS SAYING BY THAT BECAUSE HE HAS GOT HER

6   ON THE PHONE.  YOU'VE GOT TO REMEMBER DURING THIS WHOLE

7   CONVERSATION, SHE IS LISTENING TO ALL OF IT TOO, SO HE HAS

8   SPECIFICALLY GOT TO MAKE HER THINK THAT HE'S GETTING SOMETHING

9   FOR HER.

10  Q.    NOW HE SAID HE NEEDED TO GET SOME MONEY BACK FOR WHAT HE

11  PUT UP?

12  A.    YES.

13  Q.    PUTTING UP IS REFERRING TO THE THOUSAND DOLLARS?

14  A.    THE THOUSAND DOLLARS, YES.

15  Q.    AND YOU KNEW HE WAS TRYING TO GET MONEY FOR AN ATTORNEY?

16  A.    YES, I KNEW THAT.

17  Q.    AND YOUR TESTIMONY IS THAT HE USED A THOUSAND DOLLARS OF

18  KATHERINE'S MONEY.  YOU WERE GOING TO GET ELEVEN HUNDRED

19  DOLLARS, AND THAT ELEVEN HUNDRED DOLLAR BOND DEAL WAS UNDER

20  YOUR TESTIMONY THE ONLY OTHER SPECIFIC MONEY MAKING SCHEME YOU

21  ALL WERE TALKING ABOUT AT THAT TIME?

22  A.    BESIDES THE RING.  HE TOLD ME I WOULD GET MONEY FROM THAT

23  TOO ONCE I GOT THE RING.

24  Q.    HE WOULDN'T GET MONEY; YOU WOULD GET MONEY?

25  A.    HE WOULD PAY ME FOR THE RING.

PATTI ALLEN, COURT REPORTER

638

1  Q.   SO, YOU'RE SAYING THAT MR. MILLER WAS GOING TO GET A

2  THOUSAND DOLLARS FROM KATHERINE.  YOU WERE GOING TO GET ELEVEN

3  HUNDRED DOLLARS.  YOU WERE GOING TO GET THREE HUNDRED FOR A

4  HOTEL, JODEE WAS GOING TO GET FIVE OR SIX HUNDRED, AND

5  MR. MILLER IS GOING TO TWO HUNDRED TO PUT ON HIS BOOKS?

6  A.   FOR COMMISSARY.  LIKE I SAID, HE WAS WORRIED ABOUT HAVING

7  COMMISSARY.  WE ARE ALLOWED $50 A WEEK ON THE BOOKS FOR

8  COMMISSARY.

9  Q.   NOTHING FOR ATTORNEYS?

10 A.   NOTHING FOR ATTORNEYS.  HE WASN'T REALLY WORRIED ABOUT

11 ATTORNEYS AT THAT POINT.

12 Q.   THAT'S NOT WHAT YOU TOLD THE SECRET SERVICE IN MARCH OF

13 1998, IS IT?

14 A.   YES, THAT'S WHAT I TOLD THEM.  I TOLD HIM 500 TO JODEE,

15 300 TO ME, AND THE REST TO HIM ON HIS BOOKS.

16 Q.   BUT YOU TOLD THEM HE WAS WORRIED ABOUT AN ATTORNEY?

17 A.   YES, HE WAS WORRIED ABOUT AN ATTORNEY.  HE SAID HIS

18 GRANDPARENTS WERE SUPPOSED TO BE HELPING HIM WITH AN ATTORNEY,

19 HIS GRANDPARENTS AND KATHERINE.  PLEASE, WHATEVER I TOLD THEM,

20 PLEASE DON'T TWIST IT UP IF YOU DON'T MIND.

21 Q.   MR. MILLER WAS TRYING TO GET MONEY FOR AN ATTORNEY?

22 A.   YES, AND HE WAS DOING SO BY TELLING KATHERINE HE WAS

23 GOING TO GIVE HER A RING.

24 Q.   WELL, IT WOULD HAVE BEEN A LOT EASIER TO TAKE A THOUSAND

25 DOLLARS AND USE THAT FOR AN ATTORNEY RATHER THAN USE A

639

1   THOUSAND DOLLARS AND GET TWO HUNDRED BACK.

2   A.   USE A THOUSAND DOLLARS, GET TWO HUNDRED BACK, GET RID OF

3   YOUR MAIN WITNESS, AND COME UP WITH A RING FOR YOUR

4   GIRLFRIEND.   THAT'S WORTH A THOUSAND DOLLARS.

5   Q.   AND YOU HAVEN'T GOTTEN ANY MONEY FOR AN ATTORNEY?

6   A.   NO.   YOU DON'T NEED AN ATTORNEY IF YOU AIN'T GOT A

7   WITNESS.

8   Q.   BUT IF YOU'VE GOT TEN OTHER WITNESSES, YOU NEED AN

9   ATTORNEY?

10  A.   WELL, HE DIDN'T SAY NOTHING ABOUT TEN OTHER WITNESSES.

11  HE JUST SAID THAT HIS MAIN WITNESS HE WANTED RID OF.   THAT'S

12  THE ONLY ONE THAT HAD ANYTHING AGAINST HIM.

13          MR. HARBIN:   CAN YOU PUT THE NEXT TAPE ON?   IF WE

14  COULD ON THIS ONE, I WOULD LIKE TO DISTRIBUTE THE HEADPHONES.

15          THE COURT:   ALL RIGHT, WE WILL.   DOES EVERYBODY HAVE

16  A HEADPHONE?   I GUESS WE ARE ALL SET ON THAT.

17          DOES EVERYONE HAVE THE TRANSCRIPTS FOR 59-B, THE

18  SECOND TRANSCRIPT?

19  BY MR. HARBIN:

20  Q.   NOW, THE REFERENCE BY MR. MILLER TO GETTING STUFF DONE

21  THAT LAST NIGHT, IF YOU STUCK HER, YOU GOT THAT DONE LAST

22  NIGHT, THAT IS A REFERENCE TO THE BOND DEAL?

23  A.   YES.

24  Q.   NOW, IF YOU CAN, REWIND THAT ONE SENTENCE AND PLAY IT

25  AGAIN.   IT'S VERY SHORT.   I WANT YOU TO LISTEN VERY CAREFULLY,

640

1   MR. PLANTE, TO PAGE 4 WHERE THE TRANSCRIPT PREPARED BY THE
2   GOVERNMENT SAYS "INAUDIBLE."
3        WHAT YOU SAID TO MR. MILLER WAS, "WHAT I TOLD YOU IN
4   VISITATION ABOUT THE DRUGS"; RIGHT?
5   A.   NO, I NEVER SAID NOTHING ABOUT DRUGS.  REWIND THAT ONE
6   MORE TIME AND I CAN PROBABLY TELL YOU WHAT I SAID.
7   Q.   YOU WERE TALKING ABOUT DRUGS, WEREN'T YOU?
8   A.   I DIDN'T SAY DRUGS.  I'M NOT SURE WHAT THAT IS.  IT'S
9   MUMBLING.  IT SOUNDS LIKE DRAW, SOMETHING LIKE THAT, NOT
10  DRUGS.  I SAY DRUGS VERY CLEARLY.
11  Q.   WELL, IT'S NOT JUST YOU.  IT'S THE TAPE, THE QUALITY OF
12  THE TAPE, ISN'T IT?
13  A.   HOLD ON.  I'LL TELL WHAT YOU THAT IS ABOUT RIGHT NOW.  I
14  SAID DRAWER.  I SAID DRAWER BECAUSE IN THE HERB SHOP IS A CASH
15  DRAWER, AND THERE IS A MONEY IN THE CASH DRAWER.  I REMEMBER
16  NOW.  IF YOU LOOK AT SOME MORE EXHIBITS, WE HAVE NOTES WE
17  WROTE TO EACH OTHER AT THE WINDOW DURING THE VISITATION, AND
18  ONE OF THEM TALKS ABOUT KNOCKING TWO BIRDS OUT WITH ONE STONE.
19  THAT'S WHERE HE WANTED ME TO DO THIS BOND THING, AND I TOLD
20  HIM NO, I'M GOING TO DO THE PLAN A THING AT THE HERB SHOP, AND
21  THERE'S SEVEN OR EIGHT HUNDRED DOLLARS IN THE CASH REGISTER.
22  I TOLD HIM I WOULD TAKE THAT MONEY AND GIVE JODEE SOME OF IT,
23  AND LEAVE TWO OR THREE HUNDRED ON HIS BOOKS.  THAT'S WHAT I'M
24  SAYING IN THE VISITATION I TOLD YOU ABOUT.  IT'S DRAWER, NOT
25  DRUGS.  THAT'S CLEARLY WHAT THAT IS.

641

1   Q.   SO, YOUR TESTIMONY IS THAT IS A REFERENCE TO DRAWER?

2   A.   A DRAWER, A CASH DRAWER IN THE HERB SHOP.

3   Q.   AND YOUR TESTIMONY IS MR. MILLER TOLD YOU THE HERB SHOP

4   IN ROSWELL --

5   A.   HAD SIX OR SEVEN HUNDRED DOLLARS IN THE CASH DRAWER.

6   Q.   NOW, YOU REFERRED TO WHEREVER YOU GOT TO GO, BUT YOU HAD

7   A MAP, YOU SAY, TO THE HERB SHOP; CORRECT?

8   A.   YES.

9   Q.   AND YOU WERE TALKING TO GABRIELLE ABOUT THE BOND DEAL?

10  A.   WHEN?

11  Q.   WHEN YOU WERE OUT OF JAIL, YOU WERE THE ONE TALKING TO

12  GABRIELLE ABOUT THE BOND DEAL?

13  A.   HE WAS TALKING TO GABRIELLE FROM INSIDE THE JAIL ABOUT

14  THE BOND DEAL.  I CALLED HER ONE TIME, AND I TOLD HER I WOULD

15  CALL HER BACK IN A COUPLE DAYS AROUND TUESDAY, BUT I NEVER DID

16  CALL HER BACK.

17  Q.   CHEDDER WAS A TERM FOR MONEY, WASN'T IT?

18  A.   YES.

19  Q.   NOW, MR. HINSON, YOU PICKED UP HIS CAR DOWN AT THE

20  AIRPORT; CORRECT?

21  A.   AT FEDERAL EXPRESS OR FED EX.  HE WORKED AT A FED EX, OR

22  SOMEWHERE LIKE THAT.

23  Q.   DOWN BY THE AIRPORT?

24  A.   I GUESS.  I DON'T KNOW WHERE IT WAS AT.  I'M NOT FAMILIAR

25  WITH THIS AREA.  SHE DROVE ME THERE.

PATTI ALLEN, COURT REPORTER

642

1    Q.    75 SOUTH?

2    A.    I DON'T KNOW.   LIKE I SAY, I DON'T KNOW WHERE I WAS.   I

3    KNOW IT WAS FED EX, OR SOMEWHERE LIKE THAT.   SHE DROVE ME.   I

4    DIDN'T DRIVE.

5    Q.    AND YOU WERE ASKING MR. MILLER ABOUT DRIVING FROM WHERE

6    MR. HINSON WAS DOWN TO SAVANNAH AND BACK?

7    A.    HOW TO GET THERE?   NO, I WAS NOT ASKING DIRECTIONS ON HOW

8    TO GET SAVANNAH.   I WAS ASKING DID I HAVE ENOUGH TIME TO GET

9    THE BODY TO SAVANNAH AND BACK BEFORE TZEGAI GOT BACK OFF WORK.

10   HE SAID I HAD TO COME AND PICK HIM BACK UP AT WORK.

11   Q.    YOU DIDN'T MENTION ANYTHING ABOUT PICKING THE CAR UP ON

12   75 SOUTH.   YOU MENTIONED PICKING IT UP DIRECTLY FROM

13   MR. HINSON AND GOING DIRECTLY TO SAVANNAH.

14   A.    NO, I DID NOT.

15   Q.    AND AGAIN, IT WAS YOUR IMPRESSION MR. MILLER WAS MORE

16   INTERESTED IN THE BOND DEAL THAN THIS PLAN A AT THIS TIME?

17   A.    AT THAT TIME, YES.

18   Q.    SO, AGAIN, IT WAS APPARENT TO YOU THAT MR. MILLER'S

19   EMPHASIS WAS ON GETTING MONEY BACK?

20   A.    YES.

21   Q.    NOW, IN THAT TAPE THERE, THE GOVERNMENT TRANSCRIPT SAYS,

22   "MOVE THAT MONEY THE FUCKING WAY YOU WERE SUPPOSED TO," BUT

23   WHAT WAS SAID IS, "MOVE THAT MONEY TO WHO YOU WERE SUPPOSED

24   TO"; RIGHT?

25   A.    YES.

PATTI ALLEN, COURT REPORTER

1   Q.   NOW, DID YOU TELL MR. MILLER YOU HAD HOME BOYS THAT WOULD
2   HELP?
3   A.   NO, I DID NOT.   THE REASON I SAID THAT RIGHT THERE OVER
4   THE PHONE IS BECAUSE HE KNEW THAT I WAS SUPPOSED TO TELL
5   WHOEVER WAS TAKING ME TO THE LANDMARK DINER THAT I WAS THERE
6   TO MEET MY HOME BOY, BUT REALLY I WAS THERE TO LOOK ACROSS THE
7   STREET FROM THE LANDMARK DINER.
8   Q.   YOU AND MR. MILLER DID DISCUSS IT WAS IMPORTANT TO HAVE A
9   CAR WITH GOOD TAGS; CORRECT?
10  A.   YES.
11  Q.   IF YOU LOOK AT THE END OF THIS TRANSCRIPT, PAGE 23,
12  MR. MILLER SAID AGAIN HE'S GOING TO HAVE KATHERINE COME GET
13  YOU; CORRECT?
14  A.   YES.
15  Q.   AND THAT'S WHAT HAPPENED; CORRECT?
16  A.   YES.
17  Q.   EVEN THOUGH MR. MILLER KNEW YOU WERE BEING FOLLOWED?
18  A.   YES.
19          MR. HARBIN:   THIS IS PROBABLY A GOOD POINT FOR A
20  BREAK FOR TODAY, YOUR HONOR.   I HAVE GOT A WHILE TO GO.
21          THE COURT:   LADIES AND GENTLEMEN, PASS THE
22  TRANSCRIPTS AND THE HEADSETS BACK TO YOUR LEFT, PLEASE.
23          THE COURT:   MR. PLANTE, YOU ARE DIRECTED TO BE BACK
24  HERE TOMORROW MORNING NO LATER THAN 9:30.   SINCE YOU WILL BE
25  TESTIFYING FURTHER, YOU ARE INSTRUCTED NOT TO DISCUSS THIS

PATTI ALLEN, COURT REPORTER

644

1    CASE OR YOUR TESTIMONY WITH ANYONE EXCEPT FOR COUNSEL FOR

2    EITHER SIDE OR THE CASE AGENTS.  DO YOU UNDERSTAND?

3              THE WITNESS:  YES, MA'AM.

4              THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN AND LEAVE

5    THE COURTROOM.

6              AND, LADIES AND GENTLEMEN, YOU ARE EXCUSED UNTIL

7    9:30 TOMORROW MORNING.  REMEMBER THE SAME INSTRUCTIONS APPLY.

8    HAVE A NICE EVENING.  I'LL SEE YOU TOMORROW AT 9:30.

9                        -  -  -

10             (COURT ADJOURNED FOR THE DAY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOL 4 - JUN 23, 1998

645

1          C E R T I F I C A T E
2
3    UNITED STATES OF AMERICA
4    NORTHERN DISTRICT OF GEORGIA
5              I, PATTI ALLEN, OFFICIAL COURT REPORTER OF THE
6    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
7    GEORGIA, DO HEREBY CERTIFY THAT THE FOREGOING PAGES 485-645
8    CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE
9    SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE
10   MATTER THEREIN STATED.
11             IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON
12   THIS, THE 14TH DAY OF JUNE, 1998.
13
14
15
16             PATTI ALLEN
               OFFICIAL COURT REPORTER
17             NORTHERN DISTRICT OF GEORGIA
18
19
20
21
22
23
24
25

               PATTI ALLEN, COURT REPORTER

646

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN  DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4

5   UNITED STATES OF AMERICA,        )
                                     ) DOCKET NO. 1:97-CR-496-ODE
6              PLAINTIFF,            )
                                     )
7        VS.                         ) ATLANTA, GEORGIA
                                     )
8   ROBERT ETHAN MILLER, JR.,        ) JUNE 24, 1998
                                     )
9            DEFENDANT.             )
                                     )
10  _____)

11               VOLUME 5

12              PROCEEDINGS

13     BEFORE THE HONORABLE ORINDA D. EVANS, UNITED STATES

14  DISTRICT JUDGE.

15  APPEARANCES OF COUNSEL:

16

17     FOR THE GOVERNMENT:     MR. CHRISTOPHER WRAY
                               ASST. U.S. ATTORNEY
18

19

20     FOR THE DEFENDANT:      MR. JOHN HARBIN
                               POWELL GOLDSTEIN FRAZER & MURPHY
21                             ATTORNEY AT LAW

22

       COURT REPORTER:         PATTI ALLEN
23                             COURT REPORTER
                               4837 SHANNON AVENUE
24                             SPRINGFIELD, OHIO  45504
                               PHONE:  937 324-5636
25

                  PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

647

1                          INDEX

2  GOVERNMENT'S WITNESSES        DIRECT    CROSS REDIRECT  RECROSS

3  TROY PLANTE (CONT'D)                    648     675       678

4  JODEE SEIDERS                  698      722     733       736

5  STACY MCINTIRE                 744      768

6  SUSAN STEVENSON                774      779

7  KATHLEEN STORER                781      801

8  JAMES L. JOHNSON               814      823

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

648

1    (ATLANTA, FULTON COUNTY, GEORGIA, WEDNESDAY MORNING, JUNE
2    24, 1998, IN OPEN COURT.)
3                          -- - ~
4              THE COURT:  BRING THE JURY IN, PLEASE.
5              (WHEREUPON THE JURY WAS BROUGHT INTO THE COURTROOM.)
6              THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.
7         JURORS:  GOOD MORNING.
8              THE COURT:  ALL RIGHT, WE ARE READY TO RESUME.  ASK
9    MR. PLANTE TO COME IN.
10             THE CLERK:  YOU ARE REMINDED YOU ARE STILL UNDER
11   OATH.
12             THE WITNESS:  YES, MA'AM.
13             THE COURT:  YOU MAY PROCEED.
14                          -- -- -
15                        TROY MARTIN PLANTE
16   BEING PREVIOUSLY DULY SWORN, RESUMED THE WITNESS STAND AND
17   TESTIFIED FURTHER AS FOLLOWS:
18                     CROSS-EXAMINATION (CONT'D)
19   BY MR. HARBIN:
20   Q.   MR. PLANTE, WHEN YOU TALKED TO THE SECRET SERVICE AT THE
21   COBB COUNTY JAIL ON MARCH 3RD, YOU TOLD THEM THAT YOU HAD TOLD
22   ROBERT THAT YOUR BROTHER WAS SENDING YOU $5,000 FOR BOND; IS
23   THAT RIGHT?
24   A.   I DID SAY THAT AT ONE TIME.
25   Q.   AND THAT WAS THE PURPOSE OF YOUR MEETING WITH THE SECRET

VOL 5 - JUN 24, 1998

649

1   SERVICE, THAT YOUR ATTORNEY WAS BRINGING YOU OVER MONEY?

2   A.   I NEVER TOLD HIM ANYTHING ABOUT THE SECRET SERVICE.

3   Q.   BUT YOU HAD TOLD MR. MILLER THAT YOUR ATTORNEY WAS

4   BRINGING OVER MONEY FROM YOUR BROTHER FOR BOND?

5   A.   THAT WAS THE OTHER $150 THAT I PAID ON THE BOND.  THE

6   BOND WAS $1,150.

7   Q.   WEREN'T YOU HOPING ON MARCH 3 THAT THE GOVERNMENT WOULD

8   PUT UP BOND SO YOU COULD GET OUT AND DO SURVEILLANCE?

9   A.   NO, SIR.

10  Q.   LET ME HAND YOU, SIR, WHAT HAS BEEN MARKED AS

11  GOVERNMENT'S EXHIBIT 55.  THAT IS A DOCUMENT IN YOUR

12  HANDWRITING; IS THAT CORRECT?

13  A.   YES, SIR.

14  Q.   AND THAT INCLUDES A LIST OF PERSONAL THINGS THAT YOU SAY

15  WERE FOR SALE IN THE NEWSPAPER?

16  A.   YES, SIR, OUT OF THE ATLANTA JOURNAL CONSTITUTION.

17  Q.   AND YOU ARE SAYING THOSE ARE THINGS ROBERT MILLER WANTED

18  YOU TO STEAL SO HE COULD SELL THEM?

19  A.   SEVERAL THINGS ON THE LIST, YES, SIR.

20  Q.   ROBERT MILLER WANTED YOU TO DO SEVERAL THINGS WHEN YOU

21  GOT OUT; CORRECT?

22  A.   YES, SIR.

23          MR. HARBIN:  WE WOULD OFFER GOVERNMENT'S EXHIBIT 55

24  INTO EVIDENCE, YOUR HONOR.

25          MR. WRAY:  NO OBJECTION.

PATTI ALLEN, COURT REPORTER

650

1          THE COURT:  IT'S ADMITTED.

2    BY MR. HARBIN:

3    Q.   ROBERT MILLER TOLD YOU THAT HE GUARANTEED YOU THAT YOU

4    WOULD BE TIED TO HIM AS FAR AS GETTING OUT, THAT IT WOULD BE

5    SHOWN HE HAD SOMETHING TO DO WITH GETTING YOU OUT?

6    A.   REPHRASE THAT, PLEASE.

7    Q.   IT WAS A POOR QUESTION.  MR. MILLER GUARANTEED YOU THAT

8    IT WOULD BE SHOWN THAT HE HAD SOMETHING TO DO WITH GETTING YOU

9    OUT?

10   A.   HE GUARANTEED ME THAT HE WOULD GET ME OUT IF I TOOK CARE

11   OF BUSINESS FOR HIM AFTER I GOT OUT, YES.

12   Q.   AND PEOPLE WOULD KNOW THAT HE WAS CONNECTED WITH GETTING

13   YOU OUT?

14   A.   NO, NOT NECESSARILY.  THAT'S WHY IN THE TELEPHONE

15   CONVERSATION HE ASKED ME ABOUT WHOSE NAME WAS ON THAT PIECE OF

16   PAPER WHEN I GOT OUT.

17   Q.   ISN'T IT TRUE THAT YOU TOLD THE SECRET SERVICE ON MARCH

18   6TH, PAGE 28, "HE ALMOST GUARANTEED ME WHEN I LEFT THAT JAIL

19   THAT THEY ARE GOING TO KNOW WHO I AM, AND KNOW HE HAD

20   SOMETHING TO DO WITH BONDING ME OUT."

21   A.   NOT TO MY KNOWLEDGE, I DIDN'T.  I MIGHT HAVE, BUT THAT

22   WAS MARCH, AND I DON'T REMEMBER.

23   Q.   LET ME SHOW YOU BRIEFLY THIS TRANSCRIPT FOCUSING ON PAGE

24   28 RIGHT THERE.  YOU WERE INTERVIEWED BY AGENT WISNIEWSKY AND

25   OTHER SECRET SERVICE AGENTS ON MARCH 6TH?

651

1    A.    YES, I DID SAY THAT.  THE REASON I SAID THAT, I'M SAYING
2    THAT TO THE SECRET SERVICE, AND I'M REFERRING TO THE SECRET
3    SERVICE.  HE WAS SAYING I WAS GOING TO BE FOLLOWED FROM THAT
4    JAIL, AND THEY WOULD KNOW THAT I WAS BONDED OUT, AND HE HAD
5    SOMETHING TO DO WITH IT.  I WAS SPEAKING IN REFERENCE TO THE
6    SECRET SERVICE WHEN I SAID THAT, BECAUSE HE TOLD ME I PROBABLY
7    WOULD BE FOLLOWED WHEN I GOT A RIDE WITH JODEE FROM THE JAIL.
8    HE ALMOST GUARANTEED ME THEY WOULD KNOW HE HAD SOMETHING TO DO
9    WITH GETTING ME OUT.
10   Q.    MR. PLANTE, THIS WAS A DISCUSSION ABOUT WHAT YOU WERE
11   GOING TO DO WHEN YOU GOT OUT OF JAIL; CORRECT?
12   A.    YES, SIR.
13   Q.    LET ME HAND YOU A COPY OF THAT TRANSCRIPT AGAIN.  PRESENT
14   AT THIS INTERVIEW WAS YOUR ATTORNEY, JIM ANDERSON?
15   A.    YES, SIR.
16   Q.    DARRYL DEARBERG, A SECRET SERVICE AGENT?
17   A.    YES, SIR.
18   Q.    AND CRAIG WISNIEWSKY, A SECRET SERVICE AGENT?
19   A.    YES.
20   Q.    AND THOSE ARE THE SECRET SERVICE AGENTS YOU TALKED TO?
21   A.    YES, SIR.
22              THE COURT:  WHAT WAS IT DATE AGAIN?
23              MR. HARBIN:  MARCH 6TH, 1998, YOUR HONOR.
24   BY MR. HARBIN:
25   Q.    AND THIS WAS WHEN YOU WERE ABOUT TO BE BONDED OUT?

652

1    A.    IT WAS MARCH 6TH, AND I WAS ALREADY BONDED OUT.

2    Q.    YOU WERE ABOUT TO BE PICKED UP BY JODEE SEIDERS, AND YOU

3    WERE BEING INTERVIEWED BEFORE SHE PICKED YOU UP?

4              THE COURT:    YOU HAVE TO SAY YES OR NO.

5              THE WITNESS:    YES.

6              THE COURT:    WHERE DID THE INTERVIEW TAKE PLACE?

7              THE WITNESS:    WHEN I WAS RELEASED FROM THE COBB

8    COUNTY JAIL ON MARCH 6TH.

9              THE COURT:    WHERE DID IT TAKE PLACE?

10             THE WITNESS:    IT WAS IN LIKE A CONFERENCE ROOM AT

11   THE COBB COUNTY JAIL DOWNSTAIRS.

12   BY MR. HARBIN:

13   Q.    YOU TOLD JODEE SEIDERS WHEN SHE PICKED YOU UP THAT YOU

14   WERE JUST BEING PROCESSED?

15   A.    YES, SIR.

16   Q.    NOW, THIS DISCUSSION IF YOU LOOK AT PAGE 27 WAS ABOUT

17   WHAT YOU WERE GOING TO DO WHEN YOU WERE DROPPED OFF; CORRECT?

18   A.    WHAT PART ARE YOU REFERRING TO, WHAT LINE?

19   Q.    IF YOU START AT LINE 3 ON PAGE 27, AGENT WISNIEWSKY ASKED

20   YOU ABOUT JODEE TAKING YOU TO THE TEXACO STATION AND THE

21   DISCUSSION IS ABOUT WHAT YOU WERE GOING TO DO BEFORE CHECKING

22   INTO A HOTEL; CORRECT?

23   A.    YES, SIR.

24   Q.    AND IF YOU LOOK AT PAGE 28, IT SAYS THAT YOU WERE SAYING

25   THAT YOU AND ROBERT MILLER DISCUSSED YOUR CHECKING INTO A

Case 1:97-cr-00496-SDG-GGB    Document 153-6    Filed 07/14/06    Page 22 of 25

653

1   HOTEL IN A NAME OTHER THAN YOUR OWN; CORRECT?

2   A.   IT'S POSSIBLE, YES.

3   Q.   AND IF THEY DO ASK FOR I.D., I GUESS YOU MIGHT USE YOUR

4   I.D. AND CHECK IN; CORRECT?

5   A.   YES.

6   Q.   AND YOU WERE TALKING ABOUT YOUR AND ROBERT'S DISCUSSION?

7   A.   YES.

8   Q.   ABOUT THAT PLAN A, AND AGENT WISNIEWSKY SAID OKAY.  DO

9   YOU SEE THAT?

10  A.   UH-HUH.

11  Q.   AND YOU ARE TALKING TO ALL THE SECRET SERVICE AGENTS YOU

12  TALKED WITH; CORRECT, WHICH IS DARRYL DEARBERG AND AGENT

13  WISNIEWSKY?

14  A.   YES, SIR.

15  Q.   AND YOU SAID, QUOTE, "HE ALMOST GUARANTEED ME WHEN I LEFT

16  THAT JAIL THAT THEY ARE GOING TO KNOW WHO I AM, AND KNOW HE

17  HAD SOMETHING TO DO WITH BONDING ME OUT."  "HE" IS ROBERT

18  MILLER; CORRECT?

19  A.   "HE" IS ROBERT MILLER.

20  Q.   AND HE WAS USING HIS FRIENDS TO HELP TRANSPORT YOU

21  AROUND?

22  A.   YES, HE WAS.

23  Q.   SO, YOU WEREN'T TALKING ABOUT THE SECRET SERVICE

24  GUARANTEEING YOU THAT THEY WOULD KNOW?

25  A.   NO.  I WAS TELLING THE SECRET SERVICE IN THIS

PATTI ALLEN, COURT REPORTER

1  CONVERSATION THAT ROBERT MILLER TOLD ME THAT ALL HIS FRIENDS
2  WERE BEING FOLLOWED, AND THAT HE GUARANTEED ME THAT THEY WOULD
3  KNOW THAT HE HAD SOMETHING TO DO WITH BONDING ME OUT FOR THE
4  SIMPLE FACT THAT THE PEOPLE HE SENT UP THERE TO PICK ME UP
5  WOULD BE FOLLOWED TO THE JAIL, AND IT WOULD BE CHECKED OUT,
6  WHAT THEY DID AT THE JAIL, AND WHEN THEY FOUND OUT I WAS
7  BONDED OUT, THEY WOULD KNOW HE HAD SOMETHING TO DO WITH IT.
8  THAT'S WHAT I WAS TOLD BEFORE I LEFT THE COUNTY JAIL.
9  Q.   NOW, YOU TOLD THE JURY YESTERDAY, YOU SAID UNDER OATH IT
10  WAS NOT IMPORTANT TO ROBERT MILLER THAT YOU HAVE A VALID
11  DRIVER'S LICENSE GOING TO SAVANNAH.
12  A.   NOT TO MY KNOWLEDGE, IT WASN'T.  HE NEVER SAID ANYTHING
13  ABOUT IT.
14  Q.   BUT IT WAS IMPORTANT THAT YOU USE A CAR THAT HAD A VALID
15  REGISTRATION?
16  A.   YES, SIR.
17  Q.   AND INSURANCE?
18  A.   YES, A VALID TAG.
19  Q.   ALSO REGISTRATION AND INSURANCE; CORRECT?
20  A.   IF YOU HAVE A VALID TAG, YOU ARE GOING TO HAVE THEM
21  ANYWAY.
22  Q.   WELL, ROBERT MILLER AND YOU DISCUSSED IF YOU GET PULLED
23  OVER ON THIS TRIP TO SAVANNAH, YOU NEED TO HAVE VALID
24  PAPERWORK, AND THAT INCLUDES A DRIVER'S LICENSE?
25  A.   YES, SIR.

PATTI ALLEN, COURT REPORTER

655

1  Q.  NOW, YOU TOLD THE JURY YESTERDAY THAT ROBERT MILLER SAID

2  THAT HE WANTED YOU TO COMMIT THIS ALLEGED MURDER THAT YOU

3  CLAIM HE WANTED YOU TO DO AT THE HERB SHOP BECAUSE HE DIDN'T

4  WANT IT DONE IN FRONT OF HIS SON?

5  A.  YES, SIR.

6  Q.  HE HAD A PICTURE OF HIS SON AT THE JAIL, DIDN'T HE?

7  A.  YES, SIR.

8  Q.  AND WASN'T THERE A PICTURE OF HIS EX-WIFE IN THAT

9  PICTURE?

10  A.  I NEVER SAW A PICTURE OF HIS EX-WIFE.  I SAW HIS SON AND

11  HIS RECENT GIRLFRIEND.

12  Q.  NOW, YOU TOLD THE SECRET SERVICE THAT HE WANTED IT DONE

13  AT THE HERB SHOP BECAUSE HE DIDN'T WANT TO HAVE TO CALL AROUND

14  AND FIND OUT WHERE SHE LIVED?

15  A.  THAT ALSO.

16  Q.  BUT YOU DIDN'T TELL THEM THAT.  YOU TOLD THE SECRET

17  SERVICE HE WAS CONCERNED ABOUT CALLING AROUND?

18  A.  HE WAS CONCERNED ABOUT THAT ALSO FOR THE SIMPLE FACT HE

19  DIDN'T WANT ANYBODY TRACING ANYTHING BACK TO HIM OF WHY HE WAS

20  TRYING TO FIND HER NUMBER AT THE SAME TIME SHE CAME UP

21  MISSING.

22  Q.  DID HE TELL YOU UP TO THE TIME HE CAME TO JAIL THAT HE

23  AND KATHERINE MILLER WERE SEEING JENNIFER ASHFORD?

24  A.  NO.

25  Q.  THAT THEY WERE PICKING UP HIS SON AT HER PLACE?

PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

656

1  A.  NO.

2  Q.  AND YOU DIDN'T TELL THE SECRET SERVICE ABOUT HIM BEING

3  CONCERNED ABOUT HIS SON?

4  A.  YES, I DID TELL THEM THAT AT ONE TIME.

5  Q.  WELL, IT'S NOT IN THE RECORDS WE HAVE, IS IT, SIR?

6  A.  I DON'T KNOW.  I HAVE NEVER READ THE RECORDS.

7  Q.  YOU TOLD THIS JURY YESTERDAY THAT MR. MILLER WANTED YOU

8  TO ROB THE HERB SHOP?

9  A.  YES, SIR.

10  Q.  NOW, YOU TOLD THE SECRET SERVICE AND THE GRAND JURY THAT

11  MR. MILLER FIRST TALKED ABOUT A ROBBERY, AND THEN SAID HE

12  DIDN'T WANT IT TO LOOK LIKE A ROBBERY.

13  A.  HE DIDN'T WANT IT TO LOOK LIKE A ROBBERY, AND THAT'S WHEN

14  HE CAME UP WITH THE PLAN WITH HER CAR AT THE AIRPORT, SO IT

15  WOULD LOOK LIKE SHE TOOK THE MONEY OUT OF THE CASH REGISTER.

16  THAT WOULDN'T BE A ROBBERY.

17  Q.  YOU ARE QUITE EXPERIENCED AT LYING; ISN'T THAT CORRECT,

18  SIR?

19  A.  NO, SIR.

20  Q.  YOU WERE LYING DURING THESE AUDIO TAPES?

21  A.  NO, I WAS NOT LYING DURING ANY AUDIO TAPES.

22  Q.  YOU WERE TELLING THESE PEOPLE YOU WERE GOING TO DO PLANS

23  THAT YOU HAD NO INTENTION TO DO?

24  A.  BECAUSE I HAD NO INTENTION DOING THEM DOESN'T MEAN I WAS

25  LYING ABOUT ANY OF THIS.

PATTI ALLEN, COURT REPORTER