VOL 5 - JUN 24, 1998

657

1    Q.    YOU TOLD JODEE SEIDERS YOU WERE GOING TO TAKE $200 TO

2    ROBERT MILLER BECAUSE YOU PROMISED HIM YOU WERE FROM THIS BOND

3    DEAL WHERE JODEE WAS GOING TO GET MONEY, AND YOU WERE GOING TO

4    GET MONEY, AND YOU SAID, "I PROMISED HER I'M GOING TO GIVE HIM

5    $200."   SO YOU TOLD HER THAT?

6    A.    YES, I TOLD HER THIS.

7    Q.    AND THAT WAS A LIE?

8    A.    THAT WAS A LIE FOR THE SIMPLE FACT OF NOT LETTING HER

9    KNOW WHAT ME AND HIM HAD PLANNED.

10   Q.    YOU TOLD HER THAT WHEN YOU WERE BEING TAPED IN CONNECTION

11   WITH THE SECRET SERVICE?

12   A.    YES.

13   Q.    IT WAS NOT JUST HER NOT KNOWING WHAT ROBERT MILLER WAS

14   DOING?

15   A.    SO, HE WAS LYING TO ME ON THE TAPE TOO WHEN I WAS TALKING

16   TO HIM.

17   Q.    SO, ROBERT MILLER DIDN'T HAVE ANY INTENTION TO FOLLOW

18   THESE PLANS OUT?

19   A.    HE HAD ALL THE INTENTIONS OF FOLLOWING THESE PLANS OUT.

20   Q.    AND NOT ONLY ON THESE TAPES, BUT YOU HAVE USED ALIASES

21   BEFORE AND COMMITTED CRIMES IN FALSE NAMES?

22   A.    YES.

23   Q.    YOU HAVE CARRIED FALSE I.D.'S AND FALSELY PRESENTED

24   YOURSELF?

25   A.    I NEVER CARRIED A FALSE I.D.

PATTI ALLEN, COURT REPORTER

658

1   Q.   SO, IF THE JURY RECALLS YOU TESTIFYING YESTERDAY THAT YOU
2   CARRIED A FALSE I.D.--
3   A.   NO, I NEVER SAID I CARRIED FALSE I.D. I GAVE A FALSE NAME
4   WHEN I WAS ARRESTED.   I NEVER GOT CAUGHT WITH ANY FALSE I.D.
5   Q.   YOU OPERATED UNDER FALSE NAMES?
6   A.   I OPERATED UNDER FALSE NAMES.
7   Q.   AND THAT WAS A LIE?
8   A.   AND THAT WAS A LIE.
9   Q.   AND YOU HAVE STOLEN OTHER PEOPLE'S PROPERTY AND USED IT
10  AS YOUR OWN?
11  A.   YES, I HAVE.
12  Q.   MR. PLANTE, LET ME HAND YOU SOME HANDWRITTEN NOTES, THREE
13  OF WHICH ARE MARKED AS GOVERNMENT EXHIBITS 52, 53, AND 54, AND
14  ONE OF WHICH IS UNMARKED.   ARE EACH OF THOSE NOTES IN YOUR
15  HANDWRITING?
16  A.   YES, SIR.
17  Q.   AND THE NOTE THAT IS UNMARKED, THAT IS NOT MARKED AS AN
18  EXHIBIT BEGINS "I WAS JUST ABOUT, I WAS JUST THINKING ABOUT
19  WHAT YOU SAID." DO YOU SEE THAT?
20  A.   YES.
21  Q.   AND DID YOU PRESENT THAT TO MR. MILLER WHEN YOU VISITED
22  HIM AT THE JAIL?
23  A.   YES.
24  Q.   AND YOU PRESENTED EACH OF THESE TO MR. MILLER WHEN YOU
25  VISITED HIM AT THE JAIL?

VOL 5 - JUN 24, 1998

659

1    A.    YES, SIR.    I WROTE THEM WHILE I WAS IN THE VISITATION
2    ROOM AT THE JAIL.
3    Q.    YOU HELD THEM UP TO THE WINDOW?
4    A.    YES, SIR.
5    Q.    DID YOU PRESENT THESE NOTES WHEN YOU WENT TO VISIT WITH
6    JODEE SEIDERS?
7    A.    YES, SIR.
8    Q.    AND YOU PRESENTED THE NOTE MARKED AS GOVERNMENT'S EXHIBIT
9    54 TO MR. MILLER FIRST?
10   A.    YES, SIR.
11   Q.    AND THEN YOU PRESENTED --- OR WAS THE NOTE THAT IS
12   UNMARKED THE FIRST ONE?
13   A.    THAT WAS ABOUT THE THIRD ONE, THE ONE THAT IS UNMARKED.
14   Q.    YOU PRESENTED THE NOTE THAT IS GOVERNMENT'S EXHIBIT 53
15   NEXT; CORRECT?
16   A.    THAT WAS SECOND.
17   Q.    AND THEN YOU PRESENTED THE NOTE ABOUT IF I TAKE CARE OF
18   IT, KNOCK TWO BIRDS OUT WITH ONE STONE, GOVERNMENT'S EXHIBIT
19   52, LAST?
20   A.    YES, SIR.
21   Q.    ALL RIGHT.
22         MR. HARBIN:    YOUR HONOR, WE WOULD OFFER GOVERNMENT'S
23   EXHIBITS 52 THROUGH 54 INTO EVIDENCE.
24         MR. WRAY:    52, 53, AND 54?
25         MR. HARBIN:    RIGHT.


PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

660

1          MR. WRAY:  NO OBJECTION.

2          THE COURT:  THEY ARE ADMITTED.

3    BY MR. HARBIN:

4    Q.   NOW, THE FIRST NOTE ABOUT CALLING AND FEELING THINGS OUT

5    WITH THE BITCH, THAT'S YOUR WORDS; CORRECT?

6    A.   YES, SIR.

7    Q.   THAT REFERS TO THE BOND?

8    A.   GABRIELLE, YES, SIR.

9    Q.   AND THE NEXT NOTE HAS GABRIELLE'S NUMBER AT THE TOP?

10   A.   YES, SIR.

11   Q.   THAT'S DEALING WITH THE BOND DEAL?

12   A.   YES, SIR.

13   Q.   THEN YOU HAVE A PHONE NUMBER 770 518-3396.  DO YOU SEE

14   THAT?

15   A.   YES, SIR.

16   Q.   AND THAT'S A NUMBER ROBERT MILLER GAVE YOU?

17   A.   I'M NOT SURE IF IT WAS OR NOT, BUT I HAD ANOTHER FRIEND

18   IN THERE THAT GAVE ME A NUMBER TO A FRIEND OF MINE'S HOUSE

19   THAT WAS IN THE JAIL WITH US.  IT MIGHT HAVE BEEN THAT NUMBER.

20   HE MIGHT HAVE GAVE IT TO ME.  I DON'T EVEN KNOW WHERE THAT

21   NUMBER GOES TO.  I'M NOT FAMILIAR WITH IT.

22   Q.   ISN'T IT A NUMBER FOR SOMEBODY NAMED ERIN HELMS?

23   A.   IF IT IS ERIN HELMS, ROBERT MILLER GAVE IT TO ME.

24   Q.   AND YOU CALLED ERIN HELMS, DIDN'T YOU?

25   A.   I CALLED HER ONE TIME.

PATTI ALLEN, COURT REPORTER

VOL 5 -- JUN 24, 1998

661.

1   Q.   YOU CALLED HER A FEW TIMES, DIDN'T YOU?

2   A.   I CALLED HER ONE TIME.

3   Q.   AND YOU TALKED TO HER ABOUT GOING TO SAVANNAH?

4   A.   NO.

5   Q.   YOU TALKED TO HER ABOUT TAKING DRUGS TO SAVANNAH?

6   A.   NO.

7   Q.   AND THEN YOU REFER TO PLAN A, AND MONEY IN THE DRAWER,

8   YOU SAID MAYBE $700 WORTH; CORRECT?

9   A.   YES, SIR.

10  Q.   THAT'S THE MOST DETAILED REFERENCE TO PLAN A IN THESE

11  NOTES?

12  A.   THAT AND THE NEXT NOTE.  THE LAST NOTE IS IN REFERENCE TO

13  PLAN A TOO.  WHAT I WAS SAYING BY THAT RIGHT THERE WHEN I SAID

14  MONEY IN THE DRAWER, I SAID $700 OR MORE, AND HE WAS TELLING

15  ME THAT THAT WOULD BE IN THE CASH REGISTER AT THE HERB SHOP.

16  WHAT I'M SAYING HERE IS IF I CAN TAKE CARE OF IT, IT WILL BE

17  TWO BIRDS GOING OUT WITH ONE STONE.  I'M TELLING HIM INSTEAD

18  OF MESSING WITH THE BOND SCAM, I CAN COME UP WITH $700 OUT OF

19  THE CASH DRAWER, AND KNOCK TWO BIRDS OUT WITH ONE STONE, TAKE

20  CARE OF HER, AND TAKE HIM SOME MONEY, AND GO TO SAVANNAH.

21  THAT'S WHAT I'M SAYING, THAT'S ALL I NEED.

22          MR. WRAY:  YOUR HONOR, MAY WE APPROACH?

23          THE COURT:  YES.

24          (AT THE BENCH)

25          MR. WRAY:  WHAT THIS IS IS A PHOTOCOPY OF THESE FOUR

PATTI ALLEN, COURT REPORTER

1   INDIVIDUAL NOTES ON ONE PIECE OF PAPER THAT WAS TURNED OVER IN
2   DISCOVERY.   THE THREE OF THEM THAT HAVE ALREADY BEEN ADMITTED
3   ARE HERE.   THIS FOURTH NOTE, WHICH IS UNMARKED, THE GOVERNMENT
4   HAD NO INTENTION OF OFFERING IT, BUT WE OBJECT ON RELEVANCE
5   GROUNDS, AND I CAN EXPLAIN WHY I THINK IT IS IRRELEVANT.   WE
6   ALSO HAVE A 403 PROBLEM.

7            I BELIEVE MR. PLANTE WILL TESTIFY REGARDING THIS
8   LAST NOTE THAT IN THIS LAST NOTE -- IT'S A LITTLE AWKWARD, BUT
9   APPARENTLY THE DEFENDANT HAD TOLD HIM PREVIOUSLY THAT
10  KATHERINE MILLER HAD ON EARLIER VISITS TO HIM GOTTEN OUT OF
11  THE VIEW OF THE SURVEILLANCE CAMERA AND PLAYED WITH HERSELF
12  FOR MR. MILLER'S AMUSEMENT, AND HE WAS COMMENTING TO HIM I'M
13  LOOKING OVER AT THE TRASH CAN AND THINKING TO MYSELF WHAT
14  MS. MILLER DID OVER BY THE TRASH CAN.

15           THE COURT:   WE ARE TALKING ABOUT DEFENDANT'S EXHIBIT
16  76, AND WHAT YOU ARE SAYING IS THAT ABOUT THREE QUARTERS OF IT
17  IS ALREADY IN THE RECORD UNDER OTHER EXHIBIT NUMBERS?

18           MR. WRAY:   THE ORIGINALS ARE.

19           THE COURT:   AND WHAT DEFENDANT'S 76-A ADDS IS A COPY
20  OF A FOURTH NOTE.   NOW, WHO IS THE AUTHOR OF THIS FOURTH NOTE?

21           MR. WRAY:   MR. PLANTE.

22           THE COURT:   MR. PLANTE ACTUALLY DID THE WRITING?

23           MR. WRAY:   YES.

24           THE COURT:   AND IT IS A NOTE THAT PURPORTS TO SET
25  OUT WHAT MR. MILLER SAID?

VOL 5 - JUN 24, 1998

663

1       MR. WRAY: HE SAYS TO MR. MILLER, AS I UNDERSTAND
2   IT, I, TROY PLANTE, AM JUST THINKING ABOUT WHAT YOU TOLD ME
3   BEFORE ABOUT WHAT KATHERINE MILLER WAS DOING OVER BY THE TRASH
4   CAN EARLIER.
5       MR. HARBIN: I WILL CHECK WITH HIM. I WON'T SHOW
6   THAT PART AND WON'T OFFER IT. I'LL CHECK WITH MY CLIENT.
7       THE COURT: WELL, SINCE THE NOTES ARE IN THE RECORD,
8   DO YOU STILL WANT DEFENDANT'S 76 IN?
9       MR. HARBIN: I WANT TO USE IT ON THE OVERHEAD, AND I
10  JUST WANT THOSE THREE PARTS IN THE RECORD.
11      THE COURT: WHY DON'T YOU CHECK WITH HIM AND LET ME
12  KNOW WHETHER YOU ARE STILL TENDERING IT.
13          (END OF BENCH CONFERENCE)
14      THE COURT: WHAT IS THE STATUS ON DEFENDANT'S
15  EXHIBIT 76?
16      MR. HARBIN: I'M NOT OFFERING IT. I'M JUST GOING TO
17  OFFER THOSE THREE.
18      THE COURT: AND THE PARTS YOU ARE ABOUT TO DISPLAY
19  ARE ALREADY IN THE RECORD UNDER OTHER EXHIBIT NUMBERS?
20      MR. HARBIN: YES, THE ORIGINALS ARE.
21      THE COURT: YOU MAY PROCEED.
22  BY MR. HARBIN:
23  Q.  THESE ARE THE THREE NOTES YOU HAVE IDENTIFIED THAT HAVE
24  BEEN INTRODUCED?
25  A.  YES, SIR.


                    PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

664

1   Q.   AND AS MENTIONED, YOU SHOWED THIS ONE THROUGH THE GLASS

2   TO MR. MILLER FIRST; IS THAT RIGHT?

3   A.   THAT'S THE FIRST ONE.

4           THE COURT:   COULD THE WITNESS FOR THE RECORD JUST

5   IDENTIFY FIRST WHAT EACH OF THESE NOTES IS?  WHAT ARE THEY?

6           THE WITNESS:   EACH OF THESE NOTES ARE NOTES I WAS

7   WRITING ON PAPER WHILE WE WERE IN VISITATION, AND I WOULD HOLD

8   THEM UP TO THE WINDOW BECAUSE HE DIDN'T WANT ME TO SAY CERTAIN

9   THINGS OVER THE TELEPHONE BECAUSE HE THOUGHT I WAS BEING

10  RECORDED.  SO, I WROTE IT ON PAPER AND HELD IT UP TO THE

11  WINDOW, AND SHOWED IT TO HIM INSTEAD OF SAYING IT OVER THE

12  PHONE.

13          THE COURT:   WERE THEY ALL CREATED ON THE SAME DATE?

14          THE WITNESS:   YES, MA'AM.

15          THE COURT:   WHAT DATE WAS THAT?

16          THE WITNESS:   I'M NOT SURE OF THE DATE.  I THINK IT

17  WAS THE SECOND TIME I WENT TO VISITATION.  IT SHOULD BE IN THE

18  RECORD BECAUSE I WAS WEARING A WIRE ALL THREE TIMES.

19  BY MR. HARBIN:

20  Q.   THAT IS CORRECT, YOU WERE WEARING AN AUDIO TAPE MACHINE

21  TO TAPE THE CONVERSATION?

22  A.   YES, SIR.

23  Q.   AND IT WAS BEING VIDEOTAPED AS WELL THROUGH THE JAIL

24  VIDEO; ISN'T THAT RIGHT?

25  A.   THAT'S EVERY VISITATION SESSION.

PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

665

1           THE COURT:  AND JUST FOR PURPOSES OF CLARITY, IF THE

2    WITNESS COULD READ EACH OF THESE NOTES, IT WOULD BE HELPFUL.

3    THEY ARE REALLY HARD TO READ.

4           THE WITNESS:  THE FIRST ONE SAYS GABRIELLE, AND IT

5    HAS GOT A PHONE NUMBER 440-3087.  THEN 770 BY ITSELF.  THEN

6    YOU HAVE GOT THE NUMBER 770 518-9936, AND IT SAYS, "PLAN A,

7    MONEY IN THE DRAWER YOU SAID MAY BE $700 OR MORE."  AND THAT'S

8    THE FIRST ONE ON THE LEFT.

9           THE SECOND ONE SAYS, "IF I CAN TAKE CARE"--

10          THE COURT:  THAT'S NOT THE FIRST ONE ON THE LEFT.

11          MR. HARBIN:  HE IS USING WHAT HE HAS IN A FOLDER.

12   WHY DON'T YOU GO BY EXHIBIT NUMBER.

13          THE WITNESS:  OKAY.  THE FIRST ONE I READ WAS

14   EXHIBIT 52.

15   BY MR. HARBIN:

16   Q.   EXHIBIT 52 IS THE ONE YOU READ?

17   A.   THAT HAS THE TELEPHONE NUMBERS WROTE ON IT.  I'VE GOT IT

18   RIGHT HERE.  IT'S EXHIBIT 52.  SO, EXHIBIT 52 IS THE ONE I

19   JUST EXPLAINED WITH THE TELEPHONE NUMBERS ON IT.  THAT'S THE

20   ONE IN THE MIDDLE THAT YOU HAVE UP THERE.

21          EXHIBIT 53 WOULD BE, "IF I CAN TAKE CARE OF IT,

22   KNOCK TWO BIRDS OUT WITH ONE STONE, I CAN HAUL ASS.  I NEED

23   CAR."  THAT'S THE ONE ON THE LEFT ON THE SCREEN.

24          THE COURT:  READ THAT AGAIN.

25          THE WITNESS:  IT SAYS, "IF I CAN TAKE CARE OF IT,

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-7   Filed 07/14/06   Page 10 of 41

656

1   KNOCK TWO BIRDS OUT WITH ONE STONE, I CAN HAUL ASS.  I NEED

2   CAR."

3              THE COURT:  I DON'T UNDERSTAND THE LAST PART OF WHAT

4   YOU ARE SAYING.

5              THE WITNESS:  I'M TELLING HIM I NEED A CAR.  I NEED

6   A CAR.

7              THE COURT:  NEED A CAR?

8              THE WITNESS:  YES, TRANSPORTATION.

9              THE WITNESS:  AND EXHIBIT 54 WOULD BE, "I WILL CALL

10  AND FEEL THINGS OUT WITH THE BITCH AND SEE.  ARE YOU SURE THE

11  ONLY NAME THEY KNOW ME BY IS JOSE"?

12  BY MR. HARBIN:

13  Q.   AND THE ONE ON THE TOP RIGHT OF THE SCREEN, EXHIBIT 54,

14  THE ONE THAT STARTS "I WILL CALL" --

15  A.   YES, SIR, THAT'S CORRECT.

16  Q.   THAT'S ABOUT THE BOND?

17  A.   YES, SIR.

18  Q.   AND THAT'S THE FIRST ONE YOU SHOWED ON THE GLASS?

19  A.   YES, SIR.

20  Q.   AND THEN THE ONE WITH THE PHONE NUMBERS, EXHIBIT 53 ---

21  A.   YES.

22  Q.   -- THE ONE IN THE MIDDLE OF THE OVERHEAD, THAT IS THE

23  SECOND ONE YOU SHOWED?

24  A.   YES, SIR.

25  Q.   AND EXHIBIT 53, THE ONE THAT STARTS OUT, "IF I CAN TAKE

VOL 5 - JUN 24, 1998

667

1    CARE OF IT" ---

2    A.    THAT'S THE LAST ONE I SHOWED HIM.

3    Q.    AND YOU SHOWED THESE NOTES ON THE GLASS.  IS IT CORRECT

4    THAT WHEN YOU LEFT THE VISITATION, YOU GAVE THESE NOTES TO THE

5    SECRET SERVICE?

6    A.    YES, SIR.

7    Q.    ON THE WAY OUT?

8    A.    AFTER I WAS IN THE CAR.

9    Q.    IN THE CAR?

10   A.    ON THE WAY OUT, YEAH.

11   Q.    AND IS IT CORRECT THAT YOU WERE SHOWING THEM THESE,

12   PARTICULARLY THE LAST ONE WHILE JODEE SEIDERS WAS TALKING TO

13   HIM ON THE PHONE?

14   A.    YES, SIR.

15   Q.    AND ISN'T IT TRUE THAT YOU SHOWED HIM THESE WHILE YOU

16   KNEW YOU WERE ENGAGED IN SURVEILLANCE WITH THE SECRET SERVICE

17   TO COME UP WITH EVIDENCE?

18   A.    YES, SIR.

19   Q.    YOU SHOWED HIM THESE TO TRY TO GET HIM OFF THE MEXICAN

20   BOND PLAN?

21   A.    YES, SIR.

22   Q.    AND HE WANTED TO TALK ABOUT THAT, THE MEXICAN BOND?

23   A.    HE DIDN'T WANT TO TALK ABOUT IT AT THE TIME OF

24   VISITATION, BUT HE KEPT TALKING ABOUT IT OVER THE PHONE LIKE

25   YOU HEAR IN THE PHONE CONVERSATION, AND I WAS JUST TRYING TO

PATTI ALLEN, COURT REPORTER

668

1    GET ACROSS TO HIM THAT WAS SOMETHING I DIDN'T WANT TO DO.  HE

2    KEPT STRESSING HE NEEDED MONEY.  THAT'S WHY I PUT THE PART IN

3    THERE ABOUT THE $700 IN THE CASH DRAWER HE TOLD ME ABOUT.

4            MR. HARBIN:  YOUR HONOR, AT THIS TIME WE WOULD OFFER

5    TO SHOW THE VIDEO OF THAT VISITATION.

6            THE COURT:  HOW LONG WILL IT TAKE TO GET IT SET UP?

7            MR. WRAY:  I THINK IT'S ABOUT 10 OR 15 MINUTES

8    MAYBE.

9            THE COURT:  YOU MEAN TO PLAY IT?  DO WE NEED TO TAKE

10   A BREAK?  THAT'S WHAT I'M ASKING.

11           MR. WRAY:  I THINK THAT WOULD PROBABLY BE BEST.

12           THE COURT:  LET'S TAKE A SHORT BREAK, LADIES AND

13   GENTLEMEN.

14           (RECESS TAKEN)

15           THE COURT:  BRING THE JURY IN, PLEASE.

16           (WHEREUPON THE JURY WAS BROUGHT INTO THE COURTROOM.)

17           THE COURT:  YOU MAY PROCEED.

18           MR. HARBIN:  IT MIGHT BE GOOD TO DIM THE LIGHTS.

19           (WHEREUPON A VIDEO OF A JAIL VISITATION WAS PLAYED

20   FOR THE COURT AND JURY).

21   BY MR. HARBIN:

22   Q.   IS THAT YOU, MR. PLANTE?

23   A.   YES, SIR.

24   Q.   AND IS THAT JODEE SEIDERS WITH YOU?

25   A.   YES, SIR.

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-7   Filed 07/14/06   Page 13 of 41

669

1    Q.   AND IS THIS NEW CLOTHING THE GOVERNMENT PROVIDED YOU WHEN
2    YOU GOT OUT?
3    A.   SIR?
4    Q.   IS THIS NEW CLOTHING THE GOVERNMENT PROVIDED YOU WHEN YOU
5    GOT OUT?
6    A.   YES, SIR.
7         THE COURT:   WHAT IS THE DATE THAT IS SHOWN ON THERE?
8         MR. HARBIN:   MARCH 8.
9    BY MR. HARBIN:
10   Q.   YOU ALSO ATTENDED A VISITATION ON MARCH 7TH, THE DAY
11   BEFORE, WITH KATHERINE MILLER?
12   A.   YES.
13   Q.   AND MET WITH ROBERT MILLER?
14   A.   YES.
15   Q.   AND WORE AN AUDIO TAPE WIRE AT THAT TIME?
16   A.   YES, SIR.
17        THE COURT:   AND WHAT IS THE EXHIBIT NUMBER ON THIS
18   TAPE?
19        MR. HARBIN:   I DIDN'T NOTE THAT WHEN I PUT IT IN.
20        THE COURT:   HAS IT BEEN MARKED?
21        MR. HARBIN:   I CAN PULL IT OUT.
22        MR. WRAY:   I BELIEVE WHEN AGENT WISNIEWSKY WAS ON
23   THE STAND THERE WERE SOME VIDEOTAPES AUTHENTICATED.
24        MR. HARBIN:   IT'S DEFENDANT'S EXHIBIT 61, YOUR
25   HONOR.


                    PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-7   Filed 07/14/06   Page 14 of 41

670

1          THE COURT:  I'LL ADMIT DEFENDANT'S 61.

2          YOU CAN MOVE THAT FORWARD IF YOU WOULD LIKE TO.   I

3    THINK I PROBABLY DO NOT NEED TO SEE IT MYSELF.  CAN EVERYBODY

4    SEE THAT?

5    BY MR. HARBIN:

6    Q.   IS THIS THE FIRST NOTE YOU ARE WRITING, MR. PLANTE?

7    A.   I BELIEVE SO.

8    Q.   AND IS THAT THE COMPLETION OF YOUR VISITATION WITH ROBERT

9    MILLER WHEN JODEE SEIDERS WENT WITH YOU WHEN YOU PRESENTED

10   THESE NOTES?

11   A.   YES, SIR.

12   Q.   YOU SHOWED HIM THE NOTE AT ABOUT 1:42 WHEN HE WAS TALKING

13   TO JODEE SEIDERS; CORRECT?

14   A.   WHEN I SHOWED HIM THE NOTE?

15   Q.   RIGHT.

16   A.   I WASN'T TALKING TO JODEE.  I WAS SHOWING HIM THE NOTE.

17   Q.   AND YOU SHOWED HIM THIS NOTE AT ABOUT 1:44 P.M., AND HE

18   WAS TALKING TO JODEE SEIDERS?

19   A.   HE WAS TALKING TO JODEE SEIDERS.  THE REASON I HAD TO

20   SHOW THEM TO HIM AT THAT WINDOW IS BECAUSE THE PHONE IN THE

21   BOOTH NEXT TO THAT DIDN'T WORK.  THAT'S WHY I COULDN'T TALK TO

22   HIM ON THE PHONE NEXT TO THAT.  THAT'S WHY I HAD TO SIT SO

23   CLOSE LIKE THAT, BECAUSE THAT'S THE ONLY PHONE THAT WORKED.

24   THE PHONE IN THE BOOTH NEXT TO THAT DOESN'T WORK.  SO, WE HAD

25   TO TAKE TURNS WITH THE PHONE.

VOL 5 - JUN 24, 1998

671

1   Q.   SO, THAT'S THE FIRST NOTE RIGHT THERE THAT YOU SHOWED

2   ROBERT MILLER.   THE PLAN THAT WAS PLAN A, THAT WAS THE THIRD

3   NOTE YOU SHOWED HIM?

4   A.   THE NEXT TO THE LAST ONE.

5   Q.   AND IT SHOWS YOU DID IT WHILE HE WAS TALKING TO JODEE

6   SEIDERS?

7   A.   I PROBABLY SHOWED HIM EVERY ONE WHILE HE WAS TALKING TO

8   JODEE SEIDERS.

9   Q.   YOU DIDN'T TALK TO HIM ON THE PHONE DURING THIS VISIT?

10  A.   I DID TALK TO HIM ON THE PHONE AT THE BEGINNING OF THE

11  VISIT.

12  Q.   BUT YOU SHOWED HIM THIS NOTE ABOUT THIS PLAN THAT YOU SAY

13  WAS SO IMPORTANT TO HIM WHILE HE WAS TALKING TO JODEE SEIDERS?

14  A.   YES.

15  Q.   I MAY HAVE MISSED ONE.   RIGHT BEFORE 1:42 P.M., AND THIS

16  IS THE LAST NOTE YOU SHOWED HIM, YOU CHOSE TO SHOW HIM THE

17  NOTE THAT TALKS ABOUT KNOCKING OFF TWO BIRDS WITH ONE STONE,

18  YOU CHOSE TO SHOW HIM THE LAST NOTE WHILE HE WAS TALKING TO

19  JODEE SEIDERS.

20  A.   I WROTE THE NOTES WHILE HE WAS TALKING TO JODEE SEIDERS.

21  Q.   I THOUGHT YOU WROTE THE NOTES BECAUSE HE WAS AFRAID TO

22  TALK ABOUT IT ON THE PHONE?

23  A.   THAT'S WHAT I WAS DOING.   I WAS WRITING NOTES WHILE HE

24  WAS TALKING TO JODEE SEIDERS, AND I SHOWED THEM TO HIM WHILE

25  HE WAS TALKING TO HER.   THAT'S WHAT I WAS DOING ON THE SIDE

672

1   ALL THE TIME HE WAS TALKING.

2   Q.   YOU CHOSE NOT DO IT WHILE YOU WERE TALKING TO HIM ON THE

3   PHONE?

4   A..   ALL I DID WAS SAY, "WHAT'S UP"?  AND HE SAID, "PUT JODEE

5   ON THE PHONE."

6   Q.   YOU TALKED TO HIM IN THIS CONVERSATION MORE EXTENSIVELY,

7   BUT YOU CHOSE TO SHOW HIM THESE NOTES CONCERNING THIS MURDER

8   PLOT, YOU CHOSE TO PASS THIS EVIDENCE, THESE NOTES WHILE HE

9   WAS TALKING TO SOMEBODY ELSE?

10  A.   YES.   THAT'S ANOTHER REASON WHY I DIDN'T WRITE THE NOTES

11  OUT OF SPECIFICALLY WHAT I WANTED TO TELL HIM IN CASE SHE SEEN

12  ONE OF THEM.   THAT'S WHY THE NOTES ARE IN CODE TOO, IF YOU

13  LOOK AT THEM.

14  Q.   AND YOU HAD ONLY ONE BRIEF CONVERSATION WITH HIM AFTER

15  SHOWING HIM THOSE NOTES FOR A MATTER OF SECONDS; CORRECT?

16  A.   THAT'S IT.

17  Q.   NOW, SHE WAS SITTING HERE, BUT EARLIER IN THIS TAPE, AS

18  THE TAPE SHOWED, YOU SAT HERE?   YOU SWITCHED PLACES?

19  A.   THAT'S BECAUSE ONLY ONE TELEPHONE WORKED.

20  Q.   RIGHT.   YOU TALKED TO HIM ON THE TELEPHONE.   YOU COULD

21  HAVE SAT THERE.   YOU COULD HAVE PASSED HIM THE NOTES WHILE YOU

22  WERE TALKING TO HIM.   YOU COULD HAVE KEPT JODEE FROM SEEING

23  HIM, AND YOU COULD HAVE SHOWN HIM A CLEAR NOTE THAT TALKS

24  ABOUT A MURDER PLOT, COULDN'T YOU?

25  A.   I COULD HAVE IF I HAD A NOTE PREPARED BEFORE I WENT IN

PATTI ALLEN, COURT REPORTER

1   THERE, BUT I DID NOT.  I WROTE THEM ALL WHILE I WAS SITTING
2   THERE.

3   Q.   AND YOU COULD HAVE WROTE IT DOWN THAT WAY WHILE YOU WERE
4   SITTING THERE?

5   A.   HE WANTED TO TALK TO JODEE, SO I PUT HER ON THE PHONE
6   WHILE I WAS SITTING THERE WRITING THE NOTES.

7   Q.   ALL THE BETTER THAT JODEE CAN'T SEE THIS ALLEGED PLOT
8   BEING HATCHED AS SHE IS SITTING THERE TALKING AND YOU ARE
9   SITTING OVER THERE.

10  A.   I JUST PUT THE NOTE OVER ON THE WIDOW, AND HE CAN READ IT
11  REAL QUICK, AND GIVE ME A NOD YES OR NO, AND THEN I CAN GO
12  ABOUT WRITING AGAIN.

13  Q.   OR YOU COULD HAVE WRITTEN WHATEVER NOTE YOU WANTED,
14  SWITCHED PLACES WITH JODEE, AND GOT AN AUDIO TAPE OF WHAT YOU
15  ARE TALKING ABOUT GIVEN THAT THIS PLAN A WAS SO IMPORTANT.

16  A.   THAT'S THE WHOLE POINT OF BRINGING THE PAPER IN THERE, SO
17  WE WOULDN'T SAY NOTHING OVER AUDIO TAPE.  THAT'S WHY WE DIDN'T
18  SAY ANYTHING OVER THE TELEPHONE.  THAT WAS THE WHOLE POINT OF
19  DOING THIS IN THE FIRST PLACE.  THAT WAS HIS IDEA.

20  Q.   BUT, SIR, YOU WORKING WITH THE SECRET SERVICE WANTED TO
21  CREATE CONCLUSIVE EVIDENCE THAT MR. MILLER HAD A PLAN, AND YOU
22  WERE WORKING WITH HIM ON A PLAN TO KILL JENNIFER ASHFORD.  YOU
23  COULD HAVE EASILY WRITTEN A NOTE THAT CLEARLY TALKED ABOUT
24  MURDER, THE HERB SHOP, DISPOSING OF THE BODY, AND SHOWED IT TO
25  HIM FOR THE VERY REASON THAT HE SUPPOSEDLY IS CONCERNED THAT

674

1   SOMEBODY IS GOING TO HEAR IT ON THE TELEPHONE, AND SHOWED IT

2   TO HIM RIGHT THERE.

3   A.     COULD I HAVE EASILY DONE THAT?

4          MR. WRAY:  YOUR HONOR, IS THERE A QUESTION IN THERE

5   ANYWHERE?

6          MR. HARBIN:  I'LL MOVE ON, YOUR HONOR.

7          THE COURT:  IF YOU WANT TO, RESTATE THE QUESTION.

8          MR. HARBIN:  I'LL MOVE ON, YOUR HONOR.

9   BY MR. HARBIN:

10  Q.     NOW, MR. PLANTE, I BELIEVE YOU TOLD THE JURY YESTERDAY

11  THAT YOU WERE SUPPOSED TO GET SOME ADDITIONAL MONEY AT THE END

12  OF THIS.

13  A.     YES, I DID.

14  Q.     BUT YOU YOU DIDN'T KNOW HOW MUCH; IS THAT RIGHT?

15  A.     YES, SIR.

16  Q.     DIDN'T YOU TELL THE SECRET SERVICE ON MARCH 6TH THAT

17  KATHERINE MILLER WAS TO HAVE GIVEN YOU $800 OR $900 AFTER THE

18  JOB WAS DONE AFTER YOU CAME TO VISITATION AND SHOWED ROBERT

19  MILLER JENNIFER ASHFORD'S LICENSE?

20  A.     THAT WAS A ROUGH ESTIMATE.  LIKE I SAY, IT WAS $800 OR

21  $900.  THERE WAS NO EXACT PRICE.

22  Q.     BUT YOU NEVER CAME BACK AND SHOWED A LICENSE?

23  A.     NO, SIR.

24  Q.     YOU NEVER WENT TO SEE MR. MILLER WITH A VIDEOTAPE OR

25  AUDIO TAPE WIRE ON AND ASKED FOR MORE MONEY?

PATTI ALLEN, COURT REPORTER

VOL. 5 - JUN 24, 1998

675

1    A.    NO, SIR, NOT THAT I CAN RECALL.

2    Q.    YOU TALKED TO KATHERINE MILLER ABOUT CALLING AND SAYING

3    YOU HAD A LICENSE, THAT PLAN A WAS OVER, AND YOU WERE GOING TO

4    SAVANNAH?

5    A.    YES, SIR.

6          MR. HARBIN:   THAT'S ALL I HAVE AT THIS TIME, YOUR

7    HONOR.

8                        -  --  -

9                    REDIRECT EXAMINATION

10   BY MR. WRAY:

11   Q.    MR. PLANTE, JUST SO EVERYONE IS CLEAR, WHAT WERE THE

12   THINGS THAT THE DEFENDANT WANTED YOU TO DO FOR HIM ACCORDING

13   TO WHAT HE SAID TO YOU AFTER YOU GOT OUT OF JAIL IN ORDER?

14   A.    FIRST, HE WANTED ME TO DO THE BOND SCAM THING BECAUSE IT

15   WAS A LAST MINUTE THING THAT WAS SET UP.

16          THEN HE WANTED ME TO DO THE FINGER THING, WHICH IS

17   THE RING FOR HIS GIRLFRIEND TO SHOW WHERE THE THOUSAND DOLLARS

18   CAME MISSING OFF HIS ACCOUNT.

19          AND THEN HE WANTED ME TO DO THE MURDER RIGHT BEFORE

20   I LEFT.

21   Q.    AND HOW MUCH TIME DID YOU AND THE DEFENDANT HAVE BEFORE

22   YOU GOT OUT ON BOND TO TALK ABOUT THE BOND THING THAT YOU

23   REFERRED TO?

24   A.    ROUGHLY TWO TO THREE DAYS.

25   Q.    AND HOW MUCH TIME DID YOU HAVE TO TALK ABOUT THE MURDER

676

1  PLOT?

2  A.  ROUGHLY TWO TO THREE WEEKS.

3  Q.  WERE THERE MANY DETAILS LEFT UNRESOLVED IN THE MURDER

4  PLOT BY THE TIME YOU GOT OUT ON BOND?

5        MR. HARBIN:  OBJECTION, LEADING, YOUR HONOR.

6  BY MR. WRAY:

7  Q.  WHAT WAS THE STATUS OF THE MURDER PLOT WHEN YOU GOT OUT

8  ON BOND?

9  A.  THE STATUS OF THE MURDER PLOT IS IT WAS GOING TO TAKE

10  PLACE RIGHT BEFORE I WENT TO FLORIDA WITH MY GIRLFRIEND.

11  Q.  MR. HARBIN ASKED YOU SOME QUESTIONS ABOUT THE DEFENDANT

12  SAYING TO YOU THAT YOU MIGHT BE FOLLOWED.

13  A.  YES.

14  Q.  DID THE DEFENDANT TELL YOU WHETHER YOU SHOULD DO ANYTHING

15  ABOUT THAT, ABOUT BEING FOLLOWED?

16  A.  HE NEVER REALLY STATED TO DO ANYTHING ABOUT IT.  HE SAID

17  IF I CAN, THOUGH, DODGE AROUND DIFFERENT PLACES BEFORE I USED

18  THE TELEPHONE, AND STUFF LIKE THAT, LIKE SHOOT AROUND FROM

19  HOTEL TO HOTEL, AND USE A DIFFERENT PHONE.  HE DID TELL ME I

20  PROBABLY WOULD BE FOLLOWED LEAVING THE JAIL BECAUSE THEY WERE

21  FOLLOWING JODEE SEIDERS.

22  Q.  NOW, THIS BOND PLAN THAT YOU DESCRIBED --

23  A.  YES, SIR.

24  Q.  -- DID YOU UNDERSTAND THAT TO BE ILLEGAL ACTIVITY?

25  A.  YES, SIR.

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB    Document 153-7    Filed 07/14/06    Page 21 of 41

677

1    Q.    AND WHO DID YOU -- FROM YOUR UNDERSTANDING, WHO WOULD

2    HAVE BEEN RESPONSIBLE FOR INVESTIGATING AND PROSECUTING THAT

3    OFFENSE?

4    A.    THE COBB COUNTY SHERIFF'S OFFICE.

5              MR. HARBIN:  OBJECTION, LACK OF FOUNDATION.

6              THE COURT:  SUSTAINED.

7    BY MR. WRAY:

8    Q.    DID YOU HAVE AN UNDERSTANDING OF WHO WOULD HAVE BEEN

9    RESPONSIBLE FOR INVESTIGATING AND PROSECUTING THAT OFFENSE?

10   A.    YES, SIR.

11   Q.    WHO?

12   A.    COBB COUNTY SHERIFF'S OFFICE.

13   Q.    AND THIS RING ROBBERY THAT YOU DESCRIBED, DID YOU HAVE AN

14   UNDERSTANDING AS TO WHO WOULD HAVE BEEN RESPONSIBLE FOR

15   INVESTIGATING AND PROSECUTING THAT OFFENSE?

16   A.    COBB COUNTY SHERIFF'S OFFICE.

17   Q.    AND DID YOU HAVE AN UNDERSTANDING OF WHO WAS RESPONSIBLE

18   FOR PROSECUTING YOUR OWN CASE?

19   A.    THE COBB COUNTY SHERIFF'S OFFICE.

20             MR. WRAY:  THAT'S ALL I HAVE, YOUR HONOR.  OH, ONE

21   MORE QUESTION.

22   Q.    IN YOUR CONVERSATIONS WITH THE DEFENDANT, DID HE EVER

23   TELL YOU THAT PLAN A INVOLVED MARIJUANA DISTRIBUTION?

24   A.    NO, SIR.  IF IT INVOLVED MARIJUANA DISTRIBUTION, IT WOULD

25   SEEM LIKE THAT WOULD BE HIS MAIN PRIORITY IF HE WAS CONCERNED

PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

678

1    ABOUT MONEY.

2              MR. WRAY:  THAT'S ALL I HAVE.

3                        -- -- --

4                   RECROSS-EXAMINATION

5    BY MR. HARBIN:

6    Q.   JUST A BRIEF FOLLOW-UP.  MR. PLANTE, DO YOU KNOW THE

7    SHERIFFS IN GEORGIA HAVE RESPONSIBILITY FOR HOUSING PRISONERS

8    IN JAIL, AND STAFFING JAILS AND COURTS?

9    A.   YES, SIR.

10   Q.   DO YOU KNOW THEY DON'T HAVE ANY AUTHORITY FOR

11   INVESTIGATING CRIMES?

12   A.   NO, SIR.

13   Q.   YOU HAVE NO IDEA WHO WOULD HAVE HAD THE AUTHORITY TO

14   INVESTIGATE THIS BOND SCHEME, DO YOU, SIR?

15   A.   YES, SIR, I DO.  LIKE I SAID, I HAVE BEEN IN AND OUT OF

16   COURT ALL MY LIFE.  I KNOW THAT A STATE COURT WOULD TAKE CARE

17   OF THAT.  THAT'S NOT A FEDERAL OFFENSE OR SECRET SERVICE

18   OFFENSE.

19   Q.   IT WOULD NOT BE THE COBB COUNTY SHERIFF'S OFFICE AS YOU

20   JUST SAID UNDER OATH, WOULD IT, SIR?

21   A.   YES, SIR, IT WOULD.

22   Q.   THEY DON'T INVESTIGATE CRIMES, DO THEY, SIR?

23   A.   IT WOULD BE THE DETECTIVE AGENCY UP IN COBB COUNTY, BUT

24   STILL WITH THE SHERIFF'S OFFICE.

25   Q.   AND I THOUGHT YOU SAID YOU DIDN'T KNOW WHERE THIS RING

PATTI ALLEN, COURT REPORTER

679

1    WAS.

2    A.    THAT'S RIGHT HERE ON THIS OTHER EXHIBIT YOU GAVE ME RIGHT

3    HERE.

4    Q.    SO, WHERE WAS THE RING?

5    A.    THE RING WAS IN THE ATLANTA JOURNAL CONSTITUTION.

6    Q.    WHERE WAS THE PERSON WHO HAD THE RING IN THE METRO

7    ATLANTA AREA?

8    A.    I NEVER CALLED.   I HAVE NO IDEA.   I JUST HAD A COPY OF

9    DIAMOND RING, EMERALD CUT, 2.15 CARATS, FSI CLARITY, APPRAISED

10   AT $14,150.

11   Q.    THE TRUTH IS YOU HAVE NO IDEA WHETHER THE COBB COUNTY

12   SHERIFF'S OFFICE WOULD HAVE INVESTIGATED IT OR NOT BECAUSE YOU

13   DON'T KNOW WHERE THE RING WAS?

14   A.    NO.

15          MR. WRAY:   MAY I ASK ONE QUESTION THAT I THINK IS

16   WITHIN THE SCOPE?

17          THE COURT:   YES.

18                       -- -- --

19                   REDIRECT EXAMINATION

20   BY MR. WRAY:

21   Q.    MR. HARBIN ASKED YOU WHETHER YOU KNEW WHERE THE RING WAS.

22   DID YOU KNOW WHERE THE DEFENDANT WAS, WHAT COUNTY?

23   A.    YES, SIR.

24   Q.    WHAT COUNTY?

25   A.    COBB COUNTY.

                PATTI ALLEN, COURT REPORTER

680

1               MR. WRAY:  THAT'S ALL I HAVE.

2               THE COURT:  MR. PLANTE, TELL US AGAIN WHAT YOUR

3    UNDERSTANDING WAS OF WHAT THE BOND SCAM CONSISTED OF.

4               THE WITNESS:  THE BOND SCAM CONSISTED OF ME GETTING

5    IN CONTACT WITH GABRIELLE, WHICH IS THE GUY THAT IS IN THE

6    COBB COUNTY JAIL'S WIFE, THE ONE WHO WAS PUTTING UP THE MONEY

7    TO GET HIM OUT.  SHE KNOWS HE DON'T HAVE A GREEN CARD.  I KNOW

8    HE DOESN'T HAVE A GREEN CARD.  I KNOW THAT MENDOZA WASN'T HIS

9    REAL NAME.  HE WAS IN THE COBB COUNTY JAIL UNDER ANOTHER NAME.

10   MOST MEXICANS DO THAT WHEN THEY GET ARRESTED.  THEY DON'T GIVE

11   THEIR REAL NAME, BUT I WAS SUPPOSED TO MAKE IT LOOK LIKE I

12   KNEW IT WAS ILLEGAL, BUT BY MAKING $1,100 OUT OF IT, I WAS

13   GOING TO GO AHEAD AND GET HIM OUT ON A $5,000 BOND, AND THAT

14   WAS GOING TO BE THE WHOLE REASON SHE HAD TO TRUST ME WITH THE

15   MONEY AND WAIT ON ME TO RETURN WITH HIM.

16               THE COURT:  WHAT WAS THE PURPOSE OF THIS BOND SCAM?

17               THE WITNESS:  TO GET $1,100 CASH.

18               THE COURT:  FOR WHO?

19               THE WITNESS:  $500 OF IT WAS TO GO TO JODEE.  HE

20   WANTED TO THROW JODEE SOME MONEY FOR DOING ALL THE RUNNING

21   AROUND.  HE WANTED ME TO PUT $200 TO $300 ON HIS BOOKS FOR HIS

22   COMMISSARY, AND I KEEP THE REST.

23               THE COURT:  WHAT WAS YOUR UNDERSTANDING AS TO WHY

24   MR. MILLER -- THIS WAS MR. MENDOZA YOU ARE TALKING ABOUT?

25               THE WITNESS:  YES, MA'AM.

PATTI ALLEN, COURT REPORTER

VOL 5 - JUN 24, 1998

681

1          THE COURT:  WHAT WAS YOUR UNDERSTANDING AS TO WHY
2    MR. MILLER WANTED MR. MENDOZA TO GET OUT ON BOND?
3          THE WITNESS:  HE DID NOT WANT MR. MENDOZA TO GET OUT
4    ON BOND.  HE JUST WANTED TO ROB MR. MENDOZA'S WIFE OF THE BOND
5    MONEY SHE WOULD USE TO GET HIM OUT.  I WAS SUPPOSED TO POSE AS
6    A BONDSMAN TO HIS WIFE ON THE STREET AFTER I WAS OUT, AND TALK
7    HER OUT OF THAT $1,100, AND MAKE HER THINK I WAS GOING TO GO
8    GET HER HUSBAND.  IN REALITY HER HUSBAND WAS NEVER GOING TO
9    GET OUT.  I WAS GOING TO TAKE THE $1,100 AND LEAVE.
10         THE COURT:  OKAY.  NOW, THIS RING SCAM, TELL US
11   AGAIN WHAT WAS YOUR UNDERSTANDING OF HOW THAT WAS SUPPOSED TO
12   WORK?
13         THE WITNESS:  THAT WAS SUPPOSED TO WORK BY ME GOING
14   THROUGH THE NEWSPAPER AS YOU SAW ON THIS EXHIBIT HERE.
15         THE COURT:  WHAT EXHIBIT ARE YOU REFERRING TO?
16         THE WITNESS:  THIS IS EXHIBIT 55.  IT SAYS RIGHT
17   HERE, IT HAS GOT DIAMOND, EMERALD CUT, 2.15 CARATS.  IT HAS
18   FSI CLARITY, APPRAISED AT $14,150.  THEY SAID THEY WILL SELL
19   IT FOR $7,850.
20         WHAT I WAS SUPPOSED TO DO IS CALL THE NUMBER AND ASK
21   THEM ABOUT THE DIAMOND, AND TELL THEM I WANTED TO BRING AN
22   APPRAISER TO THE RESIDENCE WITH ME TO APPRAISE THE DIAMOND TO
23   MAKE IT SOUND PROFESSIONAL BECAUSE MOST PEOPLE OPEN UP TO YOU
24   WHEN YOU SAY YOU ARE BRINGING AN APPRAISER WITH YOU.  THEY
25   WOULD GIVE THEIR ADDRESS, AND I WOULD SET UP A TIME TO MEET

PATTI ALLEN, COURT REPORTER

1   WITH THEM WITH MY APPRAISER.  I WAS SUPPOSED TO GO THERE

2   WITHOUT AN APPRAISER AND ROB THEM, SAY GIVE ME THE DIAMOND

3   WITH A SKI MASK OR WHATEVER ON, AND AFTER I GOT THE DIAMOND, I

4   WAS SUPPOSED TO TURN IT OVER TO KATHERINE MILLER, AND THAT WAS

5   HIS WAY OF MAKING HER HAPPY.

6         THE COURT:  LET ME ASK YOU THIS:  IS IT CORRECT OR

7   NOT THAT ON THE SAME DAY OR THE DAY AFTER YOU AND MR. MILLER

8   TALKED ABOUT THE MURDER PLOT, THAT YOU CALLED YOUR LAWYER?

9         THE WITNESS:  YES, MA'AM.  IT WAS THE DAY AFTER.  IT

10  WASN'T THE DAY AFTER WE TALKED ABOUT THE MURDER PLOT.  IT WAS

11  THE DAY AFTER WE MADE PLANS FOR THE MURDER PLOT.  WE DREW THE

12  PLANS AND EVERYTHING OUT.  THAT NIGHT AFTER HE WENT TO SLEEP,

13  I MADE A COPY OF IT AND CONTACTED MY LAWYER THE NEXT MORNING,

14  AND GAVE THEM TO HIM IN VISITATION.

15        THE COURT:  AND WHEN DO YOU THINK YOU CONTACTED YOUR

16  LAWYER?

17        THE WITNESS:  THE DATE?

18        THE COURT:  YES, SIR.

19        THE WITNESS:  I GOT OUT ON THE 6TH.  IT WAS PROBABLY

20  AROUND FEBRUARY --- IN BETWEEN FEBRUARY 26TH AND MARCH 1ST, IN

21  BETWEEN THOSE DATES.  I'M NOT SURE OF THE EXACT DATE.  I WOULD

22  SAY ROUGHLY THE 26TH, 27TH, OR 28TH OF FEBRUARY.

23        THE COURT:  AND TO THE BEST OF YOUR RECOLLECTION,

24  WHAT DID YOU SAY TO YOUR LAWYER ON THAT DAY?

25        THE WITNESS:  ON THE TELEPHONE I DID NOT DISCUSS

PATTI ALLEN, COURT REPORTER

683

1   ANYTHING IN DETAIL.  I SAID, "LOOK, CAN YOU PLEASE COME DOWN
2   HERE AND VISIT ME"?
3           HE SAID, "WHAT'S THE PROBLEM"?
4           I SAID, "I HAVE SOMETHING VERY IMPORTANT YOU NEED TO
5   SEE."  I SAID, "YOU NEED TO PROBABLY CONTACT THE PROPER
6   AUTHORITIES WHEN I SHOW IT TO YOU."
7           HE SAID, "WHAT DOES IT HAVE TO DO WITH"?
8           I SAID, "A GUY IN HERE WANTS ME TO DO SOMETHING
9   ILLEGAL.  I NEED YOU TO VISIT ME."
10          AND THAT'S ALL I SAID, AND HE CAME DOWN TO VISIT
11  ME.
12          THE COURT:  WHEN DID HE COME TO VISIT YOU IN
13  RELATION TO YOUR TELEPHONE CALL TO HIM?
14          THE WITNESS:  I WOULD SAY IT WAS TWO TO THREE HOURS
15  LATER IN THE AFTERNOON.
16          THE COURT:  AND DID YOU ALL TALK THROUGH THE GLASS?
17          THE WITNESS:  HE KIND OF READ WHAT I WROTE DOWN ON
18  THE PAPER, AND SHOOK HIS HEAD YES AND NO.  HE DIDN'T TALK TO
19  ME IN FULL DETAIL THROUGH THE GLASS BECAUSE HE WAS KIND OF
20  SKEPTICAL ABOUT IT.
21          THE COURT:  WHEN HE CAME DOWN TO TALK TO YOU, WHAT
22  DID YOU SAY TO HIM?
23          THE WITNESS:  I SAID HERE IS THE PAPER, AND HE READ
24  IT.  HE READ EVERYTHING, BECAUSE IF YOU LOOK ON THE EXHIBIT I
25  DREW, IT'S FULLY DETAILED.  I WOULDN'T HAVE TO SAY NOTHING TO

PATTI ALLEN, COURT REPORTER

1   HIM IF HE READ IT BECAUSE IT'S FULLY DETAILED ALL THE WAY DOWN

2   TO EVERYTHING THAT WAS SUPPOSED TO HAPPEN.  I DON'T KNOW IF

3   THAT EXHIBIT HAS BEEN ADMITTED YET, BUT IT'S THE ONE I DREW

4   AND GAVE TO MY LAWYER.

5           THE COURT:  OKAY.  WELL, DID YOU TELL HIM WHAT THIS

6   WAS ABOUT?

7           THE WITNESS:  YES, MA'AM.

8           THE COURT:  WHAT YOU THOUGHT WAS GOING ON?

9           THE WITNESS:  YES, MA'AM.

10          THE COURT:  AND HOW SOON WAS IT AFTER THAT THAT YOU

11  TALKED TO THE SECRET SERVICE?

12          THE WITNESS:  THEY CAME IN THE NEXT DAY EARLY IN THE

13  MORNING, I BELIEVE IT WAS, BEFORE LUNCH IF I AM NOT MISTAKEN,

14  OR IT MIGHT HAVE BEEN AFTER.

15          THE COURT:  AND DO YOU REMEMBER WHAT THAT DATE WAS?

16          THE WITNESS:  IT WAS THE DAY AFTER I TALKED TO MY

17  LAWYER, WHATEVER DATE THAT WAS.  I'M NOT SURE.  LIKE I SAID,

18  AROUND THE 26TH TO THE 1ST, I WOULD SAY ROUGHLY THE 26TH OR

19  27TH OF FEBRUARY.

20          THE COURT:  NOW, IN RELATION TO THE TIME WHEN YOU

21  FIRST TALKED TO YOUR LAWYER, WHEN WAS IT THAT YOU AND

22  MR. MILLER FIRST DISCUSSED THIS PLAN?

23          THE WITNESS:  WHEN DID WE FIRST DISCUSS THIS PLAN?

24  WE HAD TALKED ABOUT IT SEVERAL TIMES LIKE IN FEBRUARY AND LATE

25  JANUARY, BUT IT NEVER REALLY CAME IN EFFECT UNTIL THAT LAST

685

1    MINUTE.  IT WAS LIKE ALL RIGHT, MY BOND GOT LOWERED.  WHEN MY
2    BOND GOT LOWERED FROM $16,500 TO $5,000 HE TALKED ABOUT
3    HANDLING GETTING ME OUT.

4          THEN MY BOND WAS LOWERED FROM $5,000 TO $1,000, AND
5    THEY WANTED A CASH BOND, AND THAT'S WHEN I WAS BONDED OUT.
6    THAT'S WHEN WE REALLY SERIOUSLY TALKED ABOUT IT, WHEN MY BOND
7    WAS LOWERED.

8          THE COURT:  WHEN WAS YOUR BOND LOWERED FROM $16,500
9    TO $5,000?

10         THE WITNESS:  AROUND THE 1ST OR 2ND OF MARCH.

11         THE COURT:  AND WHEN WAS IT LOWERED TO $1,000?

12         THE WITNESS:  AROUND THE 3RD OR 4TH OF MARCH.  I
13   TOLD MY LAWYER I COULDN'T MAKE THE $5,000 BOND.  I HAD BEEN IN
14   THERE SIX MONTHS ALREADY, AND THEY HADN'T INDICTED ME OR
15   ANYTHING.

16         THE COURT:  WELL, GO BACK AND RELATE TO THE BEST OF
17   YOUR RECOLLECTION HOW THE SEQUENCE OF EVENTS WENT AS FAR AS
18   YOU AND MR. MILLER TALKING ABOUT THE PLOT TO KILL MS. ASHFORD.

19         THE WITNESS:  YOU JUST WANT TO KNOW ABOUT THE PLOT
20   TO KILL MS. ASHFORD?

21         THE COURT:  I WANT TO KNOW KIND OF HOW IT WENT.
22   WHEN DID THE TALK START, AND WHO SAID WHAT FIRST, YOU KNOW?

23         THE WITNESS:  HE KIND OF TOLD ME THAT, YOU KNOW, HIS
24   GIRLFRIEND WAS TESTIFYING AGAINST HIM, OR HIS
25   EX-WIFE/GIRLFRIEND WAS TESTIFYING AGAINST HIM IN A FEDERAL

PATTI ALLEN, COURT REPORTER

686

1  CASE HE HAD OF A COUNTERFEITING CHARGE, AND HE SAID THEY DON'T
2  HAVE ANY EVIDENCE. HE TOLD ME SHE DIDN'T HAVE ANYTHING ON
3  HIM.

4  THE COURT: WHEN WAS THAT? WHEN DID YOU ALL TALK
5  ABOUT THAT?

6  THE WITNESS: HE TALKED ABOUT THAT IN DECEMBER
7  PROBABLY, AROUND DECEMBER, BUT HE DIDN'T REALLY TALK ABOUT
8  GETTING HIS WIFE KNOCKED OFF UNTIL LIKE JANUARY OR FEBRUARY,
9  THE END OF JANUARY OR BEGINNING OF FEBRUARY.

10  THE COURT: AND AT THAT PARTICULAR TIME, WHAT WAS
11  THAT CONVERSATION?

12  THE WITNESS: THAT CONVERSATION WAS GENERALLY JUST
13  TELLING ME ABOUT HIS CASE. YOU KNOW, WHEN WE ARE IN THERE,
14  EVERYBODY TELLS EVERYBODY ABOUT WHAT THEY ARE IN THERE FOR.
15  HE ASKED ME WHAT I WAS IN THERE FOR, AND I TOLD HIM FOR
16  STEALING A VAN. JAIL CONVERSATION IS ALL IT WAS REALLY.

17  THE COURT: WELL, WHAT DID HE SAY IN THAT GENERAL
18  CONVERSATION? GIVE US MORE SPECIFICS.

19  THE WITNESS: HE WAS TELLING ME THAT SHE WAS THE
20  ONLY PERSON THAT COULD COME TO COURT AND TESTIFY THAT COULD
21  REALLY DO ANY DAMAGE TO HIM IN COURT. WITHOUT HER THEY HAD NO
22  CASE. YOU KNOW, IF HE COULD GET RID OF HER SOMEHOW, HE
23  WOULDN'T HAVE TO WORRY ABOUT HIS FEDERAL CASE. ALL HE WOULD
24  HAVE IS THE LITTLE STATE PROBATION VIOLATION, BECAUSE THAT'S
25  WHY HE WAS IN THE STATE JAIL WITH ME.

687

1           THE COURT:  DID HE SAY ANYTHING TO YOU AT THAT TIME
2    ABOUT WANTING YOUR ASSISTANCE?

3           THE WITNESS:  IN DECEMBER?  NO, MA'AM.

4           THE COURT:  I THINK YOU SAID YOU WERE UP TO JANUARY
5    OR FEBRUARY.

6           THE WITNESS:  OKAY.  IN JANUARY OR FEBRUARY, YES, HE
7    ASKED ME HOW I WOULD FEEL ABOUT DOING IT.

8           I SAID I DON'T KNOW, AND THE CONVERSATION KIND OF
9    DIED OFF AFTER THAT.

10          THEN HE CAME BACK AND SAID, "HOW MUCH IS YOUR BOND"?
11   WE NEVER DISCUSSED MY BOND OR GETTING ME OUT OF THERE LIKE
12   THAT.  WE WERE TALKING ABOUT DOING STUFF AFTER I WAS OUT ON
13   THE STREET AFTER ALL THIS WAS OVER.

14          THE COURT:  THIS CONVERSATION WHERE HE ASKED YOU
15   ABOUT HOW YOU WOULD FEEL ABOUT DOING THAT --

16          THE WITNESS:  YES, MA'AM.

17          THE COURT:  -- TELL ME MORE DETAILS ABOUT THAT.
18   WHERE WERE YOU AT THAT TIME?  WHO SAID WHAT TO WHOM?

19          THE WITNESS:  WE WERE IN KIND OF LIKE A DORMATORY
20   SETUP.  IT HAS GOT AN UPSTAIRS AND DOWNSTAIRS, AND THE BEDS
21   ARE LIKE IN THE BACK OF THE DORMITORY, AND YOU HAVE GOT THE
22   DAY ROOM IN THE FRONT OF THE DORMITORY.  LIKE AT THE TOP OF
23   THE STAIRS THERE IS A BATHROOM, AND THERE IS USUALLY NO ONE
24   AROUND THE BATHROOM, AND WE WERE STANDING OVER THE RAIL
25   TALKING LIKE THAT WITH OUR ARMS OVER THE RAIL.

PATTI ALLEN, COURT REPORTER

688

1              THE COURT:  WHAT DID HE SAY?

2              THE WITNESS:  IT WAS LIKE HAVE YOU EVER DONE

3    ANYTHING LIKE THAT?  YOU'VE BEEN UP IN CHICAGO AROUND GANG

4    ACTIVITY AND ALL THAT.  I KNOW YOU'VE SEEN PEOPLE KILLED AND

5    PEOPLE SHOT AT.

6              AND I SAID YEAH, I BEEN AROUND THAT.

7              HE SAID, "DO YOU THINK YOU COULD DO SOMETHING LIKE

8    THAT"?

9              I SAID, "I PROBABLY COULD."

10             THE COURT:  DID HE ASK YOU AT THAT TIME TO DO

11   ANYTHING?

12             THE WITNESS:  HE ASKED HOW WOULD I FEEL ABOUT IT.

13             I SAID I DON'T REALLY KNOW.  YOU KNOW, I SAID IT

14   DEPENDS ON HOW MUCH MONEY WAS INVOLVED, AND STUFF LIKE THAT.

15   YOU KNOW, THAT'S BASICALLY THE CONVERSATION WE HAD.

16             THE COURT:  DID HE SAY ANYTHING ELSE AT THAT TIME?

17             THE WITNESS:  NO, MA'AM, NOT REALLY ABOUT DOING IT.

18             THE COURT:  WHEN WAS THE NEXT TIME IT CAME UP?

19             THE WITNESS:  IT CAME UP AGAIN, LIKE I SAY, MID

20   FEBRUARY OR TOWARDS THE END OF FEBRUARY.

21             THE COURT:  AND AT THAT TIME, HOW DID THE

22   CONVERSATION GO?  WHO SAID WHAT?

23             THE WITNESS:  THE CONVERSATION WAS --- WE JUST GOT

24   TOGETHER AND STARTED TALKING, AND IT WAS LIKE, MAN, I NEED

25   SOMEBODY OUT THERE TO DO THIS.  I NEED TO GET THIS TOOKEN CARE

PATTI ALLEN, COURT REPORTER

1    OF.  I GOT THIS FEDERAL CASE.  THEY ARE GOING TO PICK ME UP
2    ANY DAY.  I WANT IT TOOKEN CARE OF BEFORE THE FEDS COME GET
3    ME.
4            SO, THAT'S BASICALLY WHAT HE WAS WORRYING ABOUT, THE
5    FEDS COMING TO PICK HIM UP FROM THE STATE FACILITY, AND HE
6    WANTED IT DONE BEFORE HE LEFT.
7            HE SAID, "WHAT IS YOUR BOND?"
8            AND I SAID $16,500.  I DIDN'T CONSIDER GETTING MY
9    BOND LOWERED BECAUSE I COULDN'T MAKE A $16,500 BOND.  SO, I
10   CALLED MY LAWYER AND ASKED, "CAN YOU GET MY BOND LOWERED"?
11           AND HE WENT IN THERE AND GOT MY BOND LOWERED TO
12   $5,000.  HE WAS LIKE, "I CAN MAKE THE $5,000.  I CAN MAKE
13   "5,000."
14           THE COURT:  WELL, LET ME ASK YOU THIS:  AT THE TIME
15   YOU WERE ASKING YOUR LAWYER TO GET YOUR BOND LOWERED ---
16           THE WITNESS:  YES, MA'AM.
17           THE COURT:  -- DID HE KNOW WHY YOU WANTED IT
18   LOWERED?
19           THE WITNESS:  DID MY LAWYER KNOW THAT?  THE FIRST
20   TIME I WANTED TO GET MY BOND LOWERED, I ASKED SEVERAL TIMES,
21   AND, NO, HE DID NOT AT THAT TIME, BUT AROUND MARCH THE 1ST
22   WHEN I ASKED HIM ABOUT IT, HE DID KNOW WHAT WAS GOING ON.
23   LIKE I SAID, I CONTACTED HIM, AND HE KNEW WHAT WAS GOING ON,
24   AND WHEN HE DID KNOW WHAT WAS GOING ON, MY BOND WAS LOWERED.
25           THE COURT:  DID YOUR LAWYER FILE A MOTION WITH THE

PATTI ALLEN, COURT REPORTER

690

1  JUDGE, OR DO YOU KNOW?

2          THE WITNESS:  HE DID FILE A MOTION FOR BOND

3  REDUCTION.  I DON'T KNOW ABOUT ON THE SECOND BOND WHEN IT WAS

4  LOWERED FROM $5,000 TO $1,000.

5          THE COURT:  DO YOU KNOW WHEN THE FIRST MOTION WAS

6  FILED TO REDUCE YOUR BOND?

7          THE WITNESS:  WELL, HE FILED A MOTION FOR RELEASE ON

8  MY OWN RECOGNIZANCE OR BOND REDUCTION IF THEY DID NOT INDICT

9  ME WITHIN 60 DAYS, I BELIEVE IT WAS, AND THAT WAS SOMETIME

10  AROUND THE END OF JANUARY, BEGINNING OF FEBRUARY.  IT WAS

11  CALLED A MOTION FOR RELEASE ON OWN RECOGNIZANCE OR BOND

12  REDUCTION BECAUSE I HAD BEEN IN THERE SO LONG WITHOUT AN

13  INDICTMENT.

14          THE COURT:  HOW LONG HAD YOU BEEN IN THERE?

15          THE WITNESS:  SIX MONTHS ALTOGETHER WHEN I WAS

16  RELEASED.

17          THE COURT:  OKAY.  SO, YOU SAID THERE IS A MOTION

18  FILED.

19          THE WITNESS:  IT WAS CALLED A MOTION FOR RELEASE ON

20  OWN RECOGNIZANCE OR BOND REDUCTION.

21          THE COURT:  FILED AT THE END OF JANUARY?

22          THE WITNESS:  YES, MA'AM, BEGINNING OF FEBRUARY.

23          THE COURT:  AND WAS THERE ANOTHER MOTION FILED TO

24  REDUCE YOUR BOND?

25          THE WITNESS:  I'M NOT SURE IF THERE WAS OR NOT.

PATTI ALLEN, COURT REPORTER

691

1        THE COURT:  WELL, WAS THERE ONE FILED AROUND THE
2   MIDDLE OF FEBRUARY?
3        THE WITNESS:  THERE MIGHT HAVE BEEN.
4        THE COURT:  YOU DON'T KNOW WHETHER THERE WAS OR WAS
5   NOT?
6        THE WITNESS:  I DON'T KNOW WHETHER HE DID OR NOT.  I
7   KNOW FOR A FACT HE DID THAT ONE BECAUSE HE SENT ME A COPY OF
8   IT.
9        THE COURT:  NOW, YOU SAID THAT YOU AND MR. MILLER
10  HAD A PRETTY SPECIFIC DISCUSSION ABOUT THE MIDDLE OF FEBRUARY.
11       THE WITNESS:  YES, MA'AM.
12       THE COURT:  TELL ME WHAT YOU SAID, AND WHAT HE SAID.
13       THE WITNESS:  HE WAS LIKE, "CAN YOU DO IT?  I NEED
14  SOMEBODY OUT THERE NOW BEFORE THE FEDS COME PICK ME UP."
15       I WAS LIKE, "YEAH."  THAT'S WHEN I STARTED SAYING
16  YEAH, I'LL DO IT.
17       I SAID, "WHAT AM I GOING TO GET OUT OF IT"?
18       THAT'S WHEN HE CAME UP WITH THE BOND MONEY, WHICH IS
19  A THOUSAND DOLLARS, AND HE SAID, "I ALSO NEED YOU TO THROW MY
20  GIRLFRIEND SOMETHING BECAUSE AFTER I GET THIS THOUSAND DOLLARS
21  OFF MY BOOKS, SHE IS GOING TO KNOW WHAT IS GOING ON.  I NEED
22  TO GIVE HER A RING OR SOMETHING BECAUSE I WANT TO GET MARRIED
23  TO HER."  HE WAS PLANNING ON MARRYING HER.
24       THE COURT:  AND WHAT DID YOU SAY TO MR. MILLER AT
25  THAT PARTICULAR TIME?

PATTI ALLEN, COURT REPORTER

692

1        THE WITNESS:   I WAS LIKE, "WHERE CAN I GET ONE"?
2   THAT'S WHEN WE BOTH SAT DOWN AND LOOKED THROUGH THE NEWSPAPER
3   AND CAME UP WITH THIS LIST.   HE SAID, "LOOK, I CAN GET RID OF
4   ALL THIS OTHER CRAP."
5        THE COURT:   I MEAN ABOUT HIS REQUEST TO YOU THAT YOU
6   KILL MS. ASHFORD WHEN YOU GOT OUT.
7        THE WITNESS:   OH, THAT CAME BEFORE WE STARTED EVEN
8   TALKING ABOUT THE RING.   THAT WAS LIKE I SAID, "HOW DO YOU
9   WANT TO DO IT?"
10       AND HE STARTED SAYING, "WELL, I DON'T REALLY WANT MY
11   KID TO SEE IT," AND ALL THIS AND THAT.   HE SAID, "SHE WORKS AT
12   A HERB SHOP."
13       THE COURT:   AND THAT WAS IN THE MIDDLE OF FEBRUARY?
14       THE WITNESS:   HE STARTED EXPLAINING THE WHOLE LAYOUT
15   OF THE HERB SHOP TO ME, AND HE TOLD ME HE AND HER USED TO OWN
16   A HERB SHOP TOGETHER.   THAT'S WHY HE KNEW SO MUCH ABOUT IT.   I
17   DON'T KNOW IF THAT IS TRUE OR NOT, BUT --
18       THE COURT:   AND WHEN HE SAID THAT TO YOU, WHAT DID
19   YOU SAY TO HIM?
20       THE WITNESS:   I SAID, "WHAT DO YOU SELL IT FOR?"
21       THE COURT:   I'M TALKING ABOUT THE MURDER PLOT.
22       THE WITNESS:   I WAS LIKE, WELL, YEAH, I CAN DO IT.
23       THE COURT:   YOU TOLD HIM IN THE MIDDLE OF FEBRUARY
24   THAT YOU COULD DO IT?
25       THE WITNESS:   YEAH, BASICALLY ABOUT THE MIDDLE OF

PATTI ALLEN, COURT REPORTER

693

1   FEBRUARY.  I WAS JUST HOWEVER YOU WANT ME TO DO IT.  THAT'S

2   WHEN HE GOT INTO THE DETAILS ABOUT THE KNIFE AND GUN, AND ALL

3   THAT, AND I SAID, "NO, THAT'S TOO MESSY, TOO MUCH NOISE."

4           HE SAID, "YOU CAN BREAK HER NECK.  YOU ARE STRONG

5   ENOUGH AND BIG ENOUGH."

6           AND I WAS LIKE, "YEAH, IT MIGHT WORK."

7           THE COURT:  SO, ARE YOU PRETTY CLEAR IN YOUR MIND

8   THAT AS OF THE MIDDLE OF FEBRUARY YOU TOLD HIM YOU WERE GOING

9   TO DO IT?

10          THE WITNESS:  IT WAS PROBABLY MID FEBRUARY, TOWARDS

11  THE 20TH, ABOUT THE 20TH, 19TH, 18TH, SOMEWHERE AROUND THERE.

12  IT WAS JUST GENERAL CONVERSATION.  I DON'T KNOW THE EXACT

13  DATES, YOUR HONOR.  I'M NOT GOING TO SIT UP HERE AND COME UP

14  WITH A DATE.  I DON'T KNOW AN EXACT DATE, BUT WE DID TALK

15  AROUND OR TOWARDS THE END OF FEBRUARY OR MID FEBRUARY.  IT WAS

16  RIGHT BEFORE I GOT OUT, LIKE TWO WEEKS OR THREE WEEKS BEFORE I

17  GOT OUT.  I WOULD SAY TWO WEEKS BEFORE I CONTACTED MY LAWYER

18  TO A WEEK BEFORE I CONTACTED MY LAWYER WE HAD TALKED ABOUT IT,

19  BUT WHEN WE ACTUALLY SAID WE WERE GOING TO DO IT AND SAT DOWN

20  AND DREW THE MAP, IT WAS THE NEXT DAY THAT I CONTACTED MY

21  LAWYER BECAUSE THAT'S WHEN IT REALLY HIT ME, WHEN WE SAT DOWN

22  AND DREW THE WHOLE THING UP, AND HE WAS GOING TO GET ME OUT

23  THE NEXT DAY.

24          THE COURT:  SHALL THE WITNESS BE EXCUSED?

25          MR. HARBIN:  IF I MAY, I WOULD LIKE TO ASK A FEW

PATTI ALLEN, COURT REPORTER

694

1    QUESTIONS FOLLOWING UP ON YOUR QUESTIONS ABOUT THIS BOND.

2                      -  -  -

3                    RECROSS-EXAMINATION

4    BY MR. HARBIN:

5    Q.    ON THE BOND PLAN, MR. PLANTE, DIDN'T YOU TELL

6    MR. MENDOZA, WHO WAS IN COBB COUINTY JAIL, THAT YOU HAD A

7    CONNECTION WHO COULD GET HIM OUT FOR A FEE EVEN THOUGH HE

8    DIDN'T HAVE A GREEN CARD?

9    A.    I DID SAY THAT BEFORE I LEFT.

10   Q.    AND WASN'T THAT, IN FACT, THE PLAN, THAT YOU GET $1,100

11   AS AN EXTRA FEE IN ADDITION TO THE BOND MONEY FOR FINDING A

12   CONNECTION TO GET HIM OUT?

13   A.    IN ADDITION TO THE BOND MONEY THAT I WOULD HAVE RECEIVED

14   AFTER MY CASE WAS OVER WITH?

15   Q.    NO.   THE BOND MONEY THAT MR. MENDOZA'S GIRLFRIEND WOULD

16   HAVE GIVEN TO GET HIM OUT, YOU AND ROBERT WERE GOING TO GET

17   $1,100 FOR PUTTING THIS TOGETHER?

18   A.    YES.

19   Q.    AND MR. MENDOZA WAS GOING TO GET OUT?

20   A.    NO, MR. MENDOZA COULDN'T GET OUT.   I'M NOT A BOND AGENCY.

21   Q.    BUT YOU SAID YOU HAD CONNECTIONS WITH A BOND AGENCY?

22   A.    I DON'T HAVE ANY CONNECTIONS WITH A BOND AGENCY.   THAT'S

23   WHAT I TOLD MR. MENDOZA TO MAKE HIM THING I HAD CONNECTIONS

24   WITH A BOND AGENCY.   THAT'S THE WHOLE PLAN, TO KEEP HIM AND

25   HIS GIRLFRIEND THINKING HE WAS GOING TO GET OUT.   THAT WAY

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB Document 153-7 Filed 07/14/06 Page 39 of 41

695

1    THEY WOULD TURN THE MONEY OVER WITH NO PROBLEM.

2    Q.    AND MR. MILLER WAS GOING TO BE THERE IN JAIL WITH

3    MR. MENDOZA AFTER SETTING UP THIS PLAN WITH YOU, AND YOU SAY

4    IT WAS JUST TO RIP MR. MENDOZA OFF?

5    A.    HE WOULD HAVE THREW IT ALL OFF ON ME.    I DIDN'T KNOW HE

6    WAS GOING TO DO THAT.  HE COULD GET OUT OF THAT EASY WITH

7    MR. MENDOZA WITH NO PROBLEM.

8              THE COURT:    STATE AGAIN WHAT WAS YOUR UNDERSTANDING

9    ABOUT THE MONEY FROM MRS. MENDOZA, AND SHE IS GABRIELLE; IS

10   THAT CORRECT?

11             THE WITNESS:    YES, MA'AM.

12             THE COURT:    THE MONEY FROM MRS. MENDOZA ONCE YOU ALL

13   RIPPED HER OFF --

14             THE WITNESS:    YES, MA'AM.

15             THE COURT:    -- WHAT WAS GOING TO HAPPEN WITH THAT

16   $1,100?

17             THE WITNESS:    $500 OF IT WAS GOING TO GO TO JODEE

18   SEIDERS.  HE SAID PUT $200 TO $300 ON HIS BOOKS FOR

19   COMMISSARY.    HE REFERRED TO $300, BUT HE COULD WORK WITH $200,

20   AND THE REST WOULD GO IN MY POCKET.  SO, THAT'S LEAVING ME

21   WITH $200 OR $300 FOR DOING IT.

22             THE COURT:    AND WHAT WAS YOUR UNDERSTANDING -- LET

23   ME ASK YOU THIS:    IS IT CORRECT OR IS IT NOT CORRECT THAT THE

24   DEFENDANT TOLD YOU THAT HE NEEDED TO RAISE MONEY TO RETAIN A

25   PRIVATE ATTORNEY?

PATTI ALLEN, COURT REPORTER

Case 1:97-cr-00496-SDG-GGB   Document 153-7   Filed 07/14/06   Page 40 of 41

VOL 5 - JUN 24, 1998

1           THE WITNESS:  YES, MA'AM, HE DID SAY THAT.  HE SAID

2    THAT HE HAD GRANDPARENTS THAT COULD HELP HIM, AND HIS

3    GIRLFRIEND COULD HELP HIM, BUT HE SAID HE ALSO NEEDED MORE

4    MONEY.

5           THE COURT:  AND WHAT WAS YOUR UNDERSTANDING ABOUT

6    HOW HE WAS GOING TO GET THAT MONEY?

7           THE WITNESS:  THAT I HAD NO IDEA, REALLY.  BASICALLY

8    ALL I WAS DOING WAS HELPING HIM LOOK GOOD TO HIS GIRLFRIEND

9    FOR DOING THIS OTHER STUFF BECAUSE WHAT IS HE GOING TO BENEFIT

10   OUT OF GETTING A RING?  AND WHAT WOULD HE BENEFIT OUT OF

11   GETTING $200 ON HIS BOOKS?  SO, BASICALLY THEM TWO SCAMS RIGHT

12   THERE WAS TO MAKE HIM LOOK GOOD TO THE TWO GIRLS HE WAS SEEING

13   AT THE SAME TIME.

14   Q.   AND DID HE EVER SAY ANYTHING TO YOU ABOUT WHAT THE POINT

15   WAS OF GETTING A RING FOR KATHERINE MILLER?

16          THE WITNESS:  BECAUSE HE WANTED TO MARRY HER, AND HE

17   WANTED TO SATISFY HER AND EXPLAIN ALSO WHERE THE THOUSAND

18   DOLLARS WENT THAT SHE LEFT ON HIS ACCOUNT THAT HE USED TO BOND

19   ME OUT WITH, BECAUSE SHE PUT THAT WHOLE THOUSAND DOLLARS ON

20   HIS ACCOUNT, AND SHE GAVE HIM THAT MONEY FOR A LAWYER

21   SPECIFICALLY, BUT HE USED THAT MONEY TO BOND ME OUT.  NOW HE

22   HAS GOT TO EXPLAIN WHERE THAT BOND MONEY WENT.

23          MR. HARBIN:  OBJECTION ON LACK OF FOUNDATION TO

24   EXPLAIN WHY KATHERINE MILLER GAVE ROBERT MILLER THAT MONEY.

25          THE COURT:  I WILL SUSTAIN THAT OBJECTION AND STRIKE

VOL 5 - JUN 24, 1998

597

1   THAT PORTION OF THE WITNESS' ANSWER.  I'M REALLY JUST ASKING

2   YOU TO RELATE WHAT, IF ANYTHING, MR. MILLER MAY HAVE SAID

3   ABOUT THAT.

4           THE WITNESS:  NOTHING REALLY TOO MUCH.  HE DIDN'T

5   REALLY SAY MUCH ABOUT RAISING MONEY FOR A LAWYER.

6           THE COURT:  AND SO DID HE EXPRESS TO YOU OR NOT THAT

7   HE WANTED THE RING TO GO TO KATHERINE MILLER?

8           THE WITNESS:  YES; MA'AM.

9           THE COURT:  SO, WAS IT JUST TO IMPRESS HER; IS THAT

10  WHAT HE SAID?

11          THE WITNESS:  BASICALLY, YES, MA'AM.

12          THE COURT:  ANYTHING ELSE?

13          MR. HARBIN:  NO, YOUR HONOR.

14          THE COURT:  YOU ARE EXCUSED.

15          THE WITNESS:  THANK YOU, MA'AM.

16          THE WITNESS:  DO YOU WANT ME TO LEAVE THESE EXHIBITS

17  HERE?

18          THE COURT:  YES, PLEASE.  CALL YOUR NEXT WITNESS.

19          MR. WRAY:  WE CALL JODEE SEIDERS.

20          THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.  DO YOU

21  SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL GIVE IN THE

22  MATTER NOW PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE

23  WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

24          THE WITNESS:  I DO.

25          THE CLERK:  HAVE A SEAT IN THE WITNESS BOX AND

PATTI ALLEN, COURT REPORTER